**No. 26-1070**

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

_____

STATE OF RHODE ISLAND; STATE OF NEW YORK; STATE OF HAWAI'I; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN; STATE OF ARIZONA,

Plaintiffs-Appellees,

*(caption continued on inside cover)*

_____

On Appeal from the United States District Court
for the District of Rhode Island

_____

### BRIEF FOR DEFENDANTS-APPELLANTS

_____

BRETT A. SHUMATE
  *Assistant Attorney General*

CHARLES C. CALENDA
  *United States Attorney*

MELISSA N. PATTERSON
SIMON G. JEROME
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7209*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1673*

v.

DONALD J. TRUMP, in the official capacity as President of the United States; MINORITY BUSINESS DEVELOPMENT AGENCY; MADIHA D. LATIF, in the official capacity as Deputy Under Secretary of Commerce for Minority Business Development; HOWARD W. LUTNICK, in the official capacity as Secretary of Commerce; FEDERAL MEDIATION AND CONCILIATION SERVICE; GREGORY GOLDSTEIN, in the official capacity as Acting Director of the Federal Mediation and Conciliation Service; RUSSELL THURLOW VOUGHT, in the official capacity as Director of the Office of Management and Budget; US OFFICE OF MANAGEMENT AND BUDGET; KENNETH JACKSON, in the official capacity as Acting Executive Director of the US Interagency Council on Homelessness; US INTERAGENCY COUNCIL ON HOMELESSNESS,

Defendants-Appellants,

INSTITUTE OF MUSEUM AND LIBRARY SERVICES; LISA SOLOMSON, in the official capacity as Senior Official Performing Duties of Director of the Institute of Museum and Library Services,

Defendants.

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES......................................................................................iii

INTRODUCTION ..................................................................................................1

STATEMENT OF JURISDICTION ......................................................................3

STATEMENT OF THE ISSUES............................................................................3

STATEMENT OF THE CASE................................................................................3

      A.     Legal and Factual Background..........................................................3

      B.     Prior Proceedings............................................................................5

SUMMARY OF ARGUMENT............................................................................ 10

STANDARD OF REVIEW ................................................................................. 12

ARGUMENT ...................................................................................................... 13

I.     The District Court Lacked Subject-Matter Jurisdiction........................ 13

      A.     Claims based on MBDA's grant terminations must be heard in the Court of Federal Claims..................................................14

      B.     The district court lacked jurisdiction to hear plaintiffs' employment-related claims..........................................................20

II.    Plaintiffs Lack A Cause Of Action. ....................................................... 25

      A.     Plaintiffs lack a cause of action under the APA........................25

            1.    "Closure Decisions" are not final agency actions subject to APA review. ..........................................................25

            2.    The agencies' funding and personnel decisions are committed to their discretion by law. ...............................32

      B.     Plaintiffs lack a cause of action under the Constitution. .........39

III.    The Relief Awarded Is Overbroad........................................................................... 42

      A.    The relief awarded is not tailored to any injuries proven by plaintiffs....................................................................................................42

      B.    The district court independently lacked authority to order reinstatement. .....................................................................................48

CONCLUSION ............................................................................................................. 50

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                              **Page(s)**

*Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
 357 F.3d 62 (D.C. Cir. 2004) ..........................................................................15

*American Fed'n of Gov't Emps., AFL-CIO v. Trump*,
 148 F.4th 648 (9th Cir. 2025)..........................................................................24

*American Sci. & Eng'g, Inc. v. Califano*,
 571 F.2d 58 (1st Cir. 1978) .............................................................................18

*A.M. Capen's Co. v. American Trading & Prod. Corp.*,
 74 F.3d 317 (1st Cir. 1996)....................................................................... 22, 36

*Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*,
 794 F.3d 168 (1st Cir. 2015)............................................................................47

*Arcam Pharm. Corp. v. Faria*,
 513 F.3d 1 (1st Cir. 2007) ...............................................................................48

*Baker v. Carr*,
 369 U.S. 186 (1962) .........................................................................................49

*Bennett v. New Jersey*,
 470 U.S. 632 (1985) .........................................................................................16

*Bennett v. Spear*,
 520 U.S. 154 (1997) ................................................................................... 26, 30

*Biden v. Nebraska*,
 600 U.S. 477 (2023) .........................................................................................46

*Biden v. Texas*,
 597 U.S. 785 (2022) .........................................................................................26

*Boaz Hous. Auth. v. United States*,
 994 F.3d 1359 (Fed. Cir. 2021).......................................................................15

*Boston Redevelopment Auth. v. National Park Serv.*,
 838 F.3d 42 (1st Cir. 2016)..............................................................................12

iii

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ..................................................................43

*California v. U.S. Dep't of Transp.*,
808 F. Supp. 3d 291 (D.R.I. 2025) .........................................18

*Charlesbank Equity Fund II v. Blinds to Go, Inc.*,
370 F.3d 151 (1st Cir. 2004)...................................................46

*City of New York v. Mickalis Pawn Shop, LLC*,
645 F.3d 114 (2d Cir. 2011) ...................................................47

*City of New York v. U.S. Dep't of Def.*,
913 F.3d 423 (4th Cir. 2019) ...........................................26, 30

*Columbus Reg'l Hosp. v. United States*,
990 F.3d 1330 (Fed. Cir. 2021)...............................................16

*Community Action of Laramie Cnty., Inc. v. Bowen*,
866 F.2d 347 (10th Cir. 1989)..................................................34

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ................................................................43

*Dalton v. Specter*,
511 U.S. 462 (1994) ...........................................................40, 41

*Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
601 U.S. 42 (2024) ..................................................................14

*Department of Educ. v. California*,
604 U.S. 650 (2025) ....................................................17, 17-18

*Doe v. Rhode Island Interscholastic League*,
137 F.4th 34 (1st Cir. 2025) ....................................................13

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) ................................................................43

*Egbert v. Boule*,
596 U.S. 482 (2022) ................................................................49

*Elgin v. Department of the Treasury,*
   567 U.S. 1 (2012) ...................................................................20, 21, 49

*Esso Standard Oil Co. (P.R.) v. Rodríguez-Pérez,*
   455 F.3d 1 (1st Cir. 2006) .................................................................12-13

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*
   460 F.3d 13 (D.C. Cir. 2006) ........................................................27, 29, 31

*Gill v. Whitford,*
   585 U.S. 48 (2018) ..........................................................................42-43

*Global Health Council v. Trump,*
   153 F.4th 1 (D.C. Cir. 2025) .................................................................42

*Grosdidier v. Chairman, Broad. Bd. of Governors,*
   560 F.3d 495 (D.C. Cir. 2009) ...........................................................20-21

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
   527 U.S. 308 (1999) .......................................................................48, 49

*Haaland v. Brackeen,*
   599 U.S. 255 (2023) ...........................................................................45

*Harkrader v. Wadley,*
   172 U.S. 148 (1898) ...........................................................................49

*Harper v. Werfel,*
   118 F.4th 100 (1st Cir. 2024) .................................................................26

*Hecht Co. v. Bowles,*
   321 U.S. 321 (1944) .......................................................................43, 44

*Heckler v. Chaney,*
   470 U.S. 821 (1985) ...........................................................................37

*In re Sawyer,*
   124 U.S. 200 (1888) ...........................................................................49

*Lewis v. Casey,*
   518 U.S. 343 (1996) ...........................................................................43

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ............................................................ 33, 36, 37, 39

*Lineback v. Spurlino Materials, LLC*,
  546 F.3d 491 (7th Cir. 2008) ...................................................................47

*Lujan v. National Wildlife Fed'n*,
  497 U.S. 871 (1990) ............................................... 25, 26, 27, 28, 30-31

*Mallet & Co. v. Lacayo*,
  16 F.4th 364 (3d Cir. 2021) .....................................................................48

*Marasco & Nesselbush, LLP v. Collins*,
  6 F.4th 150 (1st Cir. 2021)......................................................................13

*Massachusetts v. National Insts. of Health*,
  164 F.4th 1 (1st Cir. 2026)................................................................ 15, 18

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ..........................................................................14-15

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ......................................................... 15, 16

*Milliken v. Bradley*,
  433 U.S. 267 (1977) .................................................................................43

*Milk Train, Inc. v. Veneman*,
  310 F.3d 747 (D.C. Cir. 2002) ................................................................34

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) .................................................................................44

*National Insts. of Health v. American Pub. Health Ass'n*,
  145 S. Ct. 2658 (2025)..................................................................17, 18, 19

*Nken v. Holder*,
  556 U.S. 418 (2009) .................................................................................24

*Norton v. Southern Utah Wilderness All.*,
  542 U.S. 55 (2004) ......................................................................25, 27, 32

vi

*Nyunt v. Chairman, Broad. Bd. of Governors,*
589 F.3d 445 (D.C. Cir. 2009) .......................................................................21

*New York v. Kennedy*:
155 F.4th 67 (1st Cir. 2025) ................................................19, 20, 23, 24, 28
789 F. Supp. 3d 174 (D.R.I. 2025) ................................................................20

*New York v. Trump,*
Nos. 25-1236, 25-1413, 2026 WL 734941 (1st Cir. Mar. 16, 2026) ....... 17, 18, 19, 36
133 F.4th 51 (1st Cir. 2025) ...........................................................................28

*Organization for Competitive Mkts. v. USDA,*
912 F.3d 455 (8th Cir. 2018) ..........................................................................32

*Policy & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.,*
313 F. Supp. 3d 62 (D.D.C. 2022) .................................................................34

*Rhode Island v. Trump,*
155 F.4th 35 (1st Cir. 2025) ..................................................................... 8, 22

*Rosario-Torres v. Hernandez-Colon,*
889 F.2d 314 (1st Cir. 1989).........................................................................48

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,*
217 F.3d 8 (1st Cir. 2000)..............................................................................42

*Royal Canin U.S.A., Inc. v. Wullschleger,*
604 U.S. 22 (2025) .........................................................................................23

*Sampson v. Murray,*
415 U.S. 61 (1974) .........................................................................................48

*Securities & Exch. Comm'n v. Navellier & Assocs., Inc.,*
108 F.4th 19 (1st Cir. 2024) ..........................................................................13

*Seila L. LLC v. CFPB,*
591 U.S. 197 (2020) .......................................................................................29

*Somerville Pub. Schs. v. McMahon,*
139 F.4th 63 (1st Cir. 2025) ....................................................22, 22-23, 23

*Spectrum Leasing Corp. v. United States*,
　764 F.2d 891 (D.C. Cir. 1985) ...............................................................16

*Sustainability Inst. v. Trump*,
　165 F.4th 817 (4th Cir. 2026)...............................................15, 17, 41

*Thakur v. Trump*,
　163 F.4th 1198 (9th Cir. 2025) ....................................................... 15, 17

*Trump v. American Fed'n of Gov't Emps.*,
　145 S. Ct. 2635 (2025).........................................................23, 29, 47

*Trump v. CASA, Inc.*,
　606 U.S. 831 (2025) ........................................................................ 2, 43

*Union Home Mortg. Corp. v. Cromer*,
　31 F.4th 356 (6th Cir. 2022)................................................................48

*Union of Concerned Scientists v. Wheeler*,
　954 F.3d 11 (1st Cir. 2020)......................................... 13, 32, 36, 38

*United States v. Fausto*,
　484 U.S. 439 (1988) ..................................................................... 20, 21

*Vaquería Tres Monjitas, Inc. v. Irizarry*,
　587 F.3d 464 (1st Cir. 2009).............................................................42

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
　435 U.S. 519 (1978) ..............................................................................37

*Vietnam Veterans of Am. v. CIA*,
　811 F.3d 1068 (9th Cir. 2016)...........................................................32

*Village of Bald Head Island v. U.S. Army Corps of Eng'rs*,
　714 F.3d 186 (4th Cir. 2013) ..............................................................26

*Wadsworth v. Nguyen*,
　129 F.4th 38 (1st Cir. 2025) ...............................................................12

*Walton v. House of Representatives*,
　265 U.S. 487 (1924) ..............................................................................49

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ...............................................................................44

*White v. Berry*,
    171 U.S. 366 (1898) ...............................................................................49

*Wilkins v. United States*,
    598 U.S. 152 (2023) ...............................................................................23

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ...............................................................................40

**Statutes:**

Consolidated Appropriations Act, 2021,
    Pub. L. No. 116-260, 134 Stat. 1182...................................................35

Consolidated Appropriations Act, 2024,
    Pub. L. No. 118-42, 138 Stat. 25 .........................................................34

Full-Year Continuing Appropriations and Extensions Act, 2025,
    Pub. L. No. 119-4, 139 Stat. 9 .............................................................34

5 U.S.C. § 551...............................................................................................25

5 U.S.C. § 701....................................................................................... 32, 37

5 U.S.C. § 702........................................................................ 14, 15, 44, 48

5 U.S.C. § 704...............................................................................................25

5 U.S.C. § 706......................................................................................26, 31, 32

5 U.S.C. § 7701.............................................................................................20

5 U.S.C. § 7703.............................................................................................20

12 U.S.C. § 5708 ..........................................................................................35

15 U.S.C. § 9502 ..........................................................................................37

15 U.S.C. §§ 9511 ................................................................................35

15 U.S.C. §§ 9511-9526 ..........................................................................5

15 U.S.C. § 9523 ..................................................................................35

15 U.S.C. § 9524 ..................................................................................35

15 U.S.C. §§ 9541-9543 ..........................................................................5

15 U.S.C. § 9543 ..................................................................................35

15 U.S.C. §§ 9552 ..................................................................................5

15 U.S.C. §§ 9552-9553 ........................................................................35

15 U.S.C. § 9561 ....................................................................................5

20 U.S.C. § 9103 ....................................................................................4

20 U.S.C. § 9108 ....................................................................................4

20 U.S.C. § 9141 ....................................................................................4

20 U.S.C. § 9165 ....................................................................................4

20 U.S.C. § 9173 ....................................................................................4

28 U.S.C. § 1491 ............................................................................. 15, 18

28 U.S.C. § 1651 ..................................................................................24

29 U.S.C. § 172 ....................................................................................37

29 U.S.C. § 173 ......................................................................................4

42 U.S.C. § 11311 ..................................................................................5

42 U.S.C. § 11314 ................................................................................37

**Executive Orders:**

*Commencing the Reduction of the Federal Bureaucracy*,
  Exec. Order No. 14,127, 90 Fed. Reg. 10,577 (Feb. 25, 2025) .......................................4

*Continuing the Reduction of the Federal Bureaucracy*,
  Exec. Order No. 14,238, 90 Fed. Reg. 13,043 (Mar. 20, 2025).....................1, 4, 29, 47

*Prescribing Additional Arrangements for Developing and Coordinating a National Program for Minority Business Enterprise*,
  Exec. Order No. 11,625, 36 Fed. Reg. 19,967 (Oct. 14, 1971) ....................................35

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

The judgment below interferes with the Executive Branch's prerogative to manage its own workforce and agency operations. The government respectfully requests that the Court hold oral argument to aid the Court in resolving the important issues presented by this appeal.

# INTRODUCTION

With an eye to "continu[ing] the reduction in the elements of the Federal bureaucracy that" he had "determined [we]re unnecessary," the President issued an Executive Order directing three federal agencies to eliminate their "non-statutory components and functions … to the maximum extent consistent with applicable law," and further to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." *Continuing the Reduction of the Federal Bureaucracy*, Exec. Order No. 14,238, §§ 1, 2(a), 90 Fed. Reg. 13,043, 13,043 (Mar. 20, 2025). There is nothing inherently unlawful about that Order. To the contrary, by its own terms, it incorporates all applicable law not once but twice. The district court nevertheless granted sweeping retrospective and prospective relief, requiring the agencies to unwind past compliance—and to forbear from all future compliance—with the Order, on the premise that each agency had arbitrarily and unlawfully adopted an unwritten "policy" of compliance with the Order, to which plaintiffs refer as a "Closure Decision." The result: the district court exceeded the judicial role by second-guessing wide-ranging aspects of the agencies' daily operations.

The district court's order cannot stand. The gravamen of plaintiffs' suit is not in fact that each agency adopted an unexpressed "policy," it is instead that the agencies improperly terminated grants and personnel. Under longstanding principles recently reaffirmed by the Supreme Court and this Court, such challenges fall outside

a federal district court's subject-matter jurisdiction. To permit plaintiffs to avoid those jurisdictional limitations by bundling their grievances together in the guise of "Closure Decisions" would elevate form over substance, allowing plaintiffs to avoid the regimes Congress established for review of federal grantmaking and personnel decisions.

Even if the district court had jurisdiction, plaintiffs nevertheless lack a cause of action to challenge a "Closure Decision." Plaintiffs' use of the term belies that such a "decision" refers to a collection of subsidiary decisions to determine which agency functions are legally required and to limit agency operations to those functions. The Administrative Procedure Act (APA) does not countenance such a programmatic attack. Nor does the APA permit suit over matters committed to agency discretion, like the grantmaking and personnel decisions plaintiffs challenge here. Plaintiffs' attempt to circumvent the APA's limitations by alleging claims directly under the Constitution, in turn, is squarely foreclosed by Supreme Court precedent.

The district court further erred in entering overbroad relief. Under longstanding limits on equitable remedies recently reaffirmed by the Supreme Court in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), as well as under the APA—which incorporates equitable principles—an injunction must be tailored to irreparable injury actually demonstrated by the complaining party. Here, the relief entered disregards equitable limits in two respects. First, it is not based on any defined universe of irreparable injuries shown by plaintiffs. And second, it nakedly sweeps in all manner

2

of lawful compliance with a lawful Executive Order.  Separately, the district court's equitable authority did not extend to reinstatement, which was a necessary consequence of the vacatur it ordered.

The Court should reverse the district court's grant of summary judgment.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1361 to hear their claims, which arise under the APA and the Constitution.  A135, ¶ 10; A135 at 55-63.  The district court entered judgment for plaintiffs on November 21, 2025.  A48.  The government filed a timely notice of appeal on January 19, 2026.  A514.  This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The issues presented are (1) whether the district court erred, because it lacked subject-matter jurisdiction and plaintiffs lacked a cause of action, in granting summary judgment to plaintiffs; and (2) whether the relief the court entered is overbroad in that it affords relief to non-parties, enjoins lawful conduct, and otherwise exceeds the district court's equitable authority.

## STATEMENT OF THE CASE

### A.    Legal and Factual Background

Shortly after taking office in January 2025, the President issued an Executive Order announcing the "policy of [his] Administration to dramatically reduce the size of the Federal Government, while increasing its accountability to the American

people." *Commencing the Reduction of the Federal Bureaucracy*, Exec. Order No. 14,217, § 1, 90 Fed. Reg. 10,577, 10,577 (Feb. 25, 2025).  Consistent with that policy, the President directed a "reduction in the elements of the Federal bureaucracy that the President has determined are unnecessary" at four federal agencies, so as to "minimize Government waste and abuse, reduce inflation, and promote American freedom and innovation." *Id.* §§ 1-2, 90 Fed. Reg. at 10,577.

The President's reform project extended the following month to seven additional agencies with the promulgation of Executive Order 14,238.  In that Order, the President ordered the agencies, which include the Federal Mediation and Conciliation Service (FMCS), the Institute of Museum and Library Services (IMLS), the United States Interagency Council on Homelessness (USICH), and the Minority Business Development Agency (MBDA), to eliminate their "non-statutory components and functions … to the maximum extent consistent with applicable law." Exec. Order No. 14,238, § 2(a)(i), (iv), (v), (vii), 90 Fed. Reg. at 13,043.

FMCS helps "parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation."  29 U.S.C. § 173(a).  IMLS is charged with "ensur[ing] the availability of museum, library, and information services adequate to meet the essential information, education, research, economic, cultural, and civic needs of the people of the United States."  20 U.S.C. § 9103(c)(1).  To that end, IMLS awards grants, carries out research and evaluation programs, and supports policy development.  *See id.* §§ 9108(a), 9141, 9165, 9173.  USICH's "mission [is] to

coordinate the Federal response to homelessness and to create a national partnership at every level of government and with the private sector to reduce and end homelessness in the nation." 42 U.S.C. § 11311. And MBDA promotes the growth of minority-owned businesses through grantmaking and research functions. *See, e.g.*, 15 U.S.C. §§ 9511-9526, 9541-9543, 9552-9553, 9561.

Shortly after Executive Order 14,238 was promulgated, these four agencies began to implement it, including by placing staff on administrative leave in anticipation of reductions in force. IMLS and MBDA also terminated a number of grant agreements in furtherance of the Order.[1]

### B.    Prior Proceedings

**1.** Twenty-one plaintiff States filed this suit on April 4, 2025. The operative complaint centers on alleged "Closure Decisions" at IMLS, MBDA, FMCS, and USICH—that is, in plaintiffs' telling, "decisions … to implement the [Executive] Order and substantially curtail [the agencies'] operations." A185, ¶ 186. Plaintiffs allege that, in implementing the Executive Order, the agencies violated the APA, their statutory obligations, and the Constitution. The same day plaintiffs filed their suit, they moved for a temporary restraining order, which the parties agreed to treat as a motion for a preliminary injunction. Dkt. 31.

---

[1] As the government indicated in a declaration appended to its motion for a stay pending appeal, IMLS voluntarily reinstated grants that were terminated under the agency's Grants to States program before the district court entered its preliminary injunction. A127, ¶ 9.

The district court granted plaintiffs' motion for a preliminary injunction as to FMCS, IMLS, and MBDA.[2]  A73-121.  The court deemed plaintiffs' label of "Closure Decisions" likely to refer to final agency action reviewable under the APA.  A93-98. The court also held that insofar as the "Closure Decisions" carried the consequences of terminations of grants and personnel, the Tucker Act and the Civil Service Reform Act (CSRA) likely did not deprive it of jurisdiction to enjoin those consequences. A86-93.  On the merits, the district court concluded that plaintiffs were likely to succeed in demonstrating that the implementation of the Executive Order was unreasoned and contrary to statutory and constitutional law.  A98-112.

The injunction prohibited FMCS, IMLS, and MBDA from implementing Section 2 of Executive Order 14,238 (the requirement to eliminate "non-statutory components and functions … to the maximum extent consistent with applicable law") and required them to "take all necessary steps to reverse any policies, memoranda, directives, or actions issued before this Order that were designed or intended, in whole or in part, to implement, give effect to, comply with, or carry out the directives contained" in the Order.  A123-24.  The injunction further provided that those defendants must "restore all [agency] employees and personal service contractors, who were involuntarily placed on leave or involuntarily terminated due to the implementation of [the] Executive Order," "to their status before March 14,

---

[2] USICH was added as a defendant by amended complaint after the district court entered the preliminary injunction.  *See* A175-84, ¶¶ 146-180.

6

2025." A124. And the injunction also directly mandated certain contract- and grant-related action, ordering the government not to "further pause, cancel, or otherwise terminate IMLS or MBDA grants or contracts or fail to disburse funds to recipients in plaintiff States according to such grants or contracts for reasons other than the grantees['] or contractors' non-compliance[] with applicable grant or contract terms." A124-25. Furthermore, defendants were required to "take immediate steps to resume the processing, disbursement, and payment of already-awarded funding, and to release awarded funds previously withheld or rendered inaccessible due to or in reliance on" the Executive Order, "with respect to recipients in plaintiff States." A125.

The injunction did not preclude defendants "from taking actions that would improve Agency efficiency or reduce the size or scope" of the agencies "as long as (a) the Agency Defendant provide[d] a reasoned explanation for such action, and (b) the action w[ould] not prevent the Agency Defendant from fulfilling any of [its] statutory obligations." A124. Moreover, the injunction did not "preclude[] the Agency Defendants from making personnel decisions that are not related to or motivated by" the Executive Order. A124.

Subsequently, the district court extended the effect of the preliminary injunction to USICH—which had been added as a defendant after the preliminary injunction issued, A175-84, ¶¶ 146-180—in an unreasoned minute order providing that "[a]ny actions implementing the Executive Order as to USICH, including [reductions in force], are STAYED until the resolution of Plaintiffs' Motion for

7

Summary Judgment," Sept. 12, 2025 Min. Order. The government unsuccessfully sought reconsideration of that order. Dkt. 86; *see* A4 n.1 (denying motion to reconsider in light of summary-judgment disposition).

2. The government appealed and sought from this Court a stay pending appeal, which was denied. *Rhode Island v. Trump*, 155 F.4th 35 (1st Cir. 2025). This Court reasoned that the government had not raised *Dalton v. Specter*, 511 U.S. 462 (1994), in seeking a stay pending appeal in the district court, thus forfeiting its counterarguments to plaintiffs' constitutional claims at the stay stage. *Rhode Island*, 155 F.4th at 46-47. Because the constitutional claims sufficed in the Court's view to sustain the preliminary injunction, the Court did not reach plaintiffs' APA claims. *Id.* at 45.

3. While the government's preliminary-injunction appeal was pending, the district court entered summary judgment for plaintiffs in an opinion that largely tracks, and otherwise incorporates at length, the preliminary-injunction opinion. At the threshold, as before, the district court determined that neither the Tucker Act nor the CSRA deprived it of jurisdiction over any part of plaintiffs' claims, A10-17, and that the plaintiffs had identified discrete and final agency action reviewable under the APA, A20-25. The district court further held that defendants' grantmaking and personnel decisions did not fit into the category of actions "committed to agency discretion by law" and thus outside the scope of APA review. A25-29. And on the merits, the district court again determined that the agencies' implementation of the

Executive Order was unreasoned and contrary to statutory and constitutional law. A30-40.

The district court granted two forms of relief:  vacatur and a permanent injunction.  With respect to vacatur, the district court deemed it "proper … to vacate" an undefined category of "actions" defendants had previously taken "in their entirety"—not in a party-specific manner, as the government had requested.  A43. And with respect to prospective relief, the district court again granted a universal remedy, "permanently enjoin[ing]" the agencies "from taking any future actions to implement, give effect to, comply with, or carry out the directives contained in the" Executive Order.  A47.

As explained in a post-judgment notice of compliance, the government understands the district court's grant of vacatur to make permanent the steps the agencies took to comply with the preliminary injunction (and, with respect to USICH, with the district court's minute-order "stay")—that is, reversal of steps taken to implement reductions in force pursuant to Executive Order 14,238 and reinstatement of grants terminated within the plaintiff States—as well as to void the "policies pursuant to which the Executive Order-related actions at issue in this case were taken."  A512.  Furthermore, the government made clear it understands the permanent injunction to bar any future step to give effect to Executive Order 14,238, but, like the preliminary injunction, "not to forbid future actions that would improve the Defendant Agencies' efficiency or reduce the size or scope of the Defendant

9

Agencies if those actions are independent of Executive Order 14,238." A512. Neither plaintiffs nor the district court has subsequently disputed the government's interpretation.

**4.** All four agency defendants noticed an appeal of the summary-judgment order to this Court. On April 6, on the government's assented-to motion, the Court dismissed IMLS and the senior official performing the duties of the agency's director from the appeal.

## SUMMARY OF ARGUMENT

**I.** The district court lacked subject-matter jurisdiction to hear this case. Plaintiffs' suit is about injuries alleged to stem from two sources: terminations of grants and terminations of personnel. Neither grievance falls within the district court's subject-matter jurisdiction.

**A.** MBDA—the only agency that makes grants at issue in this appeal—may not be sued absent a waiver of sovereign immunity, and the APA's general waiver does not apply where another statute impliedly forbids the relief sought. That is the case here with respect to plaintiffs' requests for grant funding from MBDA—which are, at their core, contractual and thus required by the Tucker Act to be heard in the Court of Federal Claims, not the District of Rhode Island.

**B.** The existence of a comprehensive statutory framework for judicial challenges to personnel decisions—the CSRA—precluded the district court from exercising jurisdiction under the general federal question statute over plaintiffs' claims

10

arising out of allegedly improper terminations of federal personnel. That plaintiffs themselves are not capable of bringing claims under the CSRA is a feature, not a bug, of that framework.

**II.** Independently of these jurisdictional defects, plaintiffs lack a cause of action under either the APA or the Constitution.

**A.** As relevant here, the APA authorizes review only of discrete "agency action" that is "final." Plaintiffs' amorphous label of "Closure Decision" describes ongoing agency operations, not action that meets either precondition to judicial review. In concluding otherwise, the district court examined collections of particular discrete actions that might themselves qualify as agency actions—but such actions cannot be aggregated to circumvent the APA's carefully drawn limitations on suit. Separately, a plaintiff may not avail herself of the APA to challenge decisions committed to agency discretion by law—a category into which the funding and personnel decisions at issue here fall.

**B.** Plaintiffs cannot evade those limitations by recasting their claims as constitutional violations of the separation of powers and Take Care Clause. As the district court's analysis shows, each of these purportedly constitutional arguments has at its core a contention that the agencies committed statutory violations. The Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462 (1994), confirms that plaintiffs therefore lack a constitutional cause of action.

11

**III.** The breadth of the equitable relief the district court awarded is independently erroneous and requires vacatur.

**A.** The Supreme Court's recent decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), leaves no doubt that in tailoring equitable relief, a district court must be guided by the injury shown by plaintiffs properly before the court. Although the district court cited *CASA*, it disregarded that principle by entering a prospective injunction that is universal in scope. The district court's retrospective relief universally vacating an undefined set of agency actions under the APA was also overbroad, because the APA incorporates traditional equitable limitations on relief. The permanent injunction is also overbroad in that it sweeps in lawful conduct, by barring any future compliance whatsoever with an Executive Order that is, facially and uncontestedly, lawful.

**B.** Insofar as the district court's vacatur and permanent injunction apply to the reinstatement of personnel, those components of the relief awarded are independently erroneous because they exceeded the court's remedial authority.

## STANDARD OF REVIEW

As a general matter, this Court reviews the district court's grant of summary judgment de novo. *Boston Redevelopment Auth. v. National Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (APA claims); *Wadsworth v. Nguyen*, 129 F.4th 38, 50 (1st Cir. 2025) (constitutional claims). Questions of law underlying the judgment, including with respect to jurisdiction and justiciability, are subject to that same standard. *Esso*

12

*Standard Oil Co. (P.R.) v. Rodríguez-Pérez*, 455 F.3d 1, 4 (1st Cir. 2006) (subject matter

jurisdiction); *Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 166 (1st Cir. 2021)

(citing *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 16 (1st Cir. 2020))

(justiciability of APA claims).

The scope of equitable relief, in turn, is generally a matter left to the district

court's discretion, *Doe v. Rhode Island Interscholastic League*, 137 F.4th 34, 39 (1st Cir.

2025), but "[t]he availability of an equitable remedy presents a question of law

engendering de novo review," *Securities & Exch. Comm'n v. Navellier & Assocs., Inc.*, 108

F.4th 19, 41 (1st Cir. 2024) (quotation omitted)

## ARGUMENT

### I.    The District Court Lacked Subject-Matter Jurisdiction.

Plaintiffs claimed that they would (or, more speculatively, could) suffer two

types of harm as a result of MBDA's, FMCS's, and USICH's compliance with

Executive Order 14,238:  losses of grant funding and cessations in agency-provided

services.  *See* A44-46 (crediting certain of these harms en masse).  In addition to

claiming that some funds and services had already been terminated, *e.g.*, A407, ¶ 776

("All preexisting MBDA grants were terminated… ."); A451, ¶ 975 ("FMCS ceased

mediation services or arbitration related services for state and local government

actors."), plaintiffs surmised that the agencies' planned reductions in force could

theoretically cause future funds to be delayed or services to be withheld, *e.g.*, A403-04,

¶¶ 759, 761 (claiming that the employees remaining at MBDA "would not be capable

13

of carrying out the MBDA's statutorily mandated functions, administering its existing programs, or spending its appropriated funds," including "to monitor the existing portfolio of grants"); A454, ¶ 989 ("FMCS will be unable to perform its statutory mission with such a dramatic reduction in personnel."); A496, ¶ 1237 (alleging that as a result of a planned reduction in force at USICH, "USICH is no longer able to visit communities to provide the resources, expertise, and assistance that has proven so effective at combatting homelessness and supporting unhoused individuals").

The district court lacked subject-matter jurisdiction to entertain plaintiffs' suit insofar as it relied on grant- and personnel-related harms. Under the Tucker Act, the first category of claims must be heard in the Court of Federal Claims, as this Court has recently reaffirmed. And the CSRA requires that plaintiffs' personnel-related claims be brought, if at all, by the affected employees themselves, through the prescribed channels that statutory framework prescribes.

### A. Claims based on MBDA's grant terminations must be heard in the Court of Federal Claims.

"[T]he United States, as sovereign, is generally immune from suits seeking money damages" absent a waiver of that immunity. *Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 48 (2024). Although the APA provides a limited waiver of the government's sovereign immunity for suits "seeking relief other than money damages," 5 U.S.C. § 702, that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-*

14

*E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702).

The Tucker Act—which provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States," 28 U.S.C. § 1491(a)(1)—is one such statute. *See Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004). This prohibition extends to claims founded on grants, like those at issue here, that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021). Other courts of appeals, in determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act, have looked at both (1) "the source of the rights upon which the plaintiff bases its claims" and (2) "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted); *see Sustainability Inst. v. Trump*, 165 F.4th 817, 825-26 (4th Cir. 2026); *Thakur v. Trump*, 163 F.4th 1198, 1204 (9th Cir. 2025); *cf. Massachusetts v. National Insts. of Health*, 164 F.4th 1, 10 (1st Cir. 2026) (adverting to, but declining to endorse, "a robust body of caselaw to determine whether an ostensibly APA-based claim is a breach-of-contract claim in disguise").

Applying the *Megapulse* test, plaintiffs' claims fall squarely within the Tucker Act to the extent they seek reinstatement of grant funding from MBDA.[3] The grant agreements between entities within the plaintiff States and MBDA are plainly the "source of the rights upon which" plaintiffs base such claims. *Megapulse*, 672 F.2d at 968; *see Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (noting that many "federal grant programs" are "much in the nature of a contract" (quotation omitted)); *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021) (describing Federal Circuit precedent "treating federal grant agreements as contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound"). For although plaintiffs point to MBDA's appropriations statute authorizing grantmaking in general, they do not claim that they are the statutorily mandated beneficiaries of any MBDA grant. *E.g.*, A407, ¶ 779 (referring to the Capital Readiness Program). And with respect to relief, plaintiffs ultimately "seek[] the classic contractual remedy of specific performance." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). Thus, plaintiffs' claims are quintessentially contractual, and they can sue to obtain unpaid monies under their various contracts only in the Court of Federal Claims.

---

[3] The only two of plaintiffs' claims that involve any kind of statutory, rather than contractual, obligation to pay money are those related to grants made under 15 U.S.C. §§ 9524 and 9552. *See infra* pp. 33-36 (explaining why plaintiffs' challenge to such grants goes to matters committed to agency discretion).

Last year, the Supreme Court stayed two lower-court orders requiring federal agencies to disburse grant funding, reasoning that the plaintiffs' claims in each case were "based on" contracts with the government, or else designed to enforce a contractual obligation to pay money, and thus likely outside the district courts' jurisdiction to adjudicate. *Department of Educ. v. California*, 604 U.S. 650 (2025) (per curiam); *National Insts. of Health v. American Pub. Health Ass'n* (*APHA*), 145 S. Ct. 2658 (2025). And only weeks ago, this Court applied the reasoning of those cases to narrow the portion of a district court's preliminary injunction that required the payment of grant monies. *New York v. Trump*, Nos. 25-1236, 25-1413, 2026 WL 734941, at *16-17 (1st Cir. Mar. 16, 2026) ("[T]he District Court ordered specific performance with respect to payment to remedy the States' contractual injuries as to 'awarded grants' and 'executed contracts.' But, under the Supreme Court's recent pronouncements regarding the interaction between the APA and the Tucker Act, it is likely the District Court cannot do so."). That reasoning applies with full force here.[4] *See also Sustainability Inst.*, 165 F.4th at 826-27; *Thakur*, 163 F.4th at 1203-04.

---

[4] In *New York*, this Court appeared to treat the Tucker Act question as a remedial one, not an issue going to the district court's jurisdiction to hear the claim *ex ante*. 2026 WL 734941, at *16 n.11. The Supreme Court's decisions in *Department of Education* and *APHA* rest on both jurisdictional and remedial principles—in *APHA*, the Supreme Court reasoned that "[t]he Administrative Procedure Act's 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants *or* to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *APHA*, 145 S. Ct. at 2658 (alteration in original) (emphasis added) (quoting *Department of Educ.*, 604 U.S. at

*Continued on next page.*

The district court declined to apply the Tucker Act on three grounds, none of which withstands scrutiny. First, the court reasoned that the Tucker Act could not apply to at least a portion of plaintiffs' claims because they were constitutional, and because sovereign immunity does not bar constitutional claims seeking specific relief. A11 (citing *California v. U.S. Dep't of Transp.*, 808 F. Supp. 3d 291, 303 (D.R.I. 2025)). That principle has no bearing here, however, because the jurisdiction conferred on the Court of Federal Claims by the Tucker Act is "exclusive" where it applies. *Massachusetts*, 164 F.4th at 10 (citing *American Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 62 (1st Cir. 1978)); *see also* 28 U.S.C. § 1491(a)(1) (including constitutional claims within the jurisdiction of the Court of Federal Claims). And for the reasons given above, this suit falls within the exclusive jurisdiction of the Court of Federal Claims.

Second, relying on Justice Barrett's controlling concurrence in *APHA*, the district court characterized plaintiffs' challenge as one to a "policy" concerning grant terminations, not the terminations themselves. A11-12 (citing *APHA*, 145 S. Ct. at 2660-61 (Barrett, J., concurring in the partial grant of the application for stay)). But if that is true, as Justice Barrett's opinion explains, the relief awarded should not have

---

651). Plaintiffs' APA claims are at least partially "based on" claims of contractual harm, and thus fell outside the district court's jurisdiction altogether. In any event, even if the Court considers the issue to be remedial, the district court erred insofar as its order required reinstatement of grants. A43 (vacating defendants' prior compliance steps); A511-13 (explaining, without objection to date, the government's understanding of the vacatur to require reinstatement of grant funds); *see New York*, 2026 WL 734941, at *17.

18

extended to vacatur of the grant terminations, as it did here. *APHA*, 145 S. Ct. at 2661 (Barrett, J., concurring in the partial grant of the application for stay) ("Vacating the guidance does not reinstate terminated grants."); *see* A43; A511-13. To the contrary, the controlling opinion explicitly envisioned that relief for terminated grants themselves would come, if at all, "in the [Court of Federal Claims]," where "plaintiffs' challenges to the grant terminations belong." *APHA*, 145 S. Ct. at 2662.

Third and finally, the district court reasoned that under the *Megapulse* framework, the essence of plaintiffs' suit is not the grants themselves because plaintiffs have mounted a wider-ranging challenge to an agency-wide "dismantling" at MBDA. A12-15. That is precisely the same argument the Supreme Court rejected on analogous facts in *Department of Education* and *APHA*, and this Court rejected in *New York*. *See New York*, 2026 WL 734941, at *17 (rejecting the plaintiffs' efforts to distinguish *Department of Education* on the grounds that they challenged "broad, categorical freezes on obligated funds," not "grant terminations as such," reasoning that under *APHA*, "[t]hat [the plaintiffs'] claims do not focus on specific, individual grants thus does not cure the likely problem with the District Court's remedy for those claims"). Even where plaintiffs purport to mount a "broad, categorical" attack on an agency's policy, their claim still belongs in the Court of Federal Claims "to the extent it requires the Agency Defendants to make disbursements to the States on awarded grants." *Id.* (internal quotation marks omitted). *New York v. Kennedy*, 155 F.4th 67 (1st Cir. 2025), to which the district court favorably cited, A13, adds little to

19

this analysis—for even if the plaintiffs there adverted to the agency's purported inability to process a grant extension, they neither directly sought nor obtained the relief of grant reinstatement, like the plaintiffs here. *New York v. Kennedy*, 789 F. Supp. 3d 174, 213 (D.R.I. 2025) (enjoining a reduction in force); *Kennedy*, 155 F.4th at 75 n.4 (discussing the grant-extension issue).

### B. The district court lacked jurisdiction to hear plaintiffs' employment-related claims.

Plaintiffs' personnel-related claims are independently precluded on jurisdictional grounds by the CSRA. The CSRA sets out an "integrated scheme of administrative and judicial review" for challenges to personnel actions taken against members of the civil service, *United States v. Fausto*, 484 U.S. 439, 445 (1988), a scheme that provides the "exclusive means" for such review, *Elgin v. Department of the Treasury*, 567 U.S. 1, 5, 8 (2012); *see also id.* at 5 (describing the scheme as "comprehensive") (quotation omitted).

The CSRA scheme permits some, but not all, challenges. Federal employees may, for example, challenge certain adverse employment actions before the Merit Systems Protection Board (MSPB), 5 U.S.C. § 7701; *see Elgin*, 567 U.S. at 5-6, 5 n.1, with the Federal Circuit possessing exclusive jurisdiction over appeals from the MSPB, 5 U.S.C. § 7703(b)(1). "Federal employees may not circumvent [these statutes'] requirements and limitations by resorting to the catchall APA to challenge agency employment actions." *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d

495, 497 (D.C. Cir.), *cert. denied*, 558 U.S. 989 (2009). "That principle applies to a 'systemwide challenge' to an agency policy … just as it does to the implementation of such a policy in a particular case." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).

Here, the employees affected by the agencies' planned reductions in force themselves have not sued. Instead, the plaintiff States have challenged federal employees' terminations by objecting to the projected consequences of the employees' absence and demanding reinstatement. *Supra* pp. 13-14. If tangentially affected parties could challenge the legality of personnel actions and obtain reinstatement of terminated employees without the constraints that apply to the aggrieved employees and the unions that represent them, that would turn the structure of the CSRA "upside down." *Fausto*, 484 U.S. at 449. Beneficiaries of government services—who are, at most, indirectly affected by terminations—should not be able to leapfrog the employees to whom the statute offers protections through a legislative scheme that carefully balances the interests of government employees and government employers, potentially coopting the remedies that those employees may or may not seek in CSRA proceedings. Allowing separate litigation by collaterally affected parties would "seriously undermine[]" "[t]he CSRA's objective of creating an integrated scheme of review," *Elgin*, 567 U.S. at 14, and harm "the development … of a unitary and consistent Executive Branch position on matters involving personnel action," *Fausto*, 484 U.S. at 449.

21

The district court did not contend with these principles in its summary-judgment order, instead relying on prior stay decisions of this Court and the Supreme Court. That reliance was mistaken. *Contra* the district court's apparent conclusion, A16, this Court's denial of a stay in this suit does not foreclose the government's arguments on appeal. In denying the government's request for a stay pending appeal of the preliminary injunction entered earlier in this case—a posture in which the burden was on the government to show an entitlement to interim relief—this Court decided only that the government's "arguments [in its stay motion] fall short of the requisite 'strong showing'" that they are likely to succeed on the merits of their challenge to the preliminary injunction." *Rhode Island v. Trump*, 155 F.4th 35, 44 (1st Cir. 2025). This Court did not resolve the underlying merits of the arguments the government later made in its now-moot preliminary-injunction appeal, which would in any event not ordinarily have done more than address the likelihood of ultimate success on a legal argument. *See, e.g.*, *A.M. Capen's Co. v. American Trading & Prod. Corp.*, 74 F.3d 317, 322 (1st Cir. 1996) (explaining that "conclusions as to the merits of the issues presented on preliminary injunction are to be understood as statements of probable outcomes, rather than as comprising the ultimate law of the case" (quotation omitted)). The same holds true of this Court's rejection of the government's channeling arguments in *Somerville Public Schools. v. McMahon*, 139 F.4th 63, 71 (1st Cir. 2025), which was also a stay decision that did not definitively resolve the underlying legal questions in that ongoing litigation. *See* A16 (citing *Somerville Pub. Schs.*, 139 F.4th

22

at 71); *see also Somerville Pub. Schs.*, 139 F.4th at 71 (noting the court's "appreciat[ion of] the [government's] concern that the CSRA may not be bypassed by the mere recharacterization of a challenge to a termination of employment" but stating that the Court was "loath *at this juncture of the proceedings* to attribute to Congress the intention in enacting the CSRA that the appellants appear to attribute to it" (emphasis added)).

Nor does *Kennedy*, 155 F.4th 67, bind the Court here.  *Cf.* A16-17.  That decision, too, was about a stay pending appeal of a preliminary injunction in which the Court decided only whether the government satisfied its "burden of justifying … extraordinary relief" by making "a strong showing that it is likely to succeed on the merits"—not a holding regarding whether the government would ultimately succeed in the case.  *Kennedy*, 155 F.4th at 72 (alteration and quotation omitted) (acknowledging it was making a decision "on a truncated timeline").  And *Kennedy*'s discussion of what the Supreme Court "likely decided" regarding the CSRA in *Trump v. American Federation of Government Employees (AFGE)*, 145 S. Ct. 2635 (2025), was mistaken.  155 F.4th at 75.  Nowhere in *AFGE* did the Supreme Court discuss subject-matter jurisdiction, meaning that its opinion carries no precedential effect on the question.  *See Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 42 (2025) ("This Court has often stated that 'drive-by jurisdictional rulings'—asserting or denying jurisdiction 'without elaboration,' or analysis of whether anything 'turn[ed] on' the ruling—should be accorded 'no precedential effect.'" (quoting *Wilkins v. United States*, 598 U.S. 152, 160 (2023))).  And even more fundamentally, courts have authority

under 28 U.S.C. § 1651 to rule on a stay application without determining whether there are any jurisdictional problems in the underlying case. *See, e.g.*, *American Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 656 n.2 (9th Cir. 2025) (per curiam) (explaining the court did "not reach the government's jurisdictional argument because we are not considering an appeal of the preliminary injunction, but only whether to grant the government's motion for a stay, for which [the court has] jurisdiction under the All Writs Act, 28 U.S.C. § 1651" (quotation omitted)); *Nken v. Holder*, 556 U.S. 418, 426 (2009) ("An appellate court's power to hold an order in abeyance while it assesses the legality of the order has been described as 'inherent,' preserved in the grant of authority to federal courts to 'issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law' … ." (citation omitted) (quoting 28 U.S.C. § 1651(a)). Any suggestion in *Kennedy* that the Supreme Court's conclusion that "the government was likely to succeed in establishing that the [challenged] Executive Order was lawful … indicates that the Supreme Court concluded that the district court likely had jurisdiction to make that decision" is thus misplaced. 155 F.4th at 75. Accordingly, this Court can and should find that plaintiffs' challenge to non-party employee terminations fell outside the district court's jurisdiction, for the reasons given above.

24

II.    **Plaintiffs Lack A Cause Of Action.**

A.    **Plaintiffs lack a cause of action under the APA.**

1.    **"Closure Decisions" are not final agency actions subject to APA review.**

**a.** Where no other statute applies, § 706(2) of the APA permits judicial review of Executive Branch decisionmaking only where a decision results in "agency action" defined by the APA—*i.e.*, "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. § 551(13)—that is "circumscribed" and "discrete," *Norton v. Southern Utah Wilderness All. (SUWA)*, 542 U.S. 55, 62 (2004).  In contrast, plaintiffs may not level a "broad programmatic attack," *id.* at 64, against an agency's (much less several agencies') "continuing (and thus constantly changing) operations," even under a facially discrete label of plaintiffs' own choosing.  *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 890 (1990) (holding challenge to what the plaintiffs called a "land withdrawal review program" outside the scope of APA review).

Even where the challenged action is sufficiently discrete to qualify as "agency action," it must also be sufficiently "final" to come within the APA's ambit.  5 U.S.C. § 704.  "To be considered 'final,' the agency action must" both "mark the 'consummation' of the agency's decisionmaking process" and "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will

25

flow.'" *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

These limitations ensure that courts do not engage in "general judicial review of [an agency]'s day-to-day operations." *Lujan*, 497 U.S. at 899. "The obvious inability for a court to function in such a day-to-day managerial role over agency operations is precisely the reason why the APA limits judicial review to discrete agency actions." *Village of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 194 (4th Cir. 2013). Instead, the requirement of final agency action "strike[s] a balance between meaningful judicial review and the needs of effective administration," *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 432 (4th Cir. 2019) (describing 5 U.S.C. § 706(1)).

**b.** Plaintiffs' challenge to what they call a "Closure Decision" at each agency does not target "agency action." A court errs where it subjects to judicial review an "abstract decision" divorced from any "specific agency action[] as defined in the APA." *Biden v. Texas*, 597 U.S. 785, 809 (2022). Yet plaintiffs' theory invited the district court to do precisely that: plaintiffs did not (indeed, could not) identify "any 'agency statement of general or particular applicability designed to implement'" the supposed "decision" each agency made, *id.* (alteration omitted), "to implement" Executive Order 14,238, Dkt. 75 at 4. Instead, plaintiffs pointed to myriad *other* steps the agencies took to support the existence of a reviewable "decision." *E.g.*, Dkt. 75 at 25-27. As the Supreme Court has explained, such hypothesizing about the existence of a reviewable decision is erroneous. *See Biden*, 597 U.S. at 809; *see* A24-25

26

(concluding that the "decisions" here were not "abstract" because the agencies terminated various grants and services).

Furthermore, plaintiffs' use of the label "Closure Decision" is merely an attempt to disguise a quintessential "broad programmatic attack," not a term referring to discrete agency action. *See Lujan*, 497 U.S. at 890. Compliance with an Executive Order is not, despite plaintiffs' strained use of the term, reducible to a single "decision." Instead, Executive Order 14,238 required officials at the four (distinct) agencies to begin making various decisions, including which programs and grants to retain, the number of staff necessary to administer programs and grants that would continue to operate, and how and when to terminate unnecessary staff. Those decisions, in turn, necessarily follow from a series of internal (and potentially external) deliberations, communications, and analyses—in other words, "a wide variety of activities that comprise the common business of managing government programs." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006) (rejecting challenge to Presidential Budget Initiative); *id.* ("Unlike 'circumscribed, discrete agency actions' that are the ordinary subjects of judicial review, the [challenged action] represents the sum of 'many individual actions,' including some 'yet to be taken.'" (citation omitted) (first quoting *SUWA*, 542 U.S. at 62; and then quoting *Lujan*, 497 U.S. at 893)); *see also Lujan*, 497 U.S. at 890.

In concluding that the "Closure Decisions" were agency actions, the district court credited plaintiffs' assertion that they challenged a "'policy' that applies the

27

[measure] 'of eliminating all functions and components not mandated by statute, and of dramatically reducing their remaining functions' across the board." A21 (quoting A94). This articulation of plaintiffs' challenge does not cure the problem; it merely substitutes "policy" for "decision" in a sentence that otherwise reaffirms that effectuating the ultimate goal of Executive Order 14,238—the elimination of unnecessary federal bureaucracy—requires countless antecedent agency actions.

*Contra* the district court and plaintiffs, a "Closure Decision" is not the sort of unwritten "policy" courts have accepted as constituting agency action. *Lujan* itself, on which the district court relied, A21, merely adverted in dictum to the possibility of "some specific order or regulation, applying some particular measure across the board." 497 U.S. at 890 n.2. But plaintiffs' theory fails to satisfy even these criteria. To start, there is no "specific order or regulation" at issue. *Id.* The same fact distinguishes this case from *Kennedy*, on which the district court also relied, A22, where the plaintiffs challenged a "statement" by agency leadership that announced a streamlining of the agency, 155 F.4th at 70. Moreover, the agencies here have not applied any "particular measure" in a uniform manner. *Lujan*, 497 U.S. at 890 n.2. As a result, this case is materially distinguishable from *New York v. Trump*, *cf.* A22, where—correctly or incorrectly—a panel of this Court denied a stay pending appeal of an injunction against a "policy" of "broad, categorical freezes on obligated funds," 133 F.4th 51, 67 (1st Cir. 2025). In contrast, reducing the scope of agency operations to the minimum functions required by law neither constitutes a defined practice with

28

respect to a particular group nor produces uniform results; it instead represents a plan to take action with future results to be determined down the line. *See Fund for Animals*, 460 F.3d at 20.

Despite purporting to review a set of "Closure Decisions," the district court in fact examined the legality and rationality of the subsequent steps the agencies took to implement those "decisions." The court reasoned, for example, that the agencies failed to justify letters sent to employees placed on administrative leave, a memorandum announcing a reduced operational scope for one agency, and the termination of individual grants by another agency. A32 (incorporating in full the court's prior reasoning on arbitrary and capricious action at A99-101); A32 & n.13 (similar analysis with respect to USICH). In effect, the district court appeared to conclude that those individual actions were likely arbitrary and capricious. But it does not automatically follow that the "Closure Decisions" that supposedly preceded the individual actions cited were themselves arbitrary and capricious. Indeed, properly analyzed, plaintiffs' theory makes little sense: it cannot be arbitrary for agency leadership to "decide" to comply with a facially valid Executive Order, because such an order is presumptively legitimate direction from the head of the Executive Branch. *See Seila L. LLC v. CFPB*, 591 U.S. 197, 203 (2020) (describing Article II's vesting of Executive Power in the President). Likewise, it cannot be "contrary to law" to decide to comply with an Executive Order whose terms command compliance with the law. Exec. Order No. 14,238, § 2(a), 90 Fed. Reg. at 13,043; *cf. AFGE*, 145 S. Ct. at 2635

29

(Sotomayor, J., concurring in the grant of stay) (concluding the Supreme Court "ha[d] no occasion to consider whether" reorganization plans required by Executive Order "can and will be carried out consistent with the constraints of law" where the Executive Order itself required the agencies to take action "consistent with applicable law" (quotation omitted)).

To be sure, the individual steps the agencies took to implement the Executive Order—like terminating a specific grant or initiating a reduction in force—might themselves qualify as "agency actions" under the APA. But as explained, plaintiffs face insurmountable threshold obstacles in seeking to challenge the grant and personnel terminations themselves in this forum. *See supra* pp. 13-25. They should not be permitted to evade those obstacles by recasting their theory in broad, programmatic terms. All in all, plaintiffs' request for judicial review of "Closure Decisions" places the district court in the "programmatic oversight" role the APA does not permit it to occupy. *City of New York*, 913 F.3d at 432.

**c.** Apart from failing to challenge "agency action," in targeting the "decision" to comply with an Executive Order to reduce agency staffing and programming, plaintiffs also fail to challenge a "final" action. The agencies' decision to implement the Executive Order marks the initiation, not the consummation, of the agency's decision-making process. *Bennett*, 520 U.S. at 177-78. And a plan to take action—even if any *subsequent* action could have definite effects for the public—does not itself create cause "the concrete effects normally required for APA review." *Lujan*, 497 U.S.

30

at 891; *see Fund for Animals*, 460 F.3d at 22 ("As is the case with more formal land use plans, there is 'considerable legal distance' between the appropriation of funds to implement a gather 'strategy' and the actual removal of wild horses and burros."). This makes sense, because attempting to review mere plans and ongoing operations under them is a futile task.  Directions may be changed, and operational decisions may be reversed.  *See, e.g.,* A127, ¶ 9 (explaining that the IMLS's Grants to States program was fully reinstated before the preliminary injunction).

The district court's conclusion that there existed a final agency action cannot be reconciled with these principles.  The court based that conclusion on the fact that the agencies had "eliminat[ed] … activities and functions" in a final manner, causing loss of funds, terminations of personnel, and the cessation of agency-provided services. A23-24.  Again, the court's analysis rests on a category error:  whether or not individual terminations of grants, personnel, or services might be final under the APA and subject to judicial review in an appropriate forum, an antecedent, amorphous decision to take steps of that sort is not.

**d.**  That plaintiffs' "Closure-Decision" theory does not allege final agency action, and is thus unreviewable under the APA, is confirmed by the fact that the APA contains a provision permitting a court to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  Insofar as plaintiffs challenge an alleged failure to perform required functions, *see* Dkt. 75 at 33 ("MBDA cannot perform [its statutory] duties with no staff[.]"); Dkt. 75 at 34 (similar, regarding

31

FMCS); Dkt. 75 at 34-35 (similar, regarding USICH), they ought to have brought claims under § 706(1).  Their failure to do so matters, because the standard of review under § 706(1) is considerably more stringent than under § 706(2).  *SUWA*, 542 U.S. at 63 (observing that through § 706(1) "the APA carried forward the traditional practice prior to its passage," including writs of mandamus); *Organization for Competitive Mkts. v. USDA*, 912 F.3d 455, 462 (8th Cir. 2018) ("Most circuits have adopted the mandamus approach to agency delay issues… ." (citation omitted)).  Had the district court applied the correct standard under § 706(1), it could not possibly have granted relief, both because plaintiffs have not identified any "discrete action[] that [is] unequivocally compelled by statute or regulation," *Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068, 1081 (9th Cir. 2016), and because their "Closure-Decision" theory rests largely on allegations of potential *future* failures to take action, not action *already* withheld or delayed.  5 U.S.C. § 706(1); *see* A44-46 (repeatedly crediting claims of harm that could come to pass if the agencies failed to continue programming).

### 2.  The agencies' funding and personnel decisions are committed to their discretion by law.

**a.**  Review under the APA is unavailable to plaintiffs for an additional, independent reason:  because through this suit, they seek to dictate agency decisions about funding and personnel that are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and thus not subject to judicial review.  *See Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17 (1st Cir. 2020).  "Such a commitment exists when

the agency action is of a kind 'traditionally regarded as committed to agency discretion,' or when the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Id.* (citation omitted) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191-92 (1993)).

**b.** The Supreme Court has expressly held that an agency's decision to "discontinue" a previously funded program and reallocate those funds to other uses is committed to agency discretion by law. *Lincoln*, 508 U.S. at 193-94. The Supreme Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion" because the point of such appropriations "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. In making this allocation, the agency must engage in "a complicated balancing of a number of factors" within "its expertise," including "whether its resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all." *Id.* at 193 (quotation omitted). As long as the agency abides by the relevant statutes and by any self-imposed obligations that may arise from regulations or grant instruments, federal law "gives the courts no leave to intrude." *Id.*

Although the Supreme Court in *Lincoln* addressed lump-sum appropriations, its logic extends to other funding programs that permit the agency to decide "how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Those decisions—like decisions regarding how best to allocate lump-sum appropriations across programs—"clearly require[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (quotation omitted); *see also Policy & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018); *cf. Community Action of Laramie Cnty., Inc. v. Bowen*, 866 F.2d 347, 354 (10th Cir. 1989) ("Funding determinations are notoriously unsuitable for judicial review, for they involve the inherently subjective weighing of the large number of varied priorities which combine to dictate the wisest dissemination of an agency's limited budget." (quotation omitted)).

MBDA's grant programs at issue here fall under that rubric. To start, MBDA is funded at present by a lump-sum appropriation. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, tit. I, § 1101(a)(2), (8), 139 Stat. 9, 10-11; *see* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. C, tit. I, 138 Stat. 25, 123 (appropriating "[f]or necessary expenses of the Minority Business Development Agency in fostering, promoting, and developing minority business enterprises, as authorized by law, $68,250,000").

34

And the specific grant programs plaintiffs cite vest MBDA's leadership with discretion to determine the appropriate number and size of grants awarded thereunder, to the extent they obligate the agencies to make grants at all.[5]  15 U.S.C. §§ 9523-9524 (requiring the establishment of an "MBDA Business Center Program" that "offers" particular "services" "in all regions of the United States," and further requiring MBDA to provide minimum funding to any Business Center established, but declining to specify a minimum number of centers, to define "regions of the United States," or to mandate particular grant recipients); *id.* § 9552 (providing that the Under Secretary "may establish MBDA Rural Business Centers" and requiring unspecified amounts of funding to be provided to those centers); *id.* § 9511 (authorizing the Under Secretary to make grants "whenever the Under Secretary determines such action is necessary or appropriate"); *id.* § 9543(b)(2) (requiring MBDA to "award grants to eligible institutions," but providing no further criteria to govern the number or size of such grants); 12 U.S.C. § 5708(e)(2) (transferring funds to MBDA "so that the Agency may use such amounts *in a manner the Agency determines appropriate*" (emphasis added)).

---

[5] Before the passage of the Minority Business Development Act, which established MBDA by statute, the Department of Commerce issued a number of grants—some of which plaintiffs invoke in this litigation, *e.g.*, A417-22, ¶¶ 834, 838, 843, 855—pursuant to an Executive Order and a lump-sum congressional appropriation.  *See Prescribing Additional Arrangements for Developing and Coordinating a National Program for Minority Business Enterprise*, Exec. Order No. 11,625, 36 Fed. Reg. 19,967 (Oct. 14, 1971); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 1237.

This Court is not bound by its recent decision in *New York*, 2026 WL 734941, to conclude that MBDA's grantmaking decisions are not discretionary.  First, *New York* was an appeal from a preliminary injunction, and thus its analysis should "be understood as [a] statement[] of [a] probable outcome[]," not a definitive ruling on the merits.  *A.M. Capen's Co.*, 74 F.3d at 322.  Second, *New York* is distinguishable on its facts.  Here, unlike in *New York*, the government has detailed the relevant statutes affording discretion, *see supra* pp. 34-35, not merely offered a sample of statutes implicated by a widespread alleged "funding freeze" across many agencies.  *See New York*, 2026 WL 734941, at *10.  Moreover, even if the Court considers itself bound by *New York*'s preliminary-injunction-stage reasoning that "*Lincoln* did not address an agency's discretion to withhold obligated funds," *id.*—a conclusion with which the government respectfully disagrees, *see Lincoln*, 508 U.S. at 193-94—that statement does not foreclose the government's arguments here that an agency has such discretion, including because these statutes are "drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Union of Concerned Scientists*, 954 F.3d at 17 (quotation omitted).

**c.**  The appropriate size of the workforce at each agency is also a matter committed to the discretion of agency leadership under the relevant statutes.  As a result, the district court erred in granting relief that requires the reinstatement of all agency employees placed on leave or terminated per the Executive Order.

36

First, deciding the number of employees necessary to exercise statutory functions fits neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191 (quoting 5 U.S.C. § 701(a)(2)). Those decisions implicate efforts to determine whether ongoing agency actions "best fit[] the agency's overall policies" and "whether agency resources are best spent on" current projects or would be better spent differently. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985); *see also Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 545 (1978) (explaining that courts lack the power to "dictat[e] to the agency the methods [and] procedures" the agency must use to complete its statutory obligations (quotation omitted)). "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Heckler*, 470 U.S. at 831-32.

Second, insofar as each agency's organic statute refers to personnel, it exudes deference to agency leadership to determine appropriate staffing needs. *See* 29 U.S.C. § 172(b) ("The [FMCS] Director is authorized … to appoint such clerical and other personnel as may be necessary for the execution of the functions of the Service … and may … appoint such conciliators and mediators as may be necessary to carry out the functions of the Service."); 15 U.S.C. § 9502(e)(1) ("In addition to the regional offices that the [MBD] Under Secretary is required to establish under paragraph (2), the Under Secretary shall establish such other offices within the Agency as are necessary to carry out this chapter."); 42 U.S.C. § 11314(b) ("With the approval of the

37

[USICH] Council, the Executive Director of [USICH] may appoint and fix the compensation of such additional personnel as the Executive Director considers necessary to carry out the duties of the Council."). And plaintiffs can point to no statute limiting the agencies' inherent and statutory discretion to make staffing decisions. Accordingly, the agencies' discretion to decide how to carry out those statutory directives—including how many or what particular personnel it needs to do so—is unreviewable, and the district court lacked authority to order relief usurping the agencies' role in this regard.

**d.** The district court did not directly address the government's arguments that funding and personnel decisions are traditionally committed to agency discretion, instead reasoning that the statutes at issue in this case are materially distinct from those implicated in *Lincoln*. A26-28. But the distinctions the district court drew are illusory. It is beside the point that "Congress specifically authorized the creation of all four agencies" here, A26, for the same was true in *Lincoln*. Furthermore, the fact that Congress had not specifically authorized the program at issue in *Lincoln* but has authorized particular grantmaking programs here does not make a difference to the ultimate question, which is whether the relevant statutes establish "meaningful standard[s] against which to judge the agenc[ies'] exercise of discretion," *Union of Concerned Scientists*, 954 F.3d at 17 (quotation omitted). *Cf.* A27-28. The grantmaking and personnel-hiring statutes here do not. Instead, they empower the agencies themselves to decide which grants to issue and how many personnel are necessary to

38

exercise each agency's statutory functions.  Similarly, the district court's rationale that here, unlike in *Lincoln*, "Congress has provided explicit direction as to how each agency is to be staffed and operated," A28, is incorrect.  The statutes cited merely obligate the agencies to carry out particular tasks; they do not govern *how* the agencies do so.  *See Lincoln*, 508 U.S. at 194 ("[B]oth the Snyder Act and the Improvement Act likewise speak about Indian health only in general terms.").

The district court's summary-judgment order applies across a wide range of grantmaking and personnel decisions at the defendant agencies without accounting for any differences among applicable statutes, regulations, or agreements.  It thus subverts the agencies' ability to consider the optimal distribution of funding and workforce size to achieve statutory goals "in what [the agencies] see[] as the most effective or desirable way." *Lincoln*, 508 U.S. at 192.  The APA does not allow for judicial review of those discretionary judgments that implicate agency expertise about allocating limited resources and advancing policy priorities.  *See id.* at 193 (noting that funding decisions involve "a complicated balancing of a number of factors" (quotation omitted)).

**B. Plaintiffs lack a cause of action under the Constitution.**

As an alternative to the APA, the district court held that in implementing the "Closure Decisions," defendants violated the separation of powers and Take Care Clause.  A36-40.  That holding is squarely foreclosed by *Dalton v. Specter*, 511 U.S. 462 (1994).

*Dalton* teaches that not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." 511 U.S. at 472. Rather, the Supreme Court has "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The Constitution is implicated, for example, if executive officers rely on it as an independent source of authority to act, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), or if the officers rely on a statute that itself violates the Constitution. *See Dalton*, 511 U.S. at 473 & n.5. But claims alleging simply that an official has "exceeded his statutory authority are not 'constitutional' claims" that can be asserted through a direct cause of action. *Id.* at 473.

Here, plaintiffs' asserted constitutional claims are really "statutory one[s]," *Dalton*, 511 U.S. at 474, as they rest entirely on the claim that the agencies have exceeded their statutory authority. *E.g.*, A191, ¶ 225 ("[W]here the Executive Branch overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine."); A192, ¶ 231 ("The Executive violates the Take Care Clause where it overrides statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes."). Other than plaintiffs' attachment of a constitutional label to the statutory violations they allege, there is no constitutional ingredient in this case: the agencies have not claimed constitutional power to carry out "Closure Decisions," nor does an allegedly unconstitutional statute authorize

40

them to do so.  Accordingly, under *Dalton*, plaintiffs lack a constitutional cause of action.  *See Sustainability Inst.*, 165 F.4th at 831 ("Plaintiffs' constitutional claims assert that because executive officials and agencies violated statutes, they also violated the Constitution. … The claims are therefore 'statutory one[s].'" (second alteration in original) (citations omitted)).

In holding otherwise, the district court misapplied *Dalton*, reading that decision to make a constitutional distinction between Executive actions taken "in the 'absence of any statutory authority,'" as in *Youngstown*, and "in excess of such authority."  A39 (emphases omitted) (quoting *Dalton*, 511 U.S. at 473).  But that is not the line the Supreme Court drew.[6]  Rather, the Supreme Court cited *Youngstown* for the proposition that a constitutional claim may arise where there is a "*conceded* absence of any statutory authority" and instead an assertion by the Executive of constitutional power.  *Dalton*, 511 U.S. at 473 (emphasis added) (emphasis omitted); *see id.* ("The only basis of authority asserted was the President's inherent constitutional power as the Executive and the Commander in Chief of the Armed Forces.").  That distinction makes sense, for the line between an action taken "in the absence of" statutory authority and one taken "in excess of" such authority is entirely unworkable, as *Dalton*

---

[6] Even if the district court were correct to distinguish between actions taken in the absence of any statutory authority and actions taken in excess of that authority, it is "demonstrably incorrect" to say that this case fits in the former category, because "Congress gave the Executive authority to issue grants under the various statutes at issue here." *Sustainability Inst.*, 165 F.4th at 832.

itself recognizes. *Id.* at 474 ("As this case demonstrates, if every claim alleging that the President exceeded his statutory authority were considered a constitutional claim, the exception identified in *Franklin* would be broadened beyond recognition."). Here, again, the Executive Branch has claimed no constitutional authority to take the actions plaintiffs allege. *See Global Health Council v. Trump*, 153 F.4th 1, 15 (D.C. Cir. 2025) (finding *Youngstown* "inapposite" where, as here, "the government disclaim[ed] any constitutional defense, although it maintain[ed] that the defendants committed no statutory violations"). That means plaintiffs' claims are statutory, not constitutional.

## III. The Relief Awarded Is Overbroad.

For the reasons given above, the district court should not have granted summary judgment to plaintiffs. When it did, however, it compounded its error by awarding relief that is fatally overbroad in two respects: that relief is not tailored to demonstrated injury or legal inadequacy, and it independently exceeds the district court's remedial authority with respect to personnel matters.

### A. The relief awarded is not tailored to any injuries proven by plaintiffs.

In tailoring injunctive relief, a district court must hew to two fundamental principles of equity. First, "injunctions must be tailored to the specific harm to be prevented," *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 487 (1st Cir. 2009) (alteration omitted) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 14 (1st Cir. 2000))—that is, "to redress the plaintiff's particular injury," *Gill v. Whitford*,

585 U.S. 48, 73 (2018) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006)). Because a plaintiff in equity must show not only harm, but irreparable harm, *see eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (citations omitted), it follows that an injunction should be crafted specifically to address the plaintiffs' substantiated claims of actual or imminent irreparable injury. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."). The Supreme Court reaffirmed this principle just last Term when it held that federal courts generally lack the authority to issue "universal" injunctions, *i.e.* those that are crafted to afford relief to non-parties. *Trump v. CASA, Inc.*, 606 U.S. 831, 839, 851 (2025). Second, the district court must limit its remedy "to the [legal] inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *see Milliken v. Bradley*, 433 U.S. 267, 280 (1977) ("[T]he nature of the … remedy is to be determined by the nature and scope of the constitutional violation. The remedy must therefore be related to 'the condition alleged to offend the Constitution… .'" (second alteration in original) (emphasis omitted) (citation omitted)).

The APA's grant of authority to "hold unlawful and set aside" agency action incorporates the foregoing principles. Congress enacted the APA against the background rule that statutory remedies should be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Courts "do not lightly assume that Congress has intended to depart from established

43

principles" of equity, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982), and ordinarily courts expect that Congress will make "an unequivocal statement of its purpose" if it intends to make "a drastic departure from the traditions of equity practice," *Hecht Co.*, 321 U.S. at 329. The "set aside" language of § 706(2), which neither refers to vacatur nor specifies as to whom the agency action should be set aside, does not meet this standard. In fact, elsewhere the APA makes clear that it does not upset traditional equitable principles, providing that its authorization of judicial review does not affect "the power or duty of the court to … deny relief on any … equitable ground." 5 U.S.C. § 702(1).

The district court's vacatur and permanent injunction go far beyond redressing any particular injuries shown by these plaintiffs. As an initial matter, it is impossible to identify definitively which injuries the district court understood itself to be remedying—because rather than proceed plaintiff by plaintiff and injury by injury, the district court purported instead to give illustrative examples and identified harms categorically. A44-45 (listing harms to 13 of the 21 plaintiff States "for instance"); A44 (relying on preliminary injunction-stage analysis of harm); A117 (reciting a laundry list of illustrative examples and stating "[t]hese are just a few key examples of how the implementation of [Executive Order 14,238] at IMLS, MBDA, and FMCS has" caused harm.). Rather than proceeding in a blunderbuss fashion, the district court was instead obligated to examine the particulars. *Cf. Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024) (vacating appellate decisions where the courts and the parties

44

had not adequately "address[ed] the full range of activities the [challenged] laws cover" to determine whether a preliminary injunction was warranted on a facial challenge).  By extension, this Court cannot determine which of the harms the district court credited are irreparable for purposes of an injunction, as opposed to compensable via other means.

What is more, the district court's preliminary-injunction-stage analysis of harms, on which the court relied at summary judgment, A44, appears to have explicitly included injuries not suffered by the plaintiffs themselves.  For example, the court cited the declaration of a representative of a nursing union, who stated the termination of FMCS' mediation programs would imperil its relationship with Brown University Health.  A117 (citing Dkt. 44-2, ¶¶ 8-10).  Neither the union nor Brown University appears to be part of the State of Rhode Island in any way.  Nor does a State like Rhode Island have standing to assert the interests of its citizens in a suit against the federal government.  *See Haaland v. Brackeen*, 599 U.S. 255, 294-95 (2023).  So it is not apparent why any harm to either the union's or the university's interests matters in this suit—and yet, the district court credited their alleged harms in fashioning its relief.

The district court took a similarly broad-brush approach to its analysis of harm in the grant-termination context, where it failed to differentiate by type of grantee, status of grant funding, and irreparability of harm.  Plaintiffs offered evidence related to various grantees—some States themselves, *e.g.*, Dkt. 3-35, at 10, others seemingly

45

state instrumentalities, *e.g.*, Dkt. 35-6, at 3-4 (New Jersey State Library).  Without analyzing whether the purported instrumentalities had or would in fact suffer harm attributable to the State itself, *see Biden v. Nebraska*, 600 U.S. 477, 490-94 (2023) (conducting a fact-intensive inquiry to answer such a question), the district court merely recited the States' declarations and counted the alleged harms against the government.  A104-07.  Similarly, the district court improperly lumped allegations of actual, already-suffered harm in with speculation about harm that might come in the future, analyzing the entire body of evidence as one undifferentiated mass.  A108-09 (grants alleged to be terminated already); A109 (expressing doubt that IMLS and MBDA retain sufficient staff to manage their grant portfolios).  This, too, was error. *See Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) ("A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.").

Whatever the universe of actual, irreparable harm shown by plaintiffs might be, the relief awarded far exceeds that harm as a facial matter.  The vacatur makes permanent the preliminary injunction's unwinding of *all* steps taken to implement Executive Order 14,238 before this lawsuit was filed, A511-13; A43—whether those steps had any effect on plaintiffs or not.  In doing so, the district court lumped together various agency decisions to terminate grants and personnel under the mantle of vacating a single "Closure Decision," even though many of those decisions likely did not affect plaintiffs at all.  The permanent injunction, in turn, goes even further,

46

prohibiting "any future actions to implement, give effect to, comply with, or carry out the directives contained in [Executive Order 14,238] with respect to IMLS, MBDA, FMCS, and USICH," without party-specific limitation whatsoever. A47. The result plainly contradicts *CASA*, which rejects universal injunctions granted under the Judiciary Act of 1789 and the traditional equitable limitations applicable to vacatur under the APA.

The district court independently erred in entering a permanent injunction that prohibits the government from giving effect to a facially lawful Executive Order. *Cf. AFGE*, 145 S. Ct. at 2635 (Sotomayor, J., concurring in the grant of stay). For the reasons given above, *supra* pp. 25-32, each agency's purported "policy" of implementing the Executive Order is not reviewable agency action. But even if it were, and even if the district court properly concluded that the four "policies" under review were unlawful or arbitrary, that conclusion would not justify prohibiting the agencies from *ever* taking any steps, ordered by the head of the Executive Branch, to streamline their operations "consistent with applicable law." Exec. Order No. 14,238, § 2(a), 90 Fed. Reg. at 13,043. *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 173 (1st Cir. 2015) (upholding portions of preliminary injunction where the plaintiff was likely to succeed but vacating portions where the plaintiff was not likely to succeed); *see City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011) (citing *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 504 (7th Cir. 2008) ("An injunction is overbroad when it seeks to restrain the defendants from

47

engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation."); *Mallet & Co. v. Lacayo*, 16 F.4th 364, 389 (3d Cir. 2021); *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 364 (6th Cir. 2022).  Both the vacatur and the permanent injunction, then, should be reversed.

### B. The district court independently lacked authority to order reinstatement.

The portion of the district court's vacatur requiring reinstatement of personnel at the four agencies was independently erroneous because reinstatement is not an available remedy under the APA.  The APA authorizes a court to grant injunctive relief subject to traditional equitable limitations.  *See* 5 U.S.C. § 702(1).  Absent express statutory authority, a federal court may grant only those equitable remedies that were "traditionally accorded by courts of equity."  *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).  Reinstatement, in turn, is not a remedy that was traditionally available at equity.[7]  *See Sampson v. Murray*, 415 U.S. 61, 83 (1974).  To the contrary, courts of equity lacked "the power … to restrain by

---

[7] This Court has stated that "reinstatement" of a wrongfully terminated public employee "is a remedy which lies within the discretion of the trial court."  *Rosario-Torres v. Hernandez-Colon*, 889 F.2d 314, 321 (1st Cir. 1989) (en banc).  Neither party in *Rosario-Torres* appears to have contested the absolute availability of reinstatement, however—as opposed to its propriety in that case, *id.* at 320 (describing the parties' positions)—and so the Court's statement was not "essential to the result reached in the case," *Arcam Pharm. Corp. v. Faria*, 513 F.3d 1, 3 (1st Cir. 2007) (distinguishing holdings from dicta).  But to the extent the Court finds a conflict between this argument and *Rosario-Torres*, the government respectfully preserves its argument for further review.

injunction the removal of a [public] officer." *In re Sawyer*, 124 U.S. 200, 212 (1888); *see, e.g.*, *Baker v. Carr*, 369 U.S. 186, 231 (1962) (decisions that "held that federal equity power could not be exercised to enjoin a state proceeding to remove a public officer" or that "withheld federal equity from staying removal of a federal officer" reflect "a traditional limit upon equity jurisdiction"); *Walton v. House of Representatives*, 265 U.S. 487, 490 (1924) ("A court of equity has no jurisdiction over the appointment and removal of public officers… ." (citations omitted)); *Harkrader v. Wadley*, 172 U.S. 148, 165 (1898); *White v. Berry*, 171 U.S. 366, 377 (1898).

The creation of new remedies is "a legislative endeavor," *Egbert v. Boule*, 596 U.S. 482, 491 (2022), and courts of equity lack "the power to create remedies previously unknown to equity jurisprudence," *Grupo Mexicano*, 527 U.S. at 332. Accordingly, where Congress departs from tradition, it does so expressly. In the CSRA, for example, Congress authorized the MSPB to award "reinstatement," as well as "backpay" to prevailing employees. *Elgin*, 567 U.S. at 6. But of course plaintiffs here seek to avoid the CSRA's comprehensive scheme, and they identify no other statutory basis for ordering employee reinstatement in APA litigation.

50

## CONCLUSION

For the foregoing reasons, the judgment below should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

CHARLES C. CALENDA
*United States Attorney*

MELISSA N. PATTERSON

*s/ Simon G. Jerome*

SIMON G. JEROME
*Attorneys, Appellate Staff*
*Civil Division, Room 7209*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1673*
*simon.g.jerome@usdoj.gov*

April 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,507 words, according to the count of Microsoft Word. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Simon G. Jerome*
Simon G. Jerome

# CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.


*s/ Simon G. Jerome*
Simon G. Jerome

**ADDENDUM**

# TABLE OF CONTENTS

Memorandum and Order on Cross-Motions for Summary Judgment (Dkt. 99) ........ A1

Judgment (Dkt. 100) ................................................................................................. A48

*Continuing the Reduction of the Federal Bureaucracy*,
    Exec. Order 14,238, 90 Fed. Reg. 13,043 (Mar. 20, 2025) ................................ A49

12 U.S.C. § 5708 ..................................................................................................... A51

15 U.S.C. § 9502 ..................................................................................................... A53

15 U.S.C. § 9511 ..................................................................................................... A56

15 U.S.C. § 9523 ..................................................................................................... A57

15 U.S.C. § 9524 ..................................................................................................... A58

15 U.S.C. § 9543 ..................................................................................................... A64

15 U.S.C. § 9552 ..................................................................................................... A66

29 U.S.C. § 172 ....................................................................................................... A70

42 U.S.C. § 11314 ................................................................................................... A72

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| STATE OF RHODE ISLAND; STATE OF NEW YORK; STATE OF HAWAI'I; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) | C.A. No. 1:25-cv-128-JJM-AEM |
| v. | ) ) |  |
| DONALD J. TRUMP, in his official capacity as President of the United States; INSTITUTE OF MUSEUM AND LIBRARY SERVICES; KEITH E. SONDERLING, in his official capacity as Acting Director of the Institute of Museum and Library Services; MINORITY BUSINESS AND DEVELOPMENT AGENCY; MADIHA D. LATIF, in her official capacity as Deputy Under Secretary of Commerce for Minority Business Development; HOWARD LUTNICK, in his official capacity as Secretary of Commerce; FEDERAL MEDIATION AND CONCILIATION SERVICE; GREGORY GOLDSTEIN, in his official capacity as Acting Director of the | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |

A1

Federal Mediation and Conciliation )
Service; U.S. OFFICE OF )
MANAGEMENT AND BUDGET; )
RUSSELL T. VOUGHT, in his official )
capacity as Director of the Office of )
Management and Budget; U.S. )
INTERAGENCY COUNCIL ON )
HOMELESSNESS; KENNETH )
JACKSON, in his official capacity as )
Acting Executive Director of the U.S. )
Interagency Council on Homelessness, )
)
      Defendants. )
)

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

    This case concerns the Trump administration's efforts to dismantle federal agencies that are responsible for, among other things, funding museums and libraries, mediating labor disputes, supporting minority-owned businesses, and preventing and ending homelessness in the United States. By now, the question presented in this case is a familiar one: may the Executive Branch undertake such actions in circumvention of the will of the Legislative Branch? In recent months, this Court—along with other courts across the country—has concluded that it may not. That answer remains the same here.

    Plaintiffs are twenty-one states (the "States") that challenge the legality of Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy" ("*Reduction* EO"). The *Reduction* EO had the effect of dismantling the Institute of Museum and Library Services ("IMLS"), the Minority Business Development Agency

2

A2

("MBDA"), the Federal Mediation and Conciliation Service ("FMCS"), and the U.S. Interagency Council on Homelessness ("USICH") by withholding already-appropriated federal funding from these agencies, terminating numerous grants and programs that these agencies administer, and placing many of the agencies' employees on administrative leave.

This Court previously issued a preliminary injunction, barring the Trump administration from implementing the *Reduction* EO. *Rhode Island v. Trump*, 781 F. Supp. 3d 25, 56 (D.R.I. 2025). The First Circuit denied Defendants' request for a stay pending appeal of the preliminary injunction, concluding that Defendants had failed to make a strong showing that they were likely to succeed on the merits of their appeal. *Rhode Island v. Trump*, 155 F.4th 35, 50 (1st Cir. 2025).

Now pending before the Court is the States' and Defendants' cross-motions for summary judgment (ECF Nos. 75, 84). The States argue that the implementation of the *Reduction* EO violates the Administrative Procedure Act ("APA"), the Separation of Powers doctrine, and the Take Clare Clause of the United States Constitution. Defendants counter on both jurisdictional and merits grounds. Also before the Court are the Defendants' Motion for Partial Reconsideration of the Court's earlier order staying the *Reduction* EO as to the U.S. Interagency Council on Homelessness

("USICH") (ECF No. 86),[1] and the States' Motion to Enforce the Court's previously issued preliminary injunction (ECF No. 88).[2]

For the following reasons, the Court GRANTS the States' Motion for Summary Judgment and DENIES Defendants' Cross-Motion for Summary Judgment.

## I.   BACKGROUND

### A.   Factual Background

The relevant agencies in this suit are IMLS, MBDA, FMCS, and USICH. "IMLS supports museums and libraries across the United States by disbursing federal funds and providing technical assistance." *Rhode Island*, 155 F.4th at 39

---

[1] Because the Court has ultimately determined that USICH's implementation of the *Reduction* EO violated both its statutory and constitutional authority, the Court DENIES Defendants' Motion for Partial Reconsideration (ECF No. 86).

[2] The States contend that Defendants violated this Court's earlier order that required MBDA to restore all the employees who were terminated as a result of the *Reduction* EO. *See* ECF No. 88 at 2-3 (citing ECF No. 60 at 3). It allegedly did so when, on October 10, 2025, the U.S. Department of Commerce sent out a Reduction-In-Force ("RIF") notice, informing twenty-four MBDA employees that their positions were being "eliminated" due to a "lack of funding" and because their functions "are not consistent with the Secretary's priorities." ECF No. 88 at 1.

In a subsequent notice, Defendants told the Court that the latest appropriations bill signed into law on November 12, 2025, nullified any RIFs that had gone into effect during the government shutdown. ECF No. 98 at 1 (citing H.R. 5371, 119th Cong. (2025)). As such, the Department of Commerce rescinded the RIFs it had issued to MBDA employees. *Id.*

The Court will remind Defendants that it is never acceptable to violate a court order, and that such violations may in some circumstances warrant further Court action. *See* 18 U.S.C. § 401. However, in light of the rescission of the RIFs, the issue presented in the States' Motion to Enforce is now moot. *See Cruz v. Farquharson*, 252 F.3d 530, 533 (1st Cir. 2001) ("When a case is moot—that is, when the issues presented are no longer live or when the parties lack a legally cognizable interest in the outcome—a case or controversy ceases to exist, and dismissal of the action is compulsory."). As such, the Court DENIES as moot the Motion to Enforce (ECF No. 88).

(citing 20 U.S.C. §§ 9121-9165, 9171-9176). "MBDA provides various forms of assistance to support the growth of 'minority-owned businesses' in the United States." *Id.* (citing 15 U.S.C. §§ 9511-9526). "FMCS is tasked with using conciliation and mediation to assist in the resolution of labor disputes in industries affecting commerce." *Id.* (citing 29 U.S.C. § 173(a)). USICH partners with states, local governments, and public and private nonprofit organizations to implement the federal strategic plan aimed at preventing and ending homelessness. *See* 42 U.S.C. § 11313(a). All four agencies were established by Congress and continue to receive annual congressional appropriations. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101(a)(2), (8), (12), 139 Stat. 9, 10-12 (2025).

On March 14, 2025, President Trump issued the *Reduction* EO, which directed seven federal agencies—including IMLS, MBDA, FMCS, and USICH[3]—to: (1) eliminate their "non-statutory components and functions ... to the maximum extent consistent with applicable law," and (2) "reduce the performance of their statutory function and associated personnel to the minimum presence and function required by law." Exec. Order No. 14238 § 2(a), 90 Fed. Reg. 13043 (Mar. 14, 2025). The *Reduction* EO instructed the head of each of these agencies to submit "[w]ithin 7 days … a report to the Director of the Office of Management and Budget confirming full

---

[3] The other three agencies, which are not subject to this lawsuit, are the Community Development Financial Institutions Fund ("CDFI Fund"), the United States Agency for Global Media ("USAGM"), and the Woodrow Wilson International Center for Scholars ("Wilson Center"). ECF No. 75 at 4 n.1.

compliance with this order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent." *Id.* § 2(b). The *Reduction* EO also outlines that, upon review of budget requests these agencies submit, the OMB Director "shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests … to the extent they are inconsistent with this order." *Id.* § 2(c).

Following issuance of the *Reduction* EO, leaders at IMLS, MBDA, FMCS, and USICH took several actions in furtherance of the EO's mandates. First, they fired, placed on administrative leave, or reassigned all or almost all employees in the four agencies. ECF No. 75 at 8, 12-13, 16, 19-20. Second, they cancelled a broad array of grants to the agencies. *Id.* at 9, 13. Third, they cancelled several public programs and services that the agencies administered and caused the agencies to default on contracts with outside service providers. *Id.* at 9, 12, 15, 20. Fourth and finally, they left the agencies unable to carry out their statutorily mandated functions and unable to spend their congressionally appropriated funds. *Id.* at 9, 13, 15, 19-20.

### B.     Procedural Background

On April 4, 2025, the States filed this action and moved for a temporary restraining order to enjoin Defendants' implementation of the *Reduction* EO as to IMLS, MBDA, and FMCS. ECF No. 1. The parties later stipulated that the motion be converted into a motion for a preliminary injunction, which the Court accepted. *See* ECF No. 31; *see also* Text Order (Apr. 10, 2025) (entering the parties' stipulation).

6
A6

On May 6, 2025, this Court granted the States' motion, and it issued its preliminary injunction on May 13, 2025. ECF Nos. 57, 60; *see also Rhode Island*, 781 F. Supp. 3d at 56. The Court held that Defendants' actions were likely arbitrary and capricious, contrary to law, and unconstitutional. *Rhode Island*, 781 F. Supp. 3d at 47, 48-49, 52.

Defendants timely appealed the preliminary injunction order to the First Circuit and sought a stay pending appeal. ECF No. 84 at 5. They also sought such a stay from this Court, *see* ECF No. 63, but that motion was denied, *see* ECF No. 67; *see also Rhode Island v. Trump*, No. 25-cv-128-JJM-LDA, 2025 WL 1594366 (D.R.I. June 5, 2025).

Meanwhile, the States submitted an amended complaint in which they added USICH as a defendant and alleged harms also caused by that agency because of the *Reduction* EO's implementation. ECF No. 68. The States subsequently moved for summary judgment. ECF No. 75. Defendants cross-moved for summary judgment. ECF No. 84.

On September 11, 2025, the First Circuit denied Defendants' motion for a stay pending appeal. *Rhode Island*, 155 F.4th at 50. The court concluded that Defendants failed to: (1) make a strong showing that they were likely to succeed on the merits of their appeal; (2) show that the States would not be likely to suffer substantial injury were the stay to be issued; or (3) show that the issuance of a stay was in the public interest. *Id.* Defendants' appeal of the preliminary injunction remains pending.

A few more developments have occurred since the First Circuit's ruling. First, this Court issued a text order in which it stayed the implementation of the *Reduction EO* as it pertained to USICH. *See* Text Order (Sept. 12, 2025). Second, Defendants filed a motion for partial reconsideration of the Court's issuance of the stay as to USICH. ECF No. 86. Third and finally, the States' moved to enforce the Court's preliminary injunction order, arguing that Defendants were attempting to dismantle the MBDA in direct contravention of the order. ECF No. 88 at 1.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). "A genuine dispute is one which 'a reasonable jury could resolve … in the favor of the non-moving party,' and a material issue is one with the 'potential to affect the outcome … under the applicable law.'" *Kinzer v. Whole Foods Mkt., Inc.*, 99 F.4th 105, 108 (1st Cir. 2024) (alterations in original) (quoting *Cherkaoui v. City of Quincy*, 877 F.3d 14, 23-24 (1st Cir. 2017)). In determining whether to grant summary judgment, a court must construe "the facts in the light most favorable to the non-moving party" and "draw[ ] all reasonable inferences" in its favor. *Id.* (quoting *Harley-Davidson Credit Corp. v. Galvin*, 807 F.3d 407, 408 (1st Cir. 2015)). "Where the parties cross-move for summary judgment, the court must examine each motion separately, drawing inferences against each movant in turn." *Vazquez-Velazquez v. P.R. Highways & Transp. Auth.*, 73 F.4th 44, 51 (1st Cir. 2023) (cleaned up).

"[T]he summary judgment rubric has a 'special twist in the administrative law context.'" *Boston Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (quoting *Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)). In this specific context, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." *Id.* The court makes that determination by "review[ing] the whole record or those parts of it cited by a party." 5 U.S.C. § 706.

## III.  DISCUSSION

### A.  The Court Has Jurisdiction Over the States' Claims

Defendants first challenge the Court's subject-matter jurisdiction over this case. ECF No. 84 at 6. They argue that the States make two types of claims that should have been bifurcated and brought before two distinct adjudicatory bodies, and not this Court. First, Defendants assert that the Tucker Act, 28 U.S.C. § 1491(a), bars judicial review over the States' "grant termination claims" and that those claims belong in the Court of Federal Claims.[4]  *Id.* at 6. Second, Defendants contend that this Court is precluded from reviewing the States' "employee removal claims" because the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 (1978), provides the Office of Special Counsel, the Merit Systems Protection Board

---

[4] Defendants acknowledge that this jurisdictional argument only applies to the States' claims against IMLS and MBDA because FMCS and ICH do not administer grants. ECF No. 84 at 6 n.2.

("MSPB"), and the Federal Labor Relations Authority ("FLRA") with the exclusive authority to review such claims. *Id.* at 11-12. Defendants also argue that the States lack Article III standing to bring their claims. *Id.* at 15. All three arguments are addressed in turn.

### 1.    The Tucker Act

In certain circumstances, the APA waives sovereign immunity for suits against the federal government. *See* 5 U.S.C. § 702. However, this "limited waiver of [sovereign] immunity does not extend to orders 'to enforce a contractual obligation to pay money….'" *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam) (quoting *Great-West Life & Annuity Ins. v. Knudson*, 534 U.S. 204, 212 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

Defendants argue that, at least with regard to IMLS and MBDA, the States are essentially bringing contract claims because they challenge those agencies' grant termination decisions. ECF No. 84 at 6-8. It is an argument that the Government has raised repeatedly in recent months in response to various challenges against executive agency actions. *See, e.g., President & Fellows of Harvard Coll. v. U.S. Dep't of Health and Human Servs.*, Nos. 25-cv-11048-ADB, 25-cv-10910-ADB, --- F. Supp. 3d ----, 2025 WL 2528380, at *11-13 (D. Mass. Sept. 3, 2025); *R.I. Coal. Against Domestic Violence v. Bondi*, No. 25-279 WES, --- F. Supp. 3d ----, 2025 WL 2271867,

at *5 n.7 (D.R.I. Aug. 8, 2025) (collecting cases).  Like many of those courts before it, this Court can easily dispense with this argument.

First, the States' APA claims aside, the Tucker Act does not prohibit this Court from reviewing the States' claim that Defendants acted unconstitutionally.  *See California v. U.S. Dep't of Transp.*, No. 25-cv-208-JJM-PAS, --- F. Supp. 3d ----, 2025 WL 3072541, at *5 (D.R.I. Nov. 4, 2025) (citing *Dugan v. Rank*, 372 U.S. 609, 621-22 (1963); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015); *Am. Policyholders Ins. Co. v. Nyacol Prods., Inc.*, 989 F.2d 1256, 1265 (1st Cir. 1993)). Whether Defendants violated the Separation of Powers doctrine and the Take Care Clause in their implementation of the *Reduction* EO is a classic constitutional question that district courts are tasked with analyzing and one that "the Court of Federal Claims . . . cannot fully adjudicate...." *President & Fellows of Harvard Coll.*, 2025 WL 2528380, at *14 (holding that Plaintiffs' First Amendment claim belonged in district court and not Court of Federal Claims because case involved "a bedrock constitutional principle rather than the interpretation of contract terms").

Second, to the extent that the APA is implicated, Defendants' Tucker Act argument fails because the States' challenge is not, at its essence, a contract claim. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982) ("[A]n action against the United States which is at its essence a contract claim lies within the Tucker Act and … a district court has no power to grant injunctive relief in such a case.").  As the Supreme Court recently explained, there is a difference—for Tucker Act purposes— between challenges to the cancellation of grants and challenges to agency policies

11

undertaken in response to executive orders. *Nat'l Insts. of Health v. Am. Pub. Health Ass'n* ("*APHA*"), 606 U.S. ----, 145 S. Ct. 2658, 2660-61 (2025) (Barrett, J., concurring). Whereas the former is a type of contract claim that must be heard in the Court of Federal Claims,[5] the latter is not and is therefore properly brought before a district court under the APA.[6] *Id.* at 2661 (Barrett, J., concurring).

Important to note is that not every case with "some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act." *Megapulse*, 672 F.2d at 967-68. This principle was recently reaffirmed by Justice Barrett: "[t]hat the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded … upon' contract that only the CFC can hear." *APHA*, 145 S. Ct. at 2661 (Barrett, J., concurring) (quoting 28 U.S.C. § 1491(a)(1)). So too by the First Circuit in *New York*

---

[5] Five Supreme Court justices have held that grant termination claims must be brought in the Court of Federal Claims. *See APHA*, 145 S. Ct. at 2659 (per curiam) (noting that Justices Thomas, Alito, Gorsuch, and Kavanaugh would have granted the Government's stay application in full, which included the determination that the district court lacked jurisdiction over plaintiffs' claims challenging NIH's grant terminations); *id.* at 2661 (Barrett, J., concurring) ("[T]he District Court likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims (CFC).").

[6] Five Supreme Court justices have held that claims challenging agency policies implemented in connection with executive orders fall within the scope of the district court's jurisdiction under the APA. *See APHA*, 145 S. Ct. at 2660-61 (Barrett, J., concurring) (noting that "the District Court was likely correct to conclude that it had jurisdiction to entertain an APA challenge to the guidance" issued by NIH in response to "changed policy priorities mandated by a series of executive orders"); *id.* at 2662-63 (Roberts, C.J., concurring in part) (noting that Chief Justice Roberts and Justices Sotomayor, Kagan, and Jackson would have denied the Government's stay application in full, which included the determination that the district court had jurisdiction over plaintiffs' challenge to NIH's directives implemented because of executive orders).

12

A12

*v. Kennedy*, 155 F.4th 67, 75 n.4 (1st Cir. 2025) (rejecting the Government's argument that "all grant-related suits must be heard by the Court of Federal Claims under the Tucker Act"), and by a district court within this circuit in *Association of American Universities v. Department of Defense*, No. 25-11740-BEM, --- F. Supp. 3d ----, 2025 WL 2899765, at *6 (D. Mass. Oct. 10, 2025) ("To argue that the background existence of Plaintiffs' grant agreements defines Plaintiffs' regulatory and statutory claims is to let the tail wag the dog.").

*New York v. Kennedy* is particularly on point here. That case concerned actions taken by the U.S. Department of Health and Human Services ("HHS") to implement an executive order by eliminating over a dozen sub-agencies and placing 10,000 full-time employees on administrative leave (i.e., reductions-in-force, or "RIFs"). *New York v. Kennedy*, 789 F. Supp. 3d 174, 189 (D.R.I. 2025). The plaintiff States sued to enjoin these HHS actions and, while they "produced evidence about the failure to process one grant to support their claims that the sub-agencies were no longer functioning," the First Circuit concluded that "the inclusion of that allegation [did] not transform their suit into a demand for money damages or an order 'to enforce a contractual obligation to pay money.'" *New York*, 155 F.4th at 75 n.4 (quoting *California*, 604 U.S. at 651) (internal citation omitted). The First Circuit also distinguished between challenges to "the cancellation of grants" and challenges "concern[ing] the dismantling of sub-agencies and a RIF at [HHS]," the latter of which the district court had jurisdiction to review. *Id.*

Here, Defendants contend that "grant terminations" are "the cornerstone of [the States'] claim" and at "[t]he heart of this action," which make it a contract claim subject to the Tucker Act. ECF No. 84 at 6, 7; *see also* ECF No. 97 at 3-5. However, simply repeating an assertion over and over does not make it true.[7] While some of the harms the States allege pertain to grant terminations, this "comprise[s] only one facet of Defendants' categorical decision to incapacitate the agencies." ECF No. 92 at 4. Just as in *New York*, the States' primary challenge is to the dismantling of IMLS, MBDA, FMCS, and USICH through policies undertaken by Defendants to eliminate their programming,[8] to eliminate their congressionally appropriated funding,[9] and to terminate a vast swath of employees through RIFs.[10] *Id.* at 13. The States argue that Defendant did this "in defiance of the administrative procedures that Congress required to be followed, the appropriations Congress ordered to be

---

[7] In fact, in an earlier filing, Defendants took the opposite stance: they contended that the States "do not challenge specific grant terminations [or] specific payments they claim to be entitled to … they challenge the entire course of conduct of three agencies moving forward." ECF No. 41 at 21.

[8] The States note that, following the implementation of the *Reduction* EO, IMLS was incapable of administering its programs, such as its Grants to States Program that distributes $180,000,000 to libraries across the United States. ECF No. 75 at 8. Similarly, MBDA could not administer its Capital Readiness Program that supports the Rhode Island Small Business HUB, the Northern Great Lakes Initiative, the Office of Business & Entrepreneurship at the University of Wisconsin System, and the Arizona Hispanic Chamber of Commerce. *Id.* at 11.

[9] The States note that, for Fiscal Year 2025, Congress appropriated $294,800,000 to IMLS. ECF No. 75 at 8. Congress also appropriated $68,250,000 to MBDA. *Id.* at 12.

[10] The States note that on March 21, 2025, Defendant Latif issued a RIF that placed all but three of MBDA's forty-nine employees on paid administrative leave. ECF No. 75 at 12. Later, even those employees that remained were reassigned to positions outside the MBDA. *Id.* Similarly, on March 31, 2025, IMLS issued a RIF that placed all seventy-seven of its employees on paid administrative leave. *Id.* at 8.

spent, and the separation of powers that constrain every officer of our government." ECF No. 75 at 4.

The "gravamen" of the States' claims "does not turn on terms of a contract between the parties; it turns largely on federal statutes and regulations put in place by Congress." *Colorado v. U.S. Dep't of Health & Human Servs.*, 788 F. Supp. 3d 277, 296 (D.R.I. 2025) (internal quotations omitted) (citing *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 464-65 (D.R.I. 2025); *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 293-94 (D. Mass. 2025)). This is apparent because, as in *Colorado*, "the States' claims do not arise in any contract, but the APA—particularly its provisions forbidding arbitrary and capricious action, action contrary to law … and the Constitution's … underlying separation of powers principles." *Id.* Again, the States' claims involve the process Defendants undertook in implementing the *Reduction* EO—not any specific terms and conditions in their grant agreements—and that makes them "precisely the type of claims that belong in district court." *Id.*

In short, notwithstanding certain actions relating to grants, this Court has jurisdiction to hear this case. *See APHA*, 145 S. Ct. at 2660-61; *Megapulse*, 672 F.2d at 967-68; *New York*, 155 F.4th at 75 n.4; *Ass'n of Am. Univs.*, 2025 WL 2899765, at *6; *Colorado*, 788 F. Supp. 3d at 296.

### 2. The Civil Service Reform Act

Defendants also argue that the CSRA divests this Court of jurisdiction over the States' claims "to the extent they challenge federal personnel decisions." ECF

15

A15

No. 84 at 13. They claim that the CSRA channels these types of disputes to the Office of Special Counsel, the MSPB, and the FLRA. *Id.* at 12 (citing *United States v. Fausto*, 484 U.S. 439, 455 (1988); *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10-15 (2012); *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump* ("*AFGE*"), 929 F.3d 748, 752 (D.C. Cir. 2019)). This argument too is easily discarded.

First, the First Circuit has already rejected Defendants' CSRA argument in this case. *See Rhode Island*, 155 F.4th at 47. As the court noted, it rejected a "seemingly identical CSRA argument" in *Somerville Public Schools*. *Id.* (citing *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 71 (1st Cir. 2025) ("[W]e are loath at this juncture of the proceedings to attribute to Congress the intention in enacting the CSRA … to bar every challenge to an unlawful effort by the Executive to shut down a statutorily created agency by summarily firing its employees en masse … except for those specific challenges that the terminated employees themselves may choose to bring."). Even though the Government subsequently sought a stay from the Supreme Court in *Somerville Public Schools*, *see McMahon v. New York*, 606 U.S. ---, 145 S. Ct. 2643 (2025), the First Circuit observed that nothing in that case indicated that it had erred in rejecting the Government's CSRA argument. *Rhode Island*, 155 F.4th at 47 (citing *McMahon*, 145 S. Ct. at 2643).

Second, as the First Circuit observed in *New York v. Kennedy*, the Supreme Court has already likely indicated that Defendants' CSRA argument fails. 155 F.4th at 75 (citing *Trump v. Am. Fed'n of Gov't Emps.* ("*AFGE*"), 606 U.S. ----, 145 S. Ct. 2635 (2025)). *AFGE* involved a similar challenge to the mass firings of federal

employees due to an agency RIF implemented under an executive order and, even though the Government raised the same CSRA argument at issue here, the Court determined that the Government was likely to succeed in its argument that the executive order was lawful. *Id.* (citing *AFGE*, 145 S. Ct. at 2635). This merits-based ruling "indicate[d] that the Supreme Court concluded that the district court likely had jurisdiction" to review the lawfulness of such agency decisions, and that it "likely decided that the CSRA did *not* funnel the dispute at issue … to the MSPB." *Id.* (citing *AFGE*, 145 S. Ct. at 2635).

Accordingly, the CSRA does not divest this Court of its jurisdiction to review the States' claims relating in part to the mass terminations of federal employees at IMLS, MBDA, FMCS, and USICH. *See Rhode Island*, 155 F.4th at 47; *Somerville Pub. Schs.*, 139 F.4th at 71; *New York*, 155 F.4th at 75; *AFGE*, 145 S. Ct. at 2635.

### 3. Standing

Defendants' last jurisdictional argument is that the States lack Article III standing because their injuries are not "actual or imminent" and are "too speculative," ECF No. 84 at 17 (first quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024); then quoting *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013)), and because the States' claim "involve no 'legally and judicially cognizable' harm" and are instead "generalized interest[s] … [that are] too abstract to constitute a 'case or controversy' appropriate for judicial resolution," *id.* at 18 (first quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997); then quoting *Spokeo v. Robins*, 578 U.S. 330, 341 (2016)).

Defendants' arguments are once again ones that have been rejected by the First Circuit in this case. *Rhode Island*, 155 F.4th at 44. Specifically, the First Circuit found that the States do in fact assert a "legally and judicially cognizable" harm rather than a "generalized interest" because they "have been and will continue to be injured by the denial of funds to which they are entitled, and … by the defendants' failure to provide services on which the plaintiffs rely." *Id.* So too did the First Circuit conclude that Defendants were unlikely to succeed in their "injury in fact" argument. *Id.* Indeed, the court left undisturbed this Court's finding that the States' injuries were sufficiently "actual or imminent" given that Defendants' actions "caused and will continue to cause the loss of services of which [the States] complain." *Id.* at 45; *see also Rhode Island*, 781 F. Supp. 3d at 38-39. The Court sees no reason to depart from these findings.

Defendants also assert that the States "lack standing to seek broad relief against the Defendant Agencies as to injuries allegedly suffered by other states and parties that are not plaintiffs before this Court." ECF No. 84 at 16. In other words, they claim that the States "can only assert standing, if at all, to remedy injury to themselves." *Id.* In addition, they assert that the States lack standing to seek relief as to the other three agencies identified in the *Reduction* EO but not named as defendants in this suit. *Id.*

Taking the latter argument first, there is no dispute among the parties that the States are *not* seeking relief as to the three agencies not named in this lawsuit. ECF No. 92 at 4; ECF No. 97 at 7. As mentioned earlier, the CDFI Fund, USAGM,

and the Wilson Center are not at issue here. *See* Section I.A. There is a dispute, however, over whether the States may seek broad relief that also happens to redress "injuries allegedly suffered by other states and parties."

Defendants cite the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), for the proposition that Article III's standing requirement prevents this Court from "grant[ing] any relief to anyone other than Plaintiffs." ECF No. 97 at 7-8. Put another way, Defendants argue that this Court may not, under Article III, "enter an order vacating or setting aside Executive Order 14238 in its entirety because such relief would implicate individuals and entities not party to this litigation." *Id.* at 8. However, Defendants are plainly wrong in asserting that *CASA* stands for this premise.

As the First Circuit has noted, the Supreme Court in *CASA* treated the question of whether an injunction is "broader than necessary to provide complete relief" as distinct from whether a plaintiff has "standing to sue." *Rhode Island*, 155 F.4th at 45 (citing *CASA*, 606 U.S. at 838 n.2, 839, 860-61). Furthermore, the Supreme Court expressly stated its "decision rest[ed] *solely* on the statutory authority that federal courts possess under the Judiciary Act of 1789," and that it was "express[ing] no view" on the Government's Article III argument. *CASA*, 606 U.S. at 841 n.4 (emphasis added). It simply cannot be that, under *CASA*, "Plaintiffs' Request … Does Not Satisfy Article III," ECF No. 97 at 7-8, when the Supreme Court "express[ed] no view" as to Article III in *CASA*. 606 U.S. at 841 n.4.

Case 2:25-cv-00128-JUM-AEM Document 98 Filed 04/08/20 of 47 Page ID 800087
Case 1:25-cv-00128-JUM-AEM Document 98 Filed 14/21/25 Page 20 of 47 Page ID
5416

Accordingly, each of Defendants' standing arguments must fail. *See Rhode Island*, 155 F.4th at 44, 45; *CASA*, 606 U.S. at 838 n.2, 841 n.4.

## B.      Implementation of the Reduction EO Is Unlawful

Having dispensed with Defendants' jurisdictional arguments, the Court now turns to the merits. The States argue that Defendants' implementation of the *Reduction* EO is unlawful for three reasons: (1) because it violates the APA; (2) because it violates the Separation of Powers doctrine; and (3) because it violates the Take Clare Clause of the United States Constitution. Each claim is addressed in turn.

### 1.      APA Claim

Beginning with the APA claim, the States assert that Defendants' implementation of the *Reduction* EO violates the APA because such actions are "arbitrary and capricious" and "contrary to law." ECF No. 75 at 27-38. Defendants counter by arguing that the States cannot seek judicial review under the APA because the agency actions are neither discrete nor final. ECF No. 84 at 19-22. They also contend that such actions are committed to agency discretion by law. ECF No. 23-27. The Court will address Defendants' contentions first before turning to the merits.

#### a.      Discrete Agency Action

Defendants assert that the States "are not challenging a discrete agency action, but rather a collection of grant terminations, personnel actions, and programmatic activities." ECF No. 84 at 19. They compare the States' challenge to the "programmatic challenges" rejected by the Supreme Court in *Lujan v. National*

*Wildlife Federation*, 497 U.S. 871 (1990). *Id.* It is an argument the Defendants made earlier in their opposition to the States' request for a preliminary injunction. *Rhode Island*, 781 F. Supp. 3d at 43. As this Court explained then, the Supreme Court in *Lujan* rejected plaintiffs' "programmatic challenge" that amounted to nothing more than "an attempt to seek wholesale programmatic improvements by court decree by couching the Bureau of Land Management's land withdrawal review program as an unlawful agency action." *Id.* (quoting *New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004))) (cleaned up). However, the Court in *Lujan* also recognized that "[i]f there is in fact some specific order or regulation, applying some particular measure across the board to all individual classification terminations and withdrawal revocations … it can of course be challenged under the APA…." *Id.* (quoting 497 U.S. at 890 n.2).

This Court determined that the States' claims are closer to the latter type of APA claim because they challenge Defendants' adoption of a "discrete, categorical policy" that applies the *Reduction* EO's mission "of eliminating all functions and components not mandated by statute, and of dramatically reducing their remaining functions" across the board, and thus are subject to APA review. *Id.* In their latest briefing, Defendants acknowledge this determination but argue that the D.C. Circuit's more recent decision in *National Treasury Employees Union* ("*NTEU*") *v. Vought* points the opposite way. ECF No. 84 at 20 (citing 149 F.4th 762, 777 (D.C. Cir. 2025)).

This position, however, ignores the fact that this Court is not bound by D.C. Circuit precedent[11]; it is instead bound by First Circuit precedent. Indeed, in recent months, the First Circuit has rejected Defendants' exact argument not once but twice. *See New York v. Trump*, 133 F.4th at 67; *New York v. Kennedy*, 155 F.4th at 76. As that court stated: "We cannot conclude that the government has made a strong showing of likely success on this [discrete agency action] argument … given that the plaintiffs challenge a particular directive, not a 'variety of programmatic deficiencies' or 'all aspects of' a program.'" *New York v. Kennedy* 155 F.4th at 76 (quoting *New York v. Trump*, 133 F.4th at 67) (quoting *Lujan*, 497 U.S. at 890 n.2)).

As such, this Court's conclusion remains the same as it was before: the States' APA claim is proper under *Lujan* because it is of the type that challenges "a discrete, categorical policy" that applies the *Reduction* EO's overarching directive "across the board." *See Rhode Island*, 781 F. Supp. 3d at 43; *New York v. Trump*, 133 F.4th at 67; *New York v. Kennedy*, 155 F.4th at 76.

### b. Final Agency Action

Defendants also contend that there has been no "final agency action" to warrant judicial review under the APA. ECF No. 84 at 21. Of course, judicial review

---

[11] In any event, the majority in *National Treasury Employees Union* seemingly ignored Footnote 2 of the Supreme Court's opinion in *Lujan*, in which it made clear that plaintiffs could challenge "some specific order or regulation, applying some particular measure across the board…." 497 U.S. at 890 n.2. The dissent did not ignore this key part of the opinion, however, and stated that "[i]t is hard to imagine an agency action that more clearly applies 'across the board' to all ensuing agency operations than an order to terminate an agency entirely." *NTEU*, 149 F.4th at 813 (Pillard, J., dissenting) (citing *Lujan*, 497 U.S. at 890 n.2).

under the APA is available "only for 'final agency action.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (quoting 5 U.S.C. § 704). This means that a plaintiff can only challenge an action that "mark[s] the 'consummation' of the agency's decisionmaking process" and is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (first quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); then quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). Courts are to apply the "finality" requirement in a "flexible" and "pragmatic" fashion. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016); *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149-51 (1967).

This Court has determined that the requisite final agency action has occurred, making this case subject to judicial review. *Rhode Island*, 781 F. Supp. 3d at 45. Specifically, the Court found that Defendants took "agency action" where, "to comply with the *Reduction* EO," each agency "adopted a policy to eliminate all non-statutorily required activities and functions and reduce their statutory functions and personnel to the bare minimum." *Id.* at 44-45. The agencies "consummate[ed] [their] decisionmaking process" upon adopting this policy given that no evidence suggests that the elimination of these activities and functions was "tentative or interlocutory." *Id.* at 45 (citing *Bennett*, 520 U.S. at 178). Also, "legal consequences" flowed from these decisions given that: (1) the States lost access to previously awarded funds due to grant terminations and the withholding or delay of disbursements; (2) the

personnel in charge of administering the agencies' programs were removed en masse; and (3) the agencies stopped providing public sector services to the States.[12]  *Id.*

Defendants do not press any new arguments to challenge final agency action other than an attempt to distinguish this case from the Supreme Court's decision in *Biden v. Texas*, 597 U.S. 785, 809 (2022).  ECF No. 84 at 22.  In that case, the Supreme Court found there to be "final agency action" where the DHS Secretary issued memoranda that "bound [agency] staff by forbidding them to continue [a DHS] program in any way from that moment on."  597 U.S. at 808-09.  Defendants assert that the conduct the States point to is "an abstract decision 'wholly apart from' any 'specific agency action, as defined in the APA.'"  ECF No. 84 at 22 (quoting *Biden*, 597 U.S. at 809).  They refer to the conduct as nothing more than "a constellation of then-ongoing actions."  ECF No. 97 at 9 (quoting *NTEU*, 149 F.4th at 784).

Far from being "abstract," the agencies' actions could not have been clearer: in response to the *Reduction* EO, which demanded the agencies' "full compliance," the agencies terminated their grants, terminated their programming and services, and terminated their employees en masse.  In undertaking these actions, some of the agencies even cited to the *Reduction* EO.  ECF No. 75 at 9, 12.  Importantly, in *New York v. Trump*, the First Circuit held that "final agency action" existed and was

---

[12] In the Court's earlier decision, the *Bennett* prongs were only applied as to IMLS, MBDA, and FMCS; USICH was not yet party to the litigation.  However, USICH also meets the requirements of *Bennett* given that, following the implementation of the *Reduction* EO, it too terminated its employees en masse, terminated its lease for office space, and ceased performing any of its statutory functions.  *See* ECF No. 75 at 26.  No evidence suggests that any of these decisions were "tentative or interlocutory."  *Id.*

sufficiently "specific" where the Plaintiff-States in that case could point to "the Agency Defendants' actions – following the executive orders and [OMB] Directive – to implement categorical funding freezes without regard and contrary to legal authority." 133 F.4th at 68 (internal quotations omitted). And the court gave no credence to the Agency Defendants' argument that those actions were based on "individualized assessments of their statutory authorities and relevant grant terms," finding them instead to be actions that were "categorical in nature." *Id.*

As in *New York v. Trump*, Defendants' actions here are "categorical in nature," and they were specifically implemented following the issuance of the *Reduction* EO. *See* 133 F.4th at 68. There can be no doubt then, as this Court has noted, that the agency actions the States point to are sufficiently specific and sufficiently final. *See Rhode Island*, 781 F. Supp. 3d at 45.

### c.     Committed to Agency Discretion

One last challenge Defendants make is that their actions are unreviewable because they are of the sort that are "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). ECF No. 84 at 23-24. To start, the APA "establishes a 'basic presumption of judicial review [for] one suffering legal wrong because of agency action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16-17 (2020) (quoting *Gardner*, 387 U.S. at 140). To honor this presumption, the Supreme Court has read this agency discretion exception "quite narrowly," finding that it only applies in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's

exercise of discretion." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (first quoting *Gardner*, 387 U.S. at 140; then quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)). Historically, these "rare circumstances" have been limited to only a few specific types of decisions, such as an agency's decision not to institute enforcement proceedings, *see Heckler v. Chaney*, 470 U.S. 821 (1985), and an agency's decision to terminate an employee in the interest of national security, *see Webster v. Doe*, 486 U.S. 592 (1988). Neither of these rare circumstances are at issue here.

Defendants contend that this case fits "neatly" within those categories of administrative decisions, like *Lincoln v. Vigil*, that courts have traditionally regarded as "committed to agency discretion." ECF No. 84 at 24 (quoting 508 U.S. 182, 191-92 (1993)). *Lincoln* involved a decision by the Indian Health Service ("IHS") to discontinue the Indian Children's Program, which provided clinical services to children, and the Supreme Court held that such a decision was "committed to agency discretion by law." 508 U.S. at 184-85. A closer review of *Lincoln* shows that Defendants' analogy is anything but "neat"; it is more akin to forcing a square peg into a round hole—and therefore must fail.

First, in *Lincoln*, Congress never expressly authorized the Indian Children's Program by any statute. *Id.* at 187. Here, by contrast, Congress specifically authorized the creation of all four agencies. *See* Museum & Library Services Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996) (establishing IMLS); Minority Business Development Act of 2021, Infrastructure Investment & Jobs Act, Pub. L.

No. 117-58, 135 Stat. 429 (codified as amended at 15 U.S.C. § 9501 *et seq.*) (establishing MBDA); Taft–Hartley Act, Labor-Management Relations Act, 1947, Pub. L. No. 80-101, § 202 (establishing FMCS); McKinney–Vento Homeless Assistance Act, Pub. L. No. 100-77, 101 Stat. 482 (codified as amended at 42 U.S.C. §§ 11301 *et seq.*) (establishing USICH).

Second, in *Lincoln*, Congress never appropriated any funds specifically for the Indian Children's Program; it instead provided IHS with a lump-sum appropriation for it to use in its discretion. *Id.* at 186-87. The Supreme Court emphasized that "where 'Congress merely appropriates lump-sum amounts *without statutorily restricting* what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions….'" *Id.* at 192 (emphasis added) (quoting *LTV Aerospace Corp.*, 55 Comp. Gen. 307, 319 (1975)). Here, by contrast, Congress specifically appropriated funds for each agency, statutorily restricting what can be done with those funds. *See* Full-Year Continuing Appropriations and Extensions Act, 2025 ("2025 Appropriations"), Pub. L. No. 119-4, § 1101(a)(8); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. D, 138 Stat. 460, 697 (appropriating $294,800,000 for IMLS); 2025 Appropriations, Pub. L. No. 119-4, § 1101(a)(2); Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, Div. C, 138 Stat. 25, 123 (appropriating $68,250,000 for MBDA); 2025 Appropriations, Pub. L. No. 119-4, § 1101(a)(8); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. D, 138 Stat. 460, 697 (appropriating $53,705,000 for FMCS); 2025

Appropriations, Pub. L. No. 119-4, § 1101(a)(12); Consolidated Appropriations Act, 2024, Pub. L. 118-42, Div. F, 138 Stat. 25, 388 (appropriating $4,300,000 for USICH).

Third and finally, in *Lincoln*, Congress made no mention of how the Indian Children's Program was to be staffed or how operations were to be conducted. *Id.* at 186-87. Here, by contrast, Congress has provided explicit direction as to how each agency is to be staffed and operated. *See* 20 U.S.C. §§ 9102, 9108, 9121-9165, 9171-9176 (explaining how IMLS is to maintain its offices, engage in research and data collection, and support museums and libraries); 15 U.S.C. §§ 9522, 9523(a)(1)-(3), 9524(a)(1)(A), 9502(d)(2), 9502(e)(2)(A) (explaining how MBDA is to maintain its offices, engage in the facilitation of minority business enterprise growth, and staff its positions); 29 U.S.C. §§ 173(a)-(c), (d), (e) (explaining how FMCS is to assist with labor disputes, conduct grievance mediations, and encourage and support joint labor-management activities); 42 U.S.C. §§ 11312(a)-(c), 11314(a), 11313(a)(5), 11313(a)(4)-(8) (explaining how USICH is to appoint its representatives, employ an Executive Director and regional coordinators, and generally carry out its duties to prevent and eliminate homelessness).

Congress's statutory restrictions on how IMLS, MBDA, FMCS, and USICH are to be funded, operated, and staffed stand in sharp contrast to how Congress gave broad discretion to IHS over the Indian Children's Program in *Lincoln*. 508 U.S. at 193 ("Of course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes."). Here, Defendants' decision to eliminate

programs, terminate grants, and implement large-scale employee RIFs undermined their ability to perform functions mandated by statute. This is clearly not an action committed to agency discretion by law, and many courts have reached the same conclusion in similar cases. *See, e.g., Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*, No. MJM-25-1458, 2025 WL 1865971, at *20 (D. Md. July 7, 2025) (rejecting Defendants' argument that their decision to terminate grants, terminate statutorily mandated programs, and issue RIFs to 85% of AmeriCorp's workforce was committed to agency discretion); *Maryland v. Corp. for Nat'l & Cmty Serv.*, 785 F. Supp. 3d 68, 94-96 (D. Md. 2025) (same); *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 112-13 (D.D.C. 2025) (rejecting Defendants' argument that their decision to terminate EPA grants and programs was committed to agency discretion where Congress specifically imposed statutory obligations for such grants and programs to be carried out); *Colorado*, 788 F. Supp. 3d at 301 (holding that HHS's decision to eliminate congressionally appropriated funds based on its own assessment that they were no longer necessary "is certainly not a question about agency discretion").

Accordingly, the Court finds that Defendants' actions were not "committed to agency discretion by law" and are thus subject to review under the APA. *Lincoln*, 508 U.S. at 193; *see also Elev8 Baltimore*, 2025 WL 1865971, at *20; *Maryland*, 785 F. Supp. 3d at 94-96; *Climate United Fund*, 778 F. Supp. 3d at 112-13; *Colorado*, 788 F. Supp. 3d at 301.

### d. Arbitrary and Capricious

Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, [and] capricious." 5 U.S.C. § 706(2)(A). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). Under this standard, while a reviewing court must ensure that the agency action is reasonable, it may not "substitute its judgment for that of the agency." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). Nevertheless, the court must still ensure that the agency has offered "a satisfactory explanation for its action including a 'rational connection between the facts found and the choices made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). That requirement is satisfied when the agency's explanation is clear enough that its "path may reasonably be discerned." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). But "where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Id.*

This Court has determined that the States were likely to succeed on the merits of their arbitrary and capricious claim. *See Rhode Island*, 781 F. Supp. 3d at 45-48. Specifically, Defendants' actions were arbitrary and capricious where: (1) Defendants

failed to offer any reasonable explanation for why the agencies were being dismantled, *see Encino Motorcars*, 579 U.S. at 221 ("[T]he agency's explanation [must be] clear enough [so] that its path may reasonably be discerned.") (internal quotations omitted); (2) Defendants failed to, in response to the *Reduction* EO's command that the agencies eliminate their "non-statutory components and functions," show that any analysis was conducted to determine which agency components and functions were statutorily required and which were not, *see State Farm*, 463 U.S. at 43 ("[T]he agency must … articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.") (internal quotations omitted); (3) Defendants couched their justifications for eliminating programs, terminating grants, and implementing large-scale employee RIFs in "mere conclusory statements," most of which merely defer to the *Reduction* EO, *see Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do; an agency's statement must be one of *reasoning*.") (internal quotations and citations omitted); and (4) Defendants failed to indicate that they considered "any of the significant reliance interests of their program beneficiaries or grantees such as libraries, museums, business centers, contractors, labor unions, states, and local governments," *see Regents*, 591 U.S. at 30 ("When an agency changes course … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account. It would be arbitrary and capricious to ignore such matters.").

The Court incorporates the reasoning set forth in its earlier opinion in resolving this case.[13] *See Rhode Island*, 781 F. Supp. 3d at 45-48. Defendants do not contest these determinations at all in their briefing. Their entire opposition to the States' APA claims is focused on claiming that there has been no discrete, final agency action and that their decisions are committed to agency discretion by law. *See* ECF No. 84 at 19-27; ECF No. 97 at 8-12. This further supports a finding in the States' favor. *Cf. Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.*, No. 25-1775 (BAH), 2025 WL 2374528, at *36 (D.D.C. Aug. 14, 2025) ("[D]efendants opted to make no argument or present evidence to the contrary on plaintiffs' arbitrary and capricious APA claim. On this record, then, plaintiffs have demonstrated a likelihood

---

[13] Because its earlier analysis pertained only to IMLS, MBDA, and FMCS, the Court will say a few words about USICH. The record demonstrates that USICH's actions were also arbitrary and capricious. First, USICH provided no "reasoned explanation" as to why it was terminating its existing programs and operations and terminating most of its staff through a RIF. ECF No. 75 at 27-28; *see Encino Motorcars*, 579 U.S. at 221. Second, USICH failed to account for the reliance interests of the constituents, including State officers, it served in addressing the nation's homelessness problem. *Id.* at 20; *see Regents*, 591 U.S. at 30. Rather, USICH has been telling these constituents—who have been calling in for assistance— that USICH is shut down and is no longer able to serve them. ECF No. 75 at 20.

Third, and most striking, USICH failed to follow its own regulations when it significantly reduced its workforce. In response to the *Reduction* EO, the agency submitted an Agency RIF and Reorganization Plan in which it stated that a minimum of thirteen USICH employees were required to fully carry out its statutory duties. *Id.* at 19. Despite this, just a few weeks later, USICH—in response to a Department of Government Efficiency ("DOGE") directive—reduced its staff to just two employees. *Id.* This conduct is undoubtedly arbitrary and capricious. *See, e.g., Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("[A]n agency action may be set aside as arbitrary and capricious under 5 U.S.C. § 706(2)(A) if the agency fails to comply with its own regulations." (internal citations and quotations omitted)); *see also Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 73 (1st Cir. 2007) (Boudin, C.J., concurring) (looking to agency's application of "its [own] general policy" to determine whether its decision was arbitrary and capricious).

of success on their APA claim that defendants' termination of plaintiffs' grant awards were arbitrary and capricious.") (citing *Thakur v. Trump*, 781 F. Supp. 3d 955, 983 (N.D. Cal. 2025) ("Agency Defendants do not contest that the termination letters represent the sum-total of their 'reasoned explanation.'")).

Accordingly, the Court concludes that Defendants acted arbitrarily and capriciously in their implementation of the *Reduction* EO, and those actions must be set aside. *See Rhode Island*, 781 F. Supp. 3d at 45-48.

### e. Contrary to Law

The APA instructs reviewing courts to "hold unlawful and set aside" agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A). Federal agencies are of course a "creature of statute," *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 177 (2022), and when charged with administering federal statutes, their "power to act is authoritatively prescribed by Congress," and they must follow "statutory mandates." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (internal quotations and citations omitted); *see also In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013).

Again, this Court has determined that the States are likely to succeed on the merits of their contrary to law claim. *Rhode Island*, 781 F. Supp. 3d at 48-51. Specifically, Defendants' actions were contrary to law where: (1) Defendants flouted the agencies' *mandatory* statutory duties by implementing policies in accordance with the *Reduction* EO that prevented them from carrying out those duties, *see In re Aiken Cnty.*, 725 F.3d at 259 (explaining that, "[u]nder Article II of the Constitution and

relevant Supreme Court precedents," the President and executive agencies "must follow statutory mandates" and may not "decline to follow a statutory mandate or prohibition simply because of policy objections"); and (2) Defendants violated each agency's appropriations statute by refusing to spend funds appropriated to them by Congress, *see id.* at 261 n.1 ("[T]he President does not have unilateral authority to refuse to spend [congressionally appropriated] funds."); *see also City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").

The Court incorporates the reasoning set forth in its earlier opinion in resolving this case.[14] *See Rhode Island*, 781 F. Supp. 3d at 48-51. The Court also notes that the U.S. Government Accountability Office ("GAO") recently released a

---

[14] Again, because the earlier opinion focused only on IMLS, MBDA, and FMCS, the Court concludes here that USICH's actions were also contrary to law. First, Congress has tasked USICH with various functions, including, but not limited to, organizing Council meetings, preparing a National Strategic Plan to End Homelessness, monitoring or evaluating federal, state, local, or private programs and activities, conducting research, and reporting on significant problems, abuses, or deficiencies in agency programs meant to assist unhouse individuals. 42 U.S.C. § 11313. To carry out these statutory duties, Congress mandated certain staffing requirements, including that USICH employ an Executive Director, 42 U.S.C. § 11314(a), and "not less than 5 . . . regional coordinators," 42 U.S.C. § 11313(a)(5). By reducing USICH's personnel down to two, Defendants have acted "contrary to law" because they have made it impossible for the agency to continue to perform its statutory duties. *See Rhode Island*, 781 F. Supp. 3d at 48-51.

Second, Congress appropriated $4.3 million to USICH so that it could carry out its agency functions. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(12); Consolidated Appropriations Act, 2024, Pub. L. 118-42, Div. F, 138 Stat. 25, 388. However, by dismantling these agencies, Defendants made it so that USICH could not spend these funds in violation of the appropriations statutes. *See Rhode Island*, 781 F. Supp. 3d at 48-51.

report in which it concluded that IMLS violated the Impoundment Control Act of 1974

("ICA"), 2 U.S.C. § 681 *et seq.* *See* U.S. Gov't Accountability Off., B-337375, Institute

of Museum and Library Services—Applicability of the Impoundment Control Act to

Reduction of Agency Functions 1-2 (2025).[15]  According to GAO, it did so when, in

response to the *Reduction* EO, IMLS unlawfully withheld funds that Congress had

appropriated it.  *Id.*  While that report only pertained to IMLS, it underscores this

Court's earlier conclusion that Defendants also acted unlawfully when they failed to

follow the procedures set forth in the ICA for rescinding or deferring funds

appropriated to each agency.  *See Rhode Island*, 781 F. Supp. 3d at 51 ("[T]he ICA

sets forth clear procedures to facilitate that process under congressional oversight.

But that process was not facilitated here.  Rather, IMLS, MBDA, and FMCS took

actions that essentially directed the rescission of funds to fulfill the President's

policy—with congressional authorization glaringly absent.").[16]  Also important to

note—for the purposes of this claim—that contrary to law "means, of course, *any* law,

and not merely those laws that the agency itself is charged with administering." *Fed.*

*Commc'ns Comm'n v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (citing

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971)).

---

[15] The report is available at: https://www.gao.gov/assets/880/878908.pdf.

[16] This conclusion also applies to USICH, considering that Defendants also
failed to follow the necessary procedures for rescinding or deferring funds
appropriated to that agency.  ECF No. 75 at 37-38.

The Court therefore finds that Defendants' actions in implementing the *Reduction* EO were "not in accordance with law" and must be set aside. *See Rhode Island*, 781 F. Supp. 3d at 48-51.

### 2. Separation of Powers and Take Care Clause Claims

Under the Constitution, the President is required to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. This requirement extends "across the entire Executive Branch—including 'independent' agencies." *English v. Trump*, 279 F. Supp. 3d 307, 327 (D.D.C. 2018) (quoting *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 496-97 (2010)). "And because federal agencies are 'creatures of statute,' and 'the Take Care Clause cannot be used to bypass agencies' limited status as creatures of statute, [they] possess only the authority that Congress has provided them.'" *Widakuswara v. Lake* ("*Widakuswara II*"), 779 F. Supp. 3d 10, 36 (D.D.C. 2025) (quoting *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 914 (D.C. Cir. 2024)).

The Court has concluded that the States were likely to succeed on their claim that Defendants' actions violated the Take Care Clause. *See Rhode Island*, 781 F. Supp. 3d at 51-52. What was particularly remarkable to the Court was that, a mere day after the *Reduction* EO's issuance, Congress passed a statute appropriating the funds necessary to carry out the functions of each agency. *Id.* at 51. Nevertheless, in the weeks that followed, Defendants proceeded to effectively shutter the very same

agencies that Congress had just funded and had charged them with administering.[17]
*Id.* These actions "simply cannot be construed as following through on [the]
constitutional mandate [of the Take Care Clause]." *Id.* (quoting *Widakuswara II*, 779
F. Supp. 3d at 36).

The Court found that the States were also likely to succeed on their related
Separation of Powers claim. *See id.* at 51-52. While there is no "separation of powers
clause" in the Constitution, "that doctrine is undoubtedly carved into the
Constitution's text by its three articles separating powers and vesting the Executive
power solely in the President." *Trump v. United States*, 603 U.S. 593, 637-38 (2024)
(citing *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 227 (2020)). As
a reminder, Article I of the Constitution grants to the Legislative Branch, the
exclusive power to make law, U.S. Const. art. I, § 1, and the power of the purse, U.S.
Const. art. I, § 8, cl. 1. As for the Executive, "[t]here is no provision in the
Constitution that authorizes the President to enact, to amend, or to repeal statutes."
*Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Simply put, "the President is
without authority to thwart congressional will by canceling appropriations passed by
Congress" and "does not have unilateral authority to refuse to spend the funds." *City
& Cnty. of San Francisco*, 897 F.3d at 1232 (citing *In re Aiken Cnty.*, 725 F.3d at 261
n.1). Nor may the President "decline to follow a statutory mandate or prohibition

---

[17] The same is true of USICH, which again was not party to this Court's
original order. Congress's appropriations statute also funded USICH for another
year. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L.
No. 119-4, § 1101(a)(12).

simply because of policy objections." *Id.* These same principles apply to the President's agents. *See, e.g., Colorado*, 788 F. Supp. 3d at 309.

In its earlier decision, the Court specifically found that, in implementing the *Reduction* EO, the Executive was "usurping Congress's: (1) power of the purse, by disregarding congressional appropriations; and (2) vested legislative authority to create and abolish federal agencies." *Rhode Island*, 781 F. Supp. 3d at 52 (citing *Widakuswara v. Lake* ("*Widakuswara I*"), 773 F. Supp. 3d 46, 57 (S.D.N.Y. 2025)).

Defendants now boldly claim that, in holding that they violated the Separation of Powers doctrine, this Court would itself be "upset[ing] the separation of powers." ECF No. 84 at 32. Such an argument lacks merit. The Separation of Powers is a principle that is integral to our democracy. As Justice Kennedy has observed, "liberty is threatened" when "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress." *Clinton*, 524 U.S. at 451 (Kennedy, J., concurring). "Money is the instrument of policy and policy affects the lives of citizens. The individual loses liberty in a real sense if that instrument is not subject to traditional constitutional constraints." *Id.; see also Mistretta v. United States*, 488 U.S. 361, 380 (1989) ("[W]ithin our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty."). Federal courts "have a constitutional obligation to safeguard personal liberties and to uphold federal law." *Stone v. Powell*, 428 U.S. 465, 493 n.35 (1976). Where, as here, Defendants' actions threaten to undermine

such liberties, the Court is not "upset[ing] the separation of powers"; it is merely performing its constitutional function.

Defendants also now argue that the Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462 (1994) forecloses the States' constitutional claims. ECF No. 84 at 28. *Dalton* involved the President's decision to close a naval shipyard, and a claim that the Secretary of Defense had violated a federal statute when he recommended closure of the shipyard. 511 U.S. at 464-66. The Supreme Court concluded that the President's decision to accept a flawed recommendation was "not a constitutional claim, but a statutory one" and that, because the statute "commit[ted] decisionmaking to the President, judicial review of the President's decision [was] not available." *Id.* at 476-77. However, the Court distinguished its decision in *Dalton* from its decision in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), where the President acted in the "*absence* of *any* statutory authority," as opposed to "a claim that the President acted in excess of such authority." *Id.* at 473 (citing *Youngstown*, 343 U.S. at 585, 587). Cases in which the President has acted in the absence of any statutory authority are of course subject to judicial review. *Id.; see also Youngstown*, 343 U.S. at 582.

Here, Defendants would like this Court to believe that the President and his subordinates merely acted in excess of their statutory authority, making judicial review unavailable under *Dalton*. ECF No. 84 at 28. But this is a grossly inapt comparison given that "no statute entrusts the Executive with discretion to unilaterally dismantle IMLS, MBDA, FMCS, and USICH." ECF No. 92 at 18.

Instead, this case is more akin to *Youngstown* because the President has no statutory

authority to cancel appropriations passed by Congress or abolish federal agencies

created by Congress. *See Rhode Island*, 781 F. Supp. 3d at 52; *see also Youngstown*,

343 U.S. at 587.

Accordingly, the Court finds that Defendants violated the Constitution's Take

Care Clause and the Separation of Powers doctrine. *Id.*; *see also Clinton*, 524 U.S.

at 438; *City & Cnty. of San Francisco*, 897 F.3d at 1232; *Widakuswara I*, 773 F. Supp.

3d at 57.

### C. Vacatur and Permanent Injunction Are Merited

Now that the Court has concluded that Defendants' actions in implementing

the *Reduction* EO violate the APA, the Take Care Clause, and the Separation of

Powers doctrine, the remaining issue concerns the type of relief that ought to be

granted in this case. The States request both vacatur of the agencies' actions and

entry of a permanent injunction, barring Defendants from future implementation of

the *Reduction* EO. ECF No. 75 at 41-56. Defendants oppose both forms of relief.

ECF No. 84 at 34-37, 38-39.

#### 1. Vacatur

Defendants first argue that vacatur is inappropriate here because "the APA

does not permit vacatur of agency action." ECF No. 84 at 38. That is plainly

incorrect.[18] The APA authorizes a court to "hold unlawful and set aside agency

---

[18] Defendants cite only to Justice Gorsuch's concurrence in *United States v. Texas*, 599 U.S. 670 (2023), in support of its argument that "the APA does not permit vacatur of agency action." ECF No. 84 at 38 (citing *id.* at 695 (Gorsuch, J.,

action." 5 U.S.C. § 706(2). "The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur" of an unlawful agency action. *Corner Post*, 603 U.S. at 826 (Kavanaugh, J., concurring); *see also Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002) ("[V]acation is a proper remedy when an agency fails to explain its reasoning adequately."). Indeed, Defendants' argument "does not reflect the law of this Circuit, including as recently reviewed by the Supreme Court." *Ass'n of Am. Univs.*, 2025 WL 2899765, at \*27 (citing *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 50 (1st Cir. 2025) (recognizing the "remedy of vacatur" under Section 706 of the APA); *APHA*, 145 S. Ct. at 2661 (Barrett, J., concurring) ("Plaintiffs frequently seek vacatur of internal agency guidance.")).

Next, Defendants rely on the Supreme Court's decision in *CASA* in an attempt to equate vacatur of agency actions with universal injunctions, the latter of which the Court recently concluded were unlikely to be authorized by the Judiciary Act of 1789. ECF No. 84 at 39 (citing *CASA*, 606 U.S. at 831). But this reliance is misguided given that the Court explicitly stated in *CASA*: "Nothing we say today resolves the distinct

---

concurring) (The APA "does not say anything about 'vacating' agency action ('wholesale' or otherwise)."). Defendants' claim is misleading, however, given that Justice Gorsuch himself purported only to "rais[e] questions" about the APA and concedes that the Supreme Court has yet to "address" those questions. *Id.* at 701-02 (Gorsuch, J. concurring).

question whether the Administrative Procedure Act authorizes federal courts to vacate agency action." 606 U.S. at 847 n.10.[19]

Finally, Defendants argue that "any equitable remedy applied in the nature of vacatur should apply only to the named parties." ECF No. 84 at 39. This argument, however, fundamentally misunderstands vacatur as a remedy. "When a federal court sets aside an agency action, the federal court vacates that order—in much the same way that an appellate court vacates the judgment of a trial court." *Corner Post*, 603 U.S. at 830 (Kavanaugh, J., concurring). "This vacation applies to the unlawful action itself, rather than merely to its application to the individual challengers." *California*, 2025 WL 3072541, at *11 (citing *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)). To use Chief Justice Roberts' words, providing party-specific relief under the APA would be "fairly radical and inconsistent with" the longstanding practices of federal courts. *Ass'n of Am. Univs.*, 2025 WL

---

[19] Defendants again attempt to rely on Justice Gorsuch's concurrence in *United States v. Texas* in support of their position. ECF No. 84 at 39 (citing *Texas*, 599 U.S. at 702 (Gorsuch, J., concurring)). The Court, again, points Defendants to Justice Gorsuch's own words: "Nor do I mean to equate vacatur of agency action with universal injunctions. Despite some similarities, courts can at least arguably trace their authority to order vacatur to language in a statute and practice in some lower courts." *Texas*, 599 U.S. at 701-02 (Gorsuch, J., concurring).

2899765, at *29 (quoting Transcript of Oral Argument at 35, *United States v. Texas*, 599 U.S. 670 (2023) (No. 22-58) (Roberts, C.J.)).

Accordingly, the Court agrees with the States. Because Defendants' actions were "arbitrary and capricious" and "contrary to law," the Court concludes that the proper remedy is to vacate those actions in their entirety.

### 2. Permanent Injunction

The States also request that the Court enter a permanent injunction. ECF No. 75 at 42. The Supreme Court has recently cautioned federal courts to ensure that "injunctions are [no] broader than necessary to provide complete relief to each plaintiff with standing to sue." *CASA*, 606 U.S. at 861. This Court bears that consideration in mind as it evaluates the States' request.

A district court will grant a permanent injunction if the plaintiff can show: (1) "actual success on the merits of its claims"; (2) that they "would be irreparably injured in the absence of injunctive relief"; (3) that the harm suffered "from the defendant's conduct would exceed the harm to the defendant accruing from the issuance of an injunction"; and (4) that "the public interest would not be adversely affected by an injunction."[20] *Doe v. R.I. Interscholastic League*, 137 F.4th 34, 40 (1st Cir. 2025)

---

[20] The test for a permanent injunction and a preliminary injunction is essentially the same, "except that 'the movant must show actual success on the merits of the claim, rather than a mere likelihood of such success.'" *Caroline T. v. Hudson Sch. Dist.*, 915 F.2d 752, 755 (1st Cir. 1990) (quoting *K-Mart Corp.*, 875 F.2d at 914-15). That the success-on-the-merits factor is the only difference means that, as with preliminary injunctions, the third and fourth injunction factors for a permanent injunction "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

(quoting *United States v. Mass. Water Res. Auth.*, 256 F.3d, 51 n.15 (1st Cir. 2001)). "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989).

The Court determines that the States are entitled to further injunctive relief. First, the States have demonstrated actual success on the merits of their claims: Defendants' implementation of the *Reduction* EO violated the APA, the Take Care Clause, and the Separation of Powers doctrine. Second, as this Court concluded in its earlier decision, the States have demonstrated that they will be irreparably injured if Defendants are allowed to dismantle the at-issue federal agencies. [21] *See Rhode Island*, 781 F. Supp. 3d at 52-54. Defendants nevertheless contend that "all [the States'] claimed harms are economic, speculative, or affect third parties rather than the Plaintiffs seeking relief," and therefore do not satisfy the irreparable-injury requirement. ECF No. 84 at 35.

The Court finds Defendants' argument unavailing, as the record paints a markedly different picture. For instance, consider the public libraries in New Mexico,

---

[21] The States would also suffer irreparable harm if USICH were to be dismantled by the implementation of the *Reduction* EO. The States receive critical resources from USICH to help their unhoused constituents. ECF No. 75 at 51-55. These resources include but are not limited to: guidance to the States as they work to establish their respective Interagency Councils on Homelessness, inter-state connections that USICH facilitates to allow various stakeholders to share strategies for preventing and ending homelessness, research and recommendations provided by USICH experts to State and local entities to address homelessness in their communities, and direct support to unhoused individuals so that they may access federal programs available to them. *Id.*; ECF No. 92 at 27.

New Jersey, Maine, and Oregon that would have to close branches, implement hiring freezes, and/or cease providing services that aim to foster literacy and support learning among its patrons were IMLS to be dismantled.  ECF No. 75 at 43-46; ECF No. 92 at 25-26.  Or consider the State universities in Hawaiʻi, Maryland, and Arizona that would be forced to eliminate their student programming, default on their contracts, and/or terminate their employees absent continued funding from MBDA.[22] ECF No. 92 at 24-25.  Next, consider the State entities in Rhode Island, Illinois, and Minnesota that face the very real prospect of work stoppage and negotiation impasses should their labor disputes go unresolved without the critical support of FMCS mediators.  ECF No. 92 at 26-27.  And finally, consider the loss that Michigan, New York, and Wisconsin would suffer without the research-based and community-specific expert assistance that each State's agencies have continuously relied on in their efforts to support unhoused individuals.  ECF No. 75 at 53-55.  All this to say: the

---

[22] To the extent that Defendants argue that this specific harm is economic and thus not irreparable, the Court notes that "some economic losses can be deemed irreparable." *Rhode Island*, 155 F.4th at 49 (quoting *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009)).  Indeed, the First Circuit has "recognized that harms to plaintiffs resulting from withheld grant funding – including 'the obligation of new debt; the inability to pay existing debt; impediments to planning, hiring, and operations; and disruptions to research projects by state universities' – may be 'irreparabl[e].'" *Id.* (quoting *New York*, 133 F.4th at 73).

In addition, to the extent that Defendants rely on *Department of Education v. California* in support of their argument, it bears noting that the Supreme Court found irreparable harm unlikely where the plaintiffs had "represented … that they ha[d] the financial wherewithal to keep their programs running" even without federal funding.  604 U.S. at 652 (2025).  Here, by contrast, several States assert that they do *not* have the "financial wherewithal to keep their programs running" absent continued funding from MBDA.  ECF No. 92 at 24 (quoting *id.* at 652).

45
A45

injuries alleged are to the States themselves and are far more than merely economic or speculative.

The final two factors concern the balance of the equities and the public interest. Defendants make the same arguments as before, asserting that an injunction would "effectively disable several federal agencies, as well as the President himself, from implementing the President's priorities consistent with their legal authorities," and that they would be harmed were the Court to order the disbursement of funds that "may not be retrievable afterwards." ECF No. 84 at 37; *see also Rhode Island*, 781. F. Supp. 3d at 54-55 (same). To be sure, as the First Circuit and the Supreme Court have observed, there may be some harm to Defendants were they erroneously required to pay funds that could not later be recouped. *See Somerville Pub. Schs.*, 139 F.4th at 75; *California*, 604 U.S. at 651-52.

However, the Court is required to "balance the competing claims of injury and … consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Given the "plethora of injuries" that would arise if the Court did not grant injunctive relief, the balance of equities favors the States. *Rhode Island*, 781. F. Supp. 3d at 54. Additionally, as this Court has determined, Defendants acted without constitutional or statutory authority in their implementation of the *Reduction* EO, and "there is generally no public interest in the perpetuation of unlawful agency action." *Somerville Pub. Schs.*, 139 F.4th at 76 (quoting *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). There is, however, a

"substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12 (*Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Here, the issuance of preliminary relief merely "orders compliance with governing statutes and the Constitution." *Widakuswara II*, 779 F. Supp. 3d at 39. The public-interest factor therefore also weighs in the States' favor.

Accordingly, the Court finds that a permanent injunction is warranted. Defendants are hereby permanently enjoined from taking any future actions to implement, give effect to, comply with, or carry out the directives contained in the *Reduction* EO with respect to IMLS, MBDA, FMCS, and USICH.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the States' Motion for Summary Judgment (ECF No. 75) and DENIES Defendants' Cross-Motion for Summary Judgment (ECF No. 84).

IT IS SO ORDERED.

JOHN J. MCCONNELL, JR.
Chief Judge
United States District Court

November 21, 2025

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

**STATE OF RHODE ISLAND,**
**et al.,**

    **Plaintiffs,**

    **v.**

                                         **C.A. No. 25-128 JJM**

**DONALD J. TRUMP,** *in his official*
*capacity as President of the United States*,
**et al.,**

    **Defendants.**

## JUDGMENT

[   ] Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

[ **X** ] Decision by the Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED:

Judgment hereby enters for the Plaintiffs State of Rhode Island, et al. and against Defendants Donald J. Trump, et al. pursuant to the Memorandum and Order entered on November 21st, 2025 by this Court.

                                              Enter:

                                              /s/ Ryan H. Jackson
                                              Deputy Clerk

Dated: November 21, 2025

# Presidential Documents

### Executive Order 14238 of March 14, 2025

### Continuing the Reduction of the Federal Bureaucracy

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* This order continues the reduction in the elements of the Federal bureaucracy that the President has determined are unnecessary.

**Sec. 2**. *Reducing the Scope of the Federal Bureaucracy.*

(a) Except as provided in subsection (b) of this section, the non-statutory components and functions of the following governmental entities shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law:

(i) the Federal Mediation and Conciliation Service;

(ii) the United States Agency for Global Media;

(iii) the Woodrow Wilson International Center for Scholars in the Smithsonian Institution;

(iv) the Institute of Museum and Library Services;

(v) the United States Interagency Council on Homelessness;

(vi) the Community Development Financial Institutions Fund; and

(vii) the Minority Business Development Agency.

(b) Within 7 days of the date of this order, the head of each governmental entity listed in subsection (a) of this section shall submit a report to the Director of the Office of Management and Budget confirming full compliance with this order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent.

(c) In reviewing budget requests submitted by the governmental entities listed in subsection (a) of this section, the Director of the Office of Management and Budget or the head of any executive department or agency charged with reviewing grant requests by such entities shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests for such governmental entities to the extent they are inconsistent with this order.

**Sec. 3**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*March 14, 2025.*

[FR Doc. 2025–04868
Filed 3–19–25; 8:45 am]
Billing code 3395–F4–P

**12 U.S.C. § 5708**

**§ 5708. Implementation and administration**

(a) General authorities and duties

The Secretary shall--

(1) consult with the Administrator of the Small Business Administration and the appropriate Federal banking agencies on the administration of the Program;

(2) establish minimum national standards for approved State programs;

(3) provide technical assistance to States for starting State programs and generally disseminate best practices;

(4) manage, administer, and perform necessary program integrity functions for the Program; and

(5) ensure adequate oversight of the approved State programs, including oversight of the cash flows, performance, and compliance of each approved State program.

(b) Appropriations

There is hereby appropriated to the Secretary, out of funds in the Treasury not otherwise appropriated, $1,500,000,000 to carry out the Program, including to pay reasonable costs of administering the Program.

(c) Termination of Secretary's Program administration functions

The authorities and duties of the Secretary to implement and administer the Program shall terminate at the end of the 7-year period beginning on March 11, 2021.

(d) Expedited contracting

During the 1-year period beginning on March 11, 2021, the Secretary may enter into contracts without regard to any other provision of law regarding public contracts, for purposes of carrying out this chapter.

(e) Technical assistance

Of the amounts appropriated for fiscal year 2021 to carry out the Program, $500,000,000 may be used by the Secretary to--

(1) provide funds to States to carry out a technical assistance plan under which a State will provide legal, accounting, and financial advisory services, either directly or contracted with legal, accounting, and financial advisory firms, with priority given to business enterprises owned and controlled by socially and

economically disadvantaged individuals, to very small businesses and business enterprises owned and controlled by socially and economically disadvantaged individuals applying for--

(A) State programs under the Program; and

(B) other State or Federal programs that support small businesses;

(2) transfer amounts to the Minority Business Development Agency, so that the Agency may use such amounts in a manner the Agency determines appropriate, including through contracting with third parties, to provide technical assistance to business enterprises owned and controlled by socially and economically disadvantaged individuals applying to--

(A) State programs under the Program; and

(B) other State or Federal programs that support small businesses; and

(3) contract with legal, accounting, and financial advisory firms (with priority given to business enterprises owned and controlled by socially and economically disadvantaged), to provide technical assistance to business enterprises owned and controlled by socially and economically disadvantaged individuals applying to--

(A) State programs under the Program; and

(B) other State or Federal programs that support small businesses.

A52

**15 U.S.C. § 9502**

**§ 9502. Minority Business Development Agency**

(a) In general

There is within the Department of Commerce the Minority Business Development Agency.

(b) Under Secretary

(1) Appointment and duties

The Agency shall be headed by the Under Secretary of Commerce for Minority Business Development, who shall--

(A) be appointed by the President, by and with the advice and consent of the Senate;

(B) except as otherwise expressly provided, be responsible for the administration of this chapter; and

(C) report directly to the Secretary.

(2) Compensation

(A) In general

The Under Secretary shall be compensated at an annual rate of basic pay prescribed for level III of the Executive Schedule under section 5314 of Title 5.

(B) Omitted

(3) References

Any reference in a law, map, regulation, document, paper, or other record of the United States to the Director of the Agency shall be deemed to be a reference to the Under Secretary.

(c) Report to Congress

Not later than 120 days after November 15, 2021, the Secretary shall submit to Congress a report that describes--

(1) the organizational structure of the Agency;

(2) the organizational position of the Agency within the Department of Commerce; and

(3) a description of how the Agency shall function in relation to the operations carried out by each other component of the Department of Commerce.

(d) Office of Business Centers

(1) Establishment

There is established within the Agency the Office of Business Centers.

(2) Director

The Office of Business Centers shall be administered by a Director, who shall be appointed by the Under Secretary.

(e) Offices of the Agency

(1) In general

In addition to the regional offices that the Under Secretary is required to establish under paragraph (2), the Under Secretary shall establish such other offices within the Agency as are necessary to carry out this chapter.

(2) Regional offices

(A) In general

In order to carry out this chapter, the Under Secretary shall establish a regional office of the Agency for each of the regions of the United States, as determined by the Under Secretary.

(B) Duties

Each regional office established under subparagraph (A) shall expand the reach of the Agency and enable the Federal Government to better serve the needs of minority business enterprises in the region served by the office, including by--

(i) understanding and participating in the business environment of that region;

(ii) working with--

(I) MBDA Business Centers that are located in that region;

(II) resource and lending partners of other appropriate Federal agencies that are located in that region; and

(III) Federal, State, and local procurement offices that are located in that region;

(iii) being aware of business retention or expansion programs that are specific to that region;

(iv) seeking out opportunities to collaborate with regional public and private programs that focus on minority business enterprises; and

A54

(v) promoting business continuity and preparedness.

**15 U.S.C. § 9511**

**§ 9511. Private sector development**

The Under Secretary shall, whenever the Under Secretary determines such action is necessary or appropriate--

(1) provide Federal assistance to minority business enterprises operating in domestic and foreign markets by making available to those business enterprises, either directly or in cooperation with private sector entities, including community-based organizations and national nonprofit organizations--

(A) resources relating to management;

(B) technological and technical assistance;

(C) financial, legal, and marketing services; and

(D) services relating to workforce development;

(2) encourage minority business enterprises to establish joint ventures and projects--

(A) with other minority business enterprises; or

(B) in cooperation with public sector entities or private sector entities, including community-based organizations and national nonprofit organizations, to increase the share of any market activity being performed by minority business enterprises; and

(3) facilitate the efforts of private sector entities and Federal agencies to advance the growth of minority business enterprises.

**15 U.S.C. § 9523**

**§ 9523. Establishment**

(a) In general

There is established in the Agency a program--

(1) that shall be known as the MBDA Business Center Program;

(2) that shall be separate and distinct from the efforts of the Under Secretary under section ____1011; and

(3) under which the Under Secretary shall make Federal assistance awards to eligible entities to operate MBDA Business Centers, which shall, in accordance with section ____1142, provide technical assistance and business development services, or specialty services, to minority business enterprises.

(b) Coverage

The Under Secretary shall take all necessary actions to ensure that the MBDA Business Center Program, in accordance with section ____1142, offers the services described in subsection (a)(3) in all regions of the United States.

**15 U.S.C. § 9524**

**§ 9524. Grants and cooperative agreements**

(a) Requirements

An MBDA Business Center (referred to in this part as a "Center"), with respect to the Federal financial assistance award made to operate the Center under the MBDA Business Center Program--

(1) shall--

(A) provide to minority business enterprises programs and services determined to be appropriate by the Under Secretary, which may include--

(i) referral services to meet the needs of minority business enterprises; and

(ii) programs and services to accomplish the goals described in section ____101(1)1;

(B) develop, cultivate, and maintain a network of strategic partnerships with organizations that foster access by minority business enterprises to economic markets, capital, or contracts;

(C) continue to upgrade and modify the services provided by the Center, as necessary, in order to meet the changing and evolving needs of the business community;

(D) establish or continue a referral relationship with not less than 1 community-based organization; and

(E) collaborate with other Centers; and

(2) in providing programs and services under the applicable MBDA Business Center agreement, may--

(A) operate on a fee-for-service basis; or

(B) generate income through the collection of--

(i) client fees;

(ii) membership fees; and

(iii) any other appropriate fees proposed by the Center in the application submitted by the Center under subsection (e).

(b) Term

Subject to subsection (g)(3), the term of an MBDA Business Center agreement shall be not less than 3 years.

A58

(c) Financial assistance

(1) In general

The amount of financial assistance provided by the Under Secretary under an MBDA Business Center agreement shall be not less than $250,000 for the term of the agreement.

(2) Matching requirement

(A) In general

A Center shall match not less than ⅓ of the amount of the financial assistance awarded to the Center under the terms of the applicable MBDA Business Center agreement, unless the Under Secretary determines that a waiver of that requirement is necessary after a demonstration by the Center of a substantial need for that waiver.

(B) Form of funds

A Center may meet the matching requirement under subparagraph (A) by using--

(i) cash or in-kind contributions, without regard to whether the contribution is made by a third party; or

(ii) Federal funds received from other Federal programs.

(3) Use of financial assistance and program income

A Center shall use--

(A) all financial assistance awarded to the Center under the applicable MBDA Business Center agreement to carry out subsection (a); and

(B) all income that the Center generates in carrying out subsection (a)--

(i) to meet the matching requirement under paragraph (2) of this subsection; and

(ii) if the Center meets the matching requirement under paragraph (2) of this subsection, to carry out subsection (a).

(d) Criteria for selection

The Under Secretary shall--

(1) establish criteria that--

(A) the Under Secretary shall use in determining whether to enter into an MBDA Business Center agreement with an eligible entity; and

(B) may include criteria relating to whether an eligible entity is located in--

(i) an area, the population of which is composed of not less than 51 percent socially or economically disadvantaged individuals, as determined in accordance with data collected by the Bureau of the Census;

(ii) a federally recognized area of economic distress; or

(iii) a State that is underserved with respect to the MBDA Business Center Program, as defined by the Under Secretary; and

(2) make the criteria and standards established under paragraph (1) publicly available, including--

(A) on the website of the Agency; and

(B) in each Notice of Funding Opportunity soliciting MBDA Business Center agreements.

(e) Applications

An eligible entity desiring to enter into an MBDA Business Center agreement shall submit to the Under Secretary an application that includes--

(1) a statement of--

(A) how the eligible entity will carry out subsection (a); and

(B) any experience or plans of the eligible entity with respect to--

(i) assisting minority business enterprises to--

(I) obtain--

(aa) large-scale contracts, grants, or procurements;

(bb) financing; or

(cc) legal assistance;

(II) access established supply chains; and

(III) engage in--

(aa) joint ventures, teaming arrangements, and mergers and acquisitions; or

(bb) large-scale transactions in global markets;

(ii) supporting minority business enterprises in increasing the size of the workforces of those enterprises, including, with respect to a minority

A60

business enterprise that does not have employees, aiding the minority business enterprise in becoming an enterprise that has employees; and

(iii) advocating for minority business enterprises; and

(2) the budget and corresponding budget narrative that the eligible entity will use in carrying out subsection (a) during the term of the applicable MBDA Business Center agreement.

(f) Notification

If the Under Secretary grants an application of an eligible entity submitted under subsection (e), the Under Secretary shall notify the eligible entity that the application has been granted not later than 150 days after the last day on which an application may be submitted under that subsection.

(g) Program examination; accreditation; extensions

(1) Examination

Not later than 180 days after November 15, 2021, and biennially thereafter, the Under Secretary shall conduct a programmatic financial examination of each Center.

(2) Accreditation

The Under Secretary may provide financial support, by contract or otherwise, to an association, not less than 51 percent of the members of which are Centers, to--

(A) pursue matters of common concern with respect to Centers; and

(B) develop an accreditation program with respect to Centers.

(3) Extensions

(A) In general

The Under Secretary may extend the term under subsection (b) of an MBDA Business Center agreement to which a Center is a party, if the Center consents to the extension.

(B) Financial assistance

If the Under Secretary extends the term of an MBDA Business Center agreement under paragraph (1), the Under Secretary shall, in the same manner and amount in which financial assistance was provided during the initial term of the agreement, provide financial assistance under the agreement during the extended term of the agreement.

A61

(h) MBDA involvement

The Under Secretary may take actions to ensure that the Agency is substantially involved in the activities of Centers in carrying out subsection (a), including by--

(1) providing to each Center training relating to the MBDA Business Center Program;

(2) requiring that the operator and staff of each Center--

(A) attend--

(i) a conference with the Agency to establish the services and programs that the Center will provide in carrying out the requirements before the date on which the Center begins providing those services and programs; and

(ii) training provided under paragraph (1);

(B) receive necessary guidance relating to carrying out the requirements under subsection (a); and

(C) work in coordination and collaboration with the Under Secretary to carry out the MBDA Business Center Program and other programs of the Agency;

(3) facilitating connections between Centers and--

(A) Federal agencies other than the Agency, as appropriate; and

(B) other institutions or entities that use Federal resources, such as--

(i) small business development centers, as that term is defined in section 632(t) of this title;

(ii) women's business centers described in section 656 of this title;

(iii) eligible entities, as that term is defined in section 2411 of Title 10, that provide services under the program carried out under chapter 142 of that title; and

(iv) entities participating in the Hollings Manufacturing Extension Partnership Program established under section 278k of this title;

(4) monitoring projects carried out by each Center; and

(5) establishing and enforcing administrative and reporting requirements for each Center to carry out subsection (a).

(i) Regulations

The Under Secretary shall issue and publish regulations that establish minimum standards regarding verification of minority business enterprise status for clients of entities operating under the MBDA Business Center Program.

**15 U.S.C. § 9543**

**§ 9543. Educational development relating to management and entrepreneurship**

(a) Duties

The Under Secretary shall, whenever the Under Secretary determines such action is necessary or appropriate--

(1) promote the education and training of socially or economically disadvantaged individuals in subjects directly relating to business administration and management;

(2) encourage institutions of higher education, leaders in business and industry, and other public sector entities and private sector entities, particularly minority business enterprises, to--

(A) develop programs to offer scholarships and fellowships, apprenticeships, and internships relating to business to socially or economically disadvantaged individuals; and

(B) sponsor seminars, conferences, and similar activities relating to business for the benefit of socially or economically disadvantaged individuals;

(3) stimulate and accelerate curriculum design and improvement in support of development of minority business enterprises; and

(4) encourage and assist private institutions and organizations and public sector entities to undertake activities similar to the activities described in paragraphs (1), (2), and (3).

(b) Parren J. Mitchell Entrepreneurship Education Grants

(1) Definition

In this subsection, the term "eligible institution" means an institution of higher education described in any of paragraphs (1) through (7) of section 1067q(a) of Title 20.

(2) Grants

The Under Secretary shall award grants to eligible institutions to develop and implement entrepreneurship curricula.

(3) Requirements

An eligible institution to which a grant is awarded under this subsection shall use the grant funds to--

(A) develop a curriculum that includes training in various skill sets needed by contemporary successful entrepreneurs, including--

    (i) business management and marketing;

    (ii) financial management and accounting;

    (iii) market analysis;

    (iv) competitive analysis;

    (v) innovation;

    (vi) strategic and succession planning;

    (vii) marketing;

    (viii) general management;

    (ix) technology and technology adoption;

    (x) leadership; and

    (xi) human resources; and

(B) implement the curriculum developed under subparagraph (A) at the eligible institution.

(4) Implementation timeline

The Under Secretary shall establish and publish a timeline under which an eligible institution to which a grant is awarded under this section shall carry out the requirements under paragraph (3).

(5) Reports

Each year, the Under Secretary shall submit to all applicable committees of Congress, and as part of the annual budget submission of the President under section 1105(a) of Title 31, a report evaluating the awarding and use of grants under this subsection during the fiscal year immediately preceding the fiscal year in which the report is submitted, which shall include, with respect to the fiscal year covered by the report--

(A) a description of each curriculum developed and implemented under each grant awarded under this section;

(B) the date on which each grant awarded under this section was awarded; and

(C) the number of eligible entities that were recipients of grants awarded under this section.

A65

**15 U.S.C. § 9552**

**§ 9552. Business Centers**

(a) In general

The Under Secretary may establish MBDA Rural Business Centers.

(b) Partnership

(1) In general

With respect to an MBDA Rural Business Center established by the Under Secretary, the Under Secretary shall establish the MBDA Rural Business Center in partnership with an eligible entity in accordance with paragraph (2).

(2) MBDA agreement

(A) In general

With respect to each MBDA Rural Business Center established by the Under Secretary, the Under Secretary shall enter into a cooperative agreement with an eligible entity that provides that--

(i) the eligible entity shall provide space, facilities, and staffing for the MBDA Rural Business Center;

(ii) the Under Secretary shall provide funding for, and oversight with respect to, the MBDA Rural Business Center; and

(iii) subject to subparagraph (B), the eligible entity shall match 20 percent of the amount of the funding provided by the Under Secretary under clause (ii), which may be calculated to include the costs of providing the space, facilities, and staffing under clause (i).

(B) Lower match requirement

Based on the available resources of an eligible entity, the Under Secretary may enter into a cooperative agreement with the eligible entity that provides that--

(i) the eligible entity shall match less than 20 percent of the amount of the funding provided by the Under Secretary under subparagraph (A)(ii); or

(ii) if the Under Secretary makes a determination, upon a demonstration by the eligible entity of substantial need, the eligible entity shall not be required to provide any match with respect to the funding provided by the Under Secretary under subparagraph (A)(ii).

(C) Eligible funds

An eligible entity may provide matching funds required under an MBDA Rural Business Center agreement with Federal funds received from other Federal programs.

(3) Term

The initial term of an MBDA Rural Business Center agreement shall be not less than 3 years.

(4) Extension

The Under Secretary and an eligible entity may agree to extend the term of an MBDA Rural Business Center agreement with respect to an MBDA Rural Business Center.

(c) Functions

An MBDA Rural Business Center shall--

(1) primarily serve clients that are--

(A) rural minority business enterprises; or

(B) minority business enterprises that are located more than 50 miles from an MBDA Business Center (other than that MBDA Rural Business Center);

(2) focus on--

(A) issues relating to--

(i) the adoption of broadband internet access service (as defined in section 8.1(b) of title 47, Code of Federal Regulations, or any successor regulation), digital literacy skills, and e-commerce by rural minority business enterprises;

(ii) advanced manufacturing;

(iii) the promotion of manufacturing in the United States;

(iv) ways in which rural minority business enterprises can meet gaps in the supply chain of critical supplies and essential goods and services for the United States;

(v) improving the connectivity of rural minority business enterprises through transportation and logistics;

(vi) promoting trade and export opportunities by rural minority business enterprises;

A67

(vii) securing financial capital;

(viii) facilitating entrepreneurship in rural areas; and

(ix) creating jobs in rural areas; and

(B) any other issue relating to the unique challenges faced by rural minority business enterprises; and

(3) provide education, training, and legal, financial, and technical assistance to minority business enterprises.

(d) Applications

(1) In general

Not later than 90 days after November 15, 2021, the Under Secretary shall issue a Notice of Funding Opportunity requesting applications from eligible entities that desire to enter into MBDA Rural Business Center agreements.

(2) Criteria and priority

In selecting an eligible entity with which to enter into an MBDA Rural Business Center agreement, the Under Secretary shall--

(A) select an eligible entity that demonstrates--

(i) the ability to collaborate with governmental and private sector entities to leverage capabilities of minority business enterprises through public-private partnerships;

(ii) the research and extension capacity to support minority business enterprises;

(iii) knowledge of the community that the eligible entity serves and the ability to conduct effective outreach to that community to advance the goals of an MBDA Rural Business Center;

(iv) the ability to provide innovative business solutions, including access to contracting opportunities, markets, and capital;

(v) the ability to provide services that advance the development of science, technology, engineering, and math jobs within minority business enterprises;

(vi) the ability to leverage resources from within the eligible entity to advance an MBDA Rural Business Center;

(vii) that the mission of the eligible entity aligns with the mission of the Agency;

(viii) the ability to leverage relationships with rural minority business enterprises; and

(ix) a referral relationship with not less than 1 community-based organization; and

(B) give priority to an eligible entity that--

(i) is located in a State or region that has a significant population of socially or economically disadvantaged individuals;

(ii) has a history of serving socially or economically disadvantaged individuals; or

(iii) in the determination of the Under Secretary, has not received an equitable allocation of land and financial resources under--

(I) the Act of July 2, 1862 (commonly known as the "First Morrill Act") (12 Stat. 503, chapter 130; 7 U.S.C. 301 et seq.); or

(II) the Act of August 30, 1890 (commonly known as the "Second Morrill Act") (26 Stat. 417, chapter 841; 7 U.S.C. 321 et seq.).

(3) Considerations

In determining whether to enter into an MBDA Rural Business Center agreement with an eligible entity under this section, the Under Secretary shall consider the needs of the eligible entity.

**29 U.S.C. § 172**

**§ 172. Federal Mediation and Conciliation Service**

(a) Creation; appointment of Director

There is created an independent agency to be known as the Federal Mediation and Conciliation Service (herein referred to as the "Service", except that for sixty days after June 23, 1947, such term shall refer to the Conciliation Service of the Department of Labor). The Service shall be under the direction of a Federal Mediation and Conciliation Director (hereinafter referred to as the "Director"), who shall be appointed by the President by and with the advice and consent of the Senate. The Director shall not engage in any other business, vocation, or employment.

(b) Appointment of officers and employees; expenditures for supplies, facilities, and services

The Director is authorized, subject to the civil service laws, to appoint such clerical and other personnel as may be necessary for the execution of the functions of the Service, and shall fix their compensation in accordance with chapter 51 and subchapter III of chapter 53 of Title 5, and may, without regard to the provisions of the civil service laws, appoint such conciliators and mediators as may be necessary to carry out the functions of the Service. The Director is authorized to make such expenditures for supplies, facilities, and services as he deems necessary. Such expenditures shall be allowed and paid upon presentation of itemized vouchers therefor approved by the Director or by any employee designated by him for that purpose.

(c) Principal and regional offices; delegation of authority by Director; annual report to Congress

The principal office of the Service shall be in the District of Columbia, but the Director may establish regional offices convenient to localities in which labor controversies are likely to arise. The Director may by order, subject to revocation at any time, delegate any authority and discretion conferred upon him by this chapter to any regional director, or other officer or employee of the Service. The Director may establish suitable procedures for cooperation with State and local mediation agencies. The Director shall make an annual report in writing to Congress at the end of the fiscal year.

(d) Transfer of all mediation and conciliation services to Service; effective date; pending proceedings unaffected

All mediation and conciliation functions of the Secretary of Labor or the United States Conciliation Service under section 51 of this title, and all functions of the

United States Conciliation Service under any other law are transferred to the Federal Mediation and Conciliation Service, together with the personnel and records of the United States Conciliation Service. Such transfer shall take effect upon the sixtieth day after June 23, 1947. Such transfer shall not affect any proceedings pending before the United States Conciliation Service or any certification, order, rule, or regulation theretofore made by it or by the Secretary of Labor. The Director and the Service shall not be subject in any way to the jurisdiction or authority of the Secretary of Labor or any official or division of the Department of Labor.

**42 U.S.C. § 11314**

**§ 11314. Director and staff**

(a) Director

The Council shall appoint an Executive Director, who shall be compensated at a rate not to exceed the rate of basic pay payable for level V of the Executive Schedule under section 5316 of Title 5. The Council shall appoint an Executive Director at the first meeting of the Council held under section 11312(c) of this title.

(b) Additional personnel

With the approval of the Council, the Executive Director of the Council may appoint and fix the compensation of such additional personnel as the Executive Director considers necessary to carry out the duties of the Council.

(c) Details from other agencies

Upon request of the Council, the head of any Federal agency may detail, on a reimbursable basis, any of the personnel of such agency to the Council to assist the Council in carrying out its duties under this subchapter. Upon request of the Council, the Secretary of Health and Human Services shall detail, on a reimbursable basis, any of the personnel of the Department of Health and Human Services who have served the Federal Task Force on the Homeless of the Department to assist the Council in carrying out its duties under this subchapter.

(d) Administrative support

The Secretary of Housing and Urban Development shall provide the Council with such administrative and support services as are necessary to ensure that the Council carries out its functions under this subchapter in an efficient and expeditious manner.

(e) Experts and consultants

With the approval of the Council, the Executive Director of the Council may procure temporary and intermittent services under section 3109(b) of Title 5.

A72