# 26-1070

# United States Court of Appeals for the First Circuit

STATE OF RHODE ISLAND; STATE OF NEW YORK; STATE OF HAWAIʻI; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN; STATE OF ARIZONA,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in the official capacity as President of the United States,

*Defendants-Appellants,*

(*Caption continues inside front cover*)

On Appeal from the United States District Court
for the District of Rhode Island

## BRIEF FOR PLAINTIFFS-APPELLEES

PETER F. NERONHA
  *Attorney General of Rhode Island*
150 South Main Street
Providence, Rhode Island 02903

ANNE E. LOPEZ
  *Attorney General of Hawaiʻi*
425 Queen Street
Honolulu, Hawaiʻi 96813

(*Additional counsel listed on signature pages.*)

LETITIA JAMES
  *Attorney General of New York*
28 Liberty Street
New York, New York 10005
(212) 416-6347

Dated: May 6, 2026

(*Caption continues from front cover.*)

DONALD J. TRUMP, in the official capacity as President of the United States; MINORITY BUSINESS DEVELOPMENT AGENCY; JOYCE MEYER, in the official capacity as Under Secretary of Commerce for Economic Affairs performing the non-exclusive functions and duties of the Under Secretary of Commerce for Minority Business Development; HOWARD LUTNICK, in the official capacity as Secretary of Commerce; FEDERAL MEDIATION AND CONCILIATION SERVICE; ANNA DAVIS, in the official capacity as General Counsel performing the duties of the Director of the Federal Mediation and Conciliation Service; RUSSELL T. VOUGHT, in the official capacity as Director of the Office of Management and Budget; U.S. OFFICE OF MANAGEMENT AND BUDGET; U.S. INTERAGENCY COUNCIL ON HOMELESSNESS; KENNETH JACKSON, in the official capacity as Acting Executive Director of the U.S. Interagency Council of Homelessness,

*Defendants-Appellants*,

INSTITUTE OF MUSEUM AND LIBRARY SERVICES; LISA SOLOMSON, in the official capacity as Senior Official Performing Duties of Director of the Institute of Museum and Library Services,

*Defendants.*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ............................................................................ 1

ISSUES PRESENTED .................................................................... 4

STATEMENT OF THE CASE ........................................................ 5

    A.  Congress Establishes the Three Agencies at Issue ................. 5

    B.  The Executive Order Directs the
        Dismantling of the Three Agencies ......................................... 9

    C.  This Lawsuit ........................................................................... 12

STANDARD OF REVIEW ............................................................ 16

SUMMARY OF ARGUMENT ...................................................... 16

ARGUMENT ................................................................................. 18

  I.  THE DISTRICT COURT PROPERLY EXERCISED
      JURISDICTION OVER PLAINTIFFS' CLAIMS. ...................................... 18

    A.  The Tucker Act Does Not Divest the District
        Court of Jurisdiction Over Claims Relating to
        Grant Terminations. .............................................................. 19

    B.  The Civil Service Reform Act Does Not Bar the
        District Court from Ordering Reinstatement of
        Agency Personnel. ................................................................. 24

  II.  THE DISTRICT COURT CORRECTLY HELD THAT DEFENDANTS'
      ACTIONS VIOLATE THE ADMINISTRATIVE PROCEDURE ACT. ............ 29

**Page**

A.  Plaintiffs Challenge Discrete and Final
Agency Action Subject to Judicial Review ............................ 30

B.  Plaintiffs' Claims Are Not Subject to Review as
Claims Seeking to Compel Unlawfully
Withheld or Unreasonably Delayed Actions ........................ 34

C.  The Actions at Issue are Not
Committed to Agency Discretion ........................................... 36

III.  THE DISTRICT COURT CORRECTLY HELD THAT DEFENDANTS'
ACTIONS VIOLATE THE CONSTITUTION. ........................................... 40

IV.  THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION
IN ORDERING INJUNCTIVE RELIEF. ................................................. 46

A.  The Injunctive Relief is Appropriately Tailored. .................. 46

B.  Employee Reinstatement is an Appropriate Exercise of
the District Court's Equitable Authority ............................. 53

CONCLUSION ..................................................................................... 55

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*American Fed'n of Gov't Emps. v. Trump,*
139 F.4th 1020 (9th Cir. 2025) .............................................. 26, 42

*American Pub. Health Ass'n v. National Insts. of Health,*
145 F.4th 39 (1st Cir. 2025).......................................... 37, 52

*Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.,*
794 F.3d 168 (1st Cir. 2015) ............................................... 51

*Axon Enter., Inc. v. Federal Trade Comm'n,*
598 U.S. 175 (2023).................................................... 25-27

*Baker v. Carr,*
369 U.S. 186 (1962)....................................................... 54

*Bell v. Hood,*
327 U.S. 678 (1946)....................................................... 41

*Bennett v. Spear,*
520 U.S. 154 (1997)....................................................... 32

*Biden v. Nebraska,*
600 U.S. 477 (2023)....................................................... 49

*Bowen v. Massachusetts,*
487 U.S. 879 (1988)....................................................... 22

*Carr v. Saul,*
593 U.S. 83 (2021)........................................................ 26

*Chamber of Com. of the U.S. v. Reich,*
74 F.3d 1322 (D.C. Cir. 1996) ........................................ 43-44

*Ciba-Geigy Corp. v. U.S. Env't Prot. Agency,*
801 F.2d 430 (D.C. Cir. 1986) ........................................... 32

**Cases**                  **Page(s)**

*City of Chi. v. Barr,*
  961 F.3d 882 (7th Cir. 2020)......................................................45-52

*City of New York v. Mickalis Pawn Shop, LLC,*
  645 F.3d 114 (2d Cir. 2011) ............................................................51

*Clinton v. City of New York,*
  524 U.S. 417 (1998).......................................................................40

*Community Action of Laramie Cnty., Inc. v. Bowen,*
  866 F.2d 347 (10th Cir. 1989)........................................................38

*Community Legal Servs. in E. Palo Alto v. U.S. Dep't of Health
  & Hum. Servs.,*
  137 F.4th 932 (9th Cir. 2025) ........................................................28

*Connectu LLC v. Zuckerberg,*
  522 F.3d 82 (1st Cir. 2008) ............................................................34

*Corner Post, Inc. v. Board of Governors of Fed. Rsrv. Sys.,*
  603 U.S. 799 (2024)................................................................. 30, 52

*Crowley Gov't Servs., Inc. v. General Servs. Admin.,*
  38 F.4th 1099 (D.C. Cir. 2022)..................................................19-20

*Dalton v. Specter,*
  511 U.S. 462 (1994).................................................................42-43

*Department of Com. v. New York,*
  588 U.S. 752 (2019).................................................................36-38

*Department of Education v. California,*
  604 U.S. 650 (2025).......................................................................22

*Department of Homeland Sec. v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020)................................................................... 29, 36

*Doe v. Rhode Island Interscholastic League,*
  137 F.4th 34 (1st Cir. 2025)...........................................................16

| **Cases** | **Page(s)** |
|---|---|

*Elgin v. Department of Treasury,*
567 U.S. 1 (2012)..............................................................................27

*Franklin v. Massachusetts,*
505 U.S. 788 (1992)..........................................................................41

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.,*
561 U.S. 477 (2010)..................................................................... 24, 41

*Gately v. Massachusetts,*
2 F.3d 1221 (1st Cir. 1993) ...............................................................53

*Global Health Council v. Trump,*
153 F.4th 1 (D.C. Cir. 2025) .............................................................45

*Grosdidier v. Chairman, Broad. Bd. of Governors,*
560 F.3d 495 (D.C. Cir. 2009) ..........................................................27

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,*
527 U.S. 308 (1999)..........................................................................54

*Harrington v. Chao,*
280 F.3d 50 (1st Cir. 2002) ...............................................................52

*Healey v. Spencer,*
765 F.3d 65 (1st Cir. 2014) ...............................................................46

*Heckler v. Chaney,*
470 U.S. 821 (1985)..........................................................................39

*In re Aiken Cnty.,*
725 F.3d 255 (D.C. Cir. 2013) ..........................................................42

*In re Sawyer,*
124 U.S. 200 (1888)..........................................................................54

*John B. Cruz Constr. Co. v. Beacon Communities Corp.,*
169 F.4th 89 (1st Cir. 2026).............................................................48

**Cases**                                                                       **Page(s)**

*K-Mart Corp. v. Oriental Plaza, Inc.,*
875 F.2d 907 (1st Cir. 1989) ............................................................... 46

*Lincoln v. Vigil,*
508 U.S. 182 (1993) ............................................................................ 38

*Lucas v. American Fed'n of Gov't Emps. (AFGE),*
151 F.4th 370 (D.C. Cir. 2025) .......................................................... 25

*Lujan v. National Wildlife Federation,*
497 U.S. 871 (1990) ....................................................................... 32-33

*MacRae v. Mattos,*
106 F.4th 122 (1st Cir. 2024) ............................................................ 16

*Mallet & Co. v. Lacayo,*
16 F.4th 364 (3d Cir. 2021) ............................................................... 52

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v.*
*Patchak,*
567 U.S. 209 (2012) ....................................................................... 18-19

*Milk Train, Inc. v. Veneman,*
310 F.3d 747 (D.C. Cir. 2002) ........................................................... 38

*Murphy Co. v. Biden,*
65 F.4th 1122 (9th Cir. 2023) ............................................................ 44

*N.A.A.C.P. v. Secretary of Hous. & Urb. Dev.,*
817 F.2d 149 (1st Cir. 1987) .............................................................. 36

*National Insts. of Health v. American Pub. Health Ass'n,*
145 S. Ct. 2658 (2025) ................................................................... 22-23

*National Min. Ass'n v. U.S. Army Corps of Eng'rs,*
145 F.3d 1399 (D.C. Cir. 1998) ......................................................... 52

**Cases**                                                                                    **Page(s)**

*New York v. Kennedy,*
  155 F.4th 67 (1st Cir. 2025)................................................20-22, 31, 33

*New York v. Trump,*
  133 F.4th 51 (1st Cir. 2025).......................................................33-34

*New York v. Trump,*
  171 F.4th 1 (1st Cir. 2025)................................................... 23, 34, 39

*Norton v. Southern Utah Wilderness All.,*
  542 U.S. 55 (2004)......................................................................34

*Nyunt v. Chairman, Broad. Bd. of Governors,*
  589 F.3d 445 (D.C. Cir. 2009) ....................................................27

*Organization for Competitive Mkts. v. U.S. Dep't of Agric.,*
  912 F.3d 455 (8th Cir. 2018)......................................................35

*Policy & Rsch., LLC v. United States Dep't of Health & Hum.*
  *Servs.,*
  313 F. Supp. 3d 62 (D.D.C. 2018) ..............................................38

*Rhode Island v. Trump,*
  155 F.4th 35 (1st Cir. 2025)....................................... 13-14, 27-28, 47

*Rosario-Torres v. Hernandez-Colon,*
  889 F.2d 314 (1st Cir. 1989) ......................................................54

*Ruskai v. Pistole,*
  775 F.3d 61 (1st Cir. 2014) ........................................................35

*Sampson v. Murray,*
  415 U.S. 61 (1974)..................................................................54-55

*Santiago-Negron v. Castro-Davila,*
  865 F.2d 431 (1st Cir. 1989) ......................................................54

*Seila L. LLC v. Consumer Fin. Prot. Bureau,*
  591 U.S. 197 (2020)....................................................................40

| **Cases** | **Page(s)** |
|---|---|

*Sierra Club v. Trump,*
929 F.3d 670 (9th Cir. 2019).................................................................44

*Sustainability Institute v. Trump,*
165 F.4th 817 (4th Cir. 2026) ..............................................................45

*Swann v. Charlotte–Mecklenburg Bd. of Educ.,*
402 U.S. 1 (1970)...................................................................................53

*Thunder Basin Coal Co. v. Reich,*
510 U.S. 200 (1994)...............................................................................25

*Trafalgar Cap. Assocs., Inc. v. Cuomo,*
159 F.3d 21 (1st Cir. 1998) ..................................................................32

*Trump v. American Fed'n of Gov't Emps.,*
145 S. Ct. 2635 (2025)..........................................................................50

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
578 U.S. 590 (2016)....................................................................... 30, 32

*Union Home Mortg. Corp. v. Cromer,*
31 F.4th 356 (6th Cir. 2022) ................................................................52

*Union of Concerned Scientists v. Wheeler,*
954 F.3d 11 (1st Cir. 2020) ......................................................... 36, 39

*United States v. Casey,*
825 F.3d 1 (1st Cir. 2016) ....................................................................29

*United States v. Fausto,*
484 U.S. 439 (1988)...............................................................................27

*United States v. Morrison,*
529 U.S. 598 (2000)...............................................................................40

*United States v. Tohono O'Odham Nation,*
563 U.S. 307 (2011)...............................................................................21

**Cases**                                                              **Page(s)**

*USP Holdings, Inc. v. United States,*
  36 F.4th 1359 (Fed. Cir. 2022) ..............................................................43

*Vaqueria Tres Monjitas, Inc. v. Irizarry,*
  587 F.3d 464 (1st Cir. 2009) ..................................................................47

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def.*
  *Council, Inc.,*
  435 U.S. 519 (1978) ................................................................................39

*Vietnam Veterans of Am. v. Central Intel. Agency,*
  811 F.3d 1068 (9th Cir. 2016) ...............................................................36

*Vitarelli v. Seaton,*
  359 U.S. 535 (1959) ................................................................................54

*Walton v. House of Representatives of Okla.,*
  265 U.S. 487 (1924) ................................................................................54

*Whitman v. American Trucking Ass'ns,*
  531 U.S. 457 (2001) ................................................................................30

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ................................................................................41

**Constitutions**

U.S. Const.
  art. I, § 1 ................................................................................................40
  art. II, § 1 ...............................................................................................40
  art. II, § 3 ...............................................................................................40

**Federal Statutes**                                                                  **Page(s)**

Consolidated Appropriations Act, 2024, Pub. L. No. 118-42,
    138 Stat. 25 .......................................................................................... 8

Full-Year Continuing Appropriations and Extensions Act, 2025,
    Pub. L. No. 119-4, 139 Stat. 9 .................................................. 8, 41-42

Further Consolidated Appropriations Act, 2024,
    Pub. L. No. 118-47, 138 Stat. 460 ................................................... 8-9

Homeless Emergency Assistance and Rapid Transition to
    Housing Act of 2009, Pub. L. No. 111-22, 123 Stat. 1663 .................. 41

Labor Management Relations Act, 1947, Pub. L. No. 80-101,
    61 Stat. 136 ........................................................................................ 41

Minority Business Development Act of 2021,
    Pub. L. No. 117-58, 135 Stat. 1445 .................................................... 41

5 U.S.C.
    § 701 .................................................................................................... 36
    § 702 .................................................................................................... 18
    § 704 .................................................................................................... 30
    § 706 ......................................................................................... 3, 21, 29
    § 1101 et seq. ......................................................................................... 3
    § 7701 .................................................................................................. 24

15 U.S.C.
    § 9502 .................................................................................................... 6
    § 9513 .................................................................................................... 6
    § 9522 .................................................................................................... 5
    § 9523 .................................................................................................... 5
    § 9524 .................................................................................................... 5

28 U.S.C. § 1491 ..................................................................................... 3, 19

29 U.S.C. § 173 ............................................................................................ 6

**Federal Statutes** **Page(s)**

42 U.S.C.
  § 11311 ................................................................................ 7
  § 11313 .............................................................................. 7-8
  § 11320 ................................................................................ 8

**Federal Regulation**

Exec. Order No. 14,238, Continuing the Reduction of the Federal
    Bureaucracy (Mar. 14, 2025), 90 Fed. Reg. 13043 ............................... 9

## INTRODUCTION

In March 2025, President Trump issued an executive order directing numerous congressionally created and funded agencies, including the Minority Business and Development Agency (MBDA), the Federal Mediation and Conciliation Service (FMCS), and the United States Interagency Council on Homelessness (USICH) to eliminate all functions not required by statute and to reduce their statutorily required functions to the minimum required by law. Defendants implemented that executive order by gutting the agencies' operations, eliminating nearly all staff, and leaving the remaining personnel incapable of fulfilling the agencies' statutorily mandated functions.[1]

---

[1] By order of this Court, defendants Institute of Museum and Library Services (IMLS) and Lisa Solomson, in her official capacity as Acting Director of IMLS, were voluntarily dismissed from the appeal. Doc No. 00118427447 (Apr. 6, 2026). The remaining defendants-appellants are MBDA, FMCS, USICH, the Office of Management and Budget (OMB), Joyce Meyer, in her official capacity performing the duties of the Under Secretary of Commerce for MBDA, Howard Lutnick, in his official capacity as Secretary of Commerce, Anna Davis, in her official capacity performing the duties of the Director of FMCS, Kenneth Jackson, in his official capacity as Acting Executive Director of USICH, Russell T. Vought, in his official capacity as Director of OMB, and Donald J. Trump, in his official capacity as President of the United States.

Plaintiff States[2] brought this suit to enjoin defendants' lawless actions. Plaintiffs rely on MBDA, FMCS, and USICH to assist state entities in expanding economic opportunities for disadvantaged individuals, maintaining public sector labor peace, and tackling the challenges of homelessness. By abruptly dismantling these agencies without congressional approval or any reasoned explanation, defendants violated multiple statutory and constitutional mandates and, in doing so, inflicted irreparable harm on plaintiffs.

The U.S. District Court for the District of Rhode Island (McConnell, J.) granted summary judgment to plaintiffs on all their claims, based on an extensive and largely uncontroverted record demonstrating injury and illegality. The district court permanently enjoined defendants from implementing the directives contained in the President's executive order with respect to the defendant agencies, and it vacated the challenged agency actions. This Court should affirm.

---

[2] Plaintiffs-appellees are the States of Arizona, California, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Massachusetts, the People of the State of Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin.

As an initial matter, and as this Court observed in denying defendants' motion for a stay pending appeal at the preliminary injunction stage, defendants have made no attempt to defend the legality of their actions. Instead, defendants press a series of threshold arguments designed to shield their illegal actions from judicial scrutiny. The district court properly rejected these objections, and defendants identify no error in the court's thorough, well-reasoned opinion.

First, the district court properly exercised jurisdiction over plaintiffs' claims. Plaintiffs' claims relating to grant funding do not arise from a contract dispute subject to the Tucker Act, 28 U.S.C. § 1491, and therefore need not be brought in the Court of Federal Claims. Likewise, to the extent plaintiffs challenge the dismantling of federal agencies through indiscriminate personnel reductions, their claims are not subject to administrative review under the Civil Service Reform Act, 5 U.S.C. § 1101 et seq.

Second, the district court correctly granted summary judgment to plaintiffs on their claims under the Administrative Procedure Act (APA), 5 U.S.C. § 706. Defendants orchestrated a set of final agency actions in implementing across-the-board policies meant to cripple the agencies in accordance with the President's directive and in contravention of congres-

sional appropriations as well as the agencies' originating statutes. Those actions are reviewable under the APA, and such review does not interfere with the discretion committed to agencies by law.

Third, the district court correctly granted summary judgment to plaintiffs on their constitutional claims. Defendants' actions violated the separation of powers doctrine and the Take Care Clause, and defendants do not argue to the contrary. Their only argument—that no constitutional cause of action is available to plaintiffs—misconstrues the governing law.

Fourth, and finally, the district court properly exercised its discretion in crafting injunctive relief to remediate the specific harms plaintiffs demonstrated.

## ISSUES PRESENTED

1.    Whether the district court properly exercised jurisdiction over plaintiffs' claims, which seek equitable relief to redress injuries caused to plaintiffs by defendants' actions dismantling MBDA, FMCS, and USICH.

2.    Whether the district court correctly granted summary judgment to plaintiffs on their APA claims, where plaintiffs challenge final and discrete agency actions.

3.    Whether the district court correctly granted summary judgment to plaintiffs on their constitutional claims, where plaintiffs challenge actions that unlawfully usurped Congress's powers and flouted multiple statutory mandates.

4.    Whether the district court abused its broad discretion in crafting injunctive relief tailored to remediate the harms demonstrated by plaintiffs.

## STATEMENT OF THE CASE

### A.    Congress Establishes the Three Agencies at Issue

This appeal involves three federal agencies created by Congress, each of which serves critical and statutorily mandated functions.

**MBDA.** MBDA is a federal agency responsible for facilitating the growth of minority businesses through various forms of assistance. *See* 15 U.S.C. §§ 9522, 9523(a)(1)-(3). (*See* A. 399-402.) Congress has instructed that the MBDA "shall" provide financial awards and technical assistance to MBDA business centers, 15 U.S.C. § 9523(a)(3), and laid out criteria the agency must use in awarding funds, *id.* § 9524(d). MBDA is required to establish a "regional office . . . for each of the regions of the United

5

States," *id.* § 9502(c)(2)(A), with statutorily enumerated duties for each of those offices, *id.* § 9502(e)(2)(B).

Congress also requires MBDA to collect and analyze data relating to minority business enterprises, *id.* § 9513(a)(1)(A), to conduct economic research, studies, and surveys, *id.* § 9513(a)(1)(B)(i), and to provide outreach, educational services, and technical assistance in at least five languages, *id.* § 9513(a)(1)(C).

**FMCS.** Established in 1947, FMCS is the federal agency responsible for "assisting parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation." 29 U.S.C. § 173(a). (*See* A. 446.)

FMCS is required by statute to perform various functions promoting the peaceful resolution of labor disputes. The agency provides mediation and conciliation services, 29 U.S.C. § 173(a)-(c), conducts grievance mediations in certain cases involving collective-bargaining agreements, *id.* § 173(d), and supports "the establishment . . . of joint labor management activities," *id.* § 173(c). (A. 446.) Additionally, the agency offers training and other services to employers, unions, and federal agencies. (A. 447.) FMCS's services are provided to parties free of charge or at reduced cost.

(A. 447-448.) The use of FMCS-appointed mediators has helped resolve labor disputes and prevent costly disruptions to the economy. (A. 447-448.) Indeed, public sector collective-bargaining agreements in many States expressly mandate or allow for FMCS's involvement in labor relations. (A. 480-481.)

In fiscal year 2024, FMCS mediated 2,318 collective-bargaining negotiations, 1,362 high-impact grievance mediations, and 792 alternative-dispute resolution cases. It conducted 1,477 single or multi-day training and intervention panels, provided 10,004 arbitration panels, and appointed 4,350 arbitrators. (A. 448.)

**USICH.** Established in 1987, USICH is the only federal agency dedicated exclusively to addressing the devastating problems caused by homelessness. (A. 487-488.) *See* 42 U.S.C. § 11311. The agency has been assigned a long list of statutory duties to fulfill this urgent mission, many of which expressly envision cooperation with States. For example, USICH is required to (1) "monitor, evaluate, and recommend improvements in" homelessness programs conducted by state agencies, 42 U.S.C. § 11313(a)(4); (2) provide "professional and technical assistance" to States, *id.* § 11313(a)(5); (3) encourage "the creation of State Interagency Councils

on Homelessness" and the formulation of plans to end homelessness at the state level, *id.* § 11313(a)(6); (4) develop tools to ensure that those experiencing homelessness can access relevant state resources, *id.* § 11313(a)(7); (5) and "prepare and distribute to States . . . a bimonthly bulletin" that describes available federal resources, *id.* § 11313(a)(11). (A. 488-489.)

To ensure that States benefit from the services and resources that USICH provides, Congress also directed each State to "designate an individual to serve as a State contact person for the purpose of receiving and disseminating information and communications received from the Council, including the bimonthly bulletin described in section 11313(a)(7)." 42 U.S.C. § 11320(a). (A. 177-178.) And until March 2025, USICH hosted quarterly meetings with over twenty-five States and provided one-on-one support for state interagency councils on homelessness. (A. 490.)

For fiscal year 2025, Congress appropriated $68.25 million to MBDA, $53.7 million to FMCS, and $4.3 million to USICH. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(2), (8), 139 Stat. 9, 10-11; Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. F, tit. III, 138 Stat. 25, 388; Further Consoli-

dated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, 138 Stat. 460, 697.

## B.    The Executive Order Directs the Dismantling of the Three Agencies

On March 14, 2025, the President issued an executive order that directed seven federal agencies, including MBDA, FMCS, and USICH, to dramatically curtail their operations.[3] *See* Exec. Order No. 14,238, Continuing the Reduction of the Federal Bureaucracy § 2(a) (Mar. 14, 2025), 90 Fed. Reg. 13043 ("*Reduction* EO"). (A. 49-50.) Invoking the President's authority under "the Constitution and the laws of the United States," the agencies were ordered to eliminate all "non-statutory components and functions . . . to the maximum extent consistent with applicable law," and to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." (A. 49.) The order further instructed the Office of Management and Budget to deny the agencies authorization to spend federal funds for any functions beyond

---

[3] The other agencies subject to the *Reduction* EO are IMLS, the Community Development Financial Institutions Fund, the United States Agency for Global Media, and the Woodrow Wilson International Center for Scholars in the Smithsonian Institution.

9

the minimum required by statute. (*See* A. 49.) All of the subject agencies were required to report within one week that they had achieved "full compliance" with the order. (A. 49.)

Defendants implemented the *Reduction* EO through an indiscriminate reduction in force and termination of grants. MBDA circulated a memorandum announcing a Reduction in Force (RIF) "[i]n accordance with" the *Reduction* EO. (A. 206; *see* A. 161-162.) The agency placed nearly all staff on administrative leave and notified employees that it was "abolishing all positions within MBDA." (A. 406-407 (quotation marks omitted); *see* A. 161-162.) All employees who had not been placed on administrative leave were eventually reassigned to positions outside of MBDA. (A. 406.) Without sufficient resources and employees, MBDA could not carry out its statutorily mandated functions, administer its existing programs, or spend its appropriated funds. (*See* A. 403.) It could not adequately monitor the agency's existing portfolio of more than 100 grants or issue new grant awards in a timely manner. (A. 403-404.) Nor could it feasibly have awarded new grants before many of the existing grants ended according to their terms, or in time to expend all of the remaining funds appro-

priated to the agency for fiscal year 2025. (A. 404-405.) In all, the agency was "effectively closed." (A. 406.)

Similarly, FMCS placed nearly every employee on administrative leave and announced that it would cease "[a]ll Public Sector work" as of April 18, 2025. (A. 449 (quotation marks omitted).) The memorandum announcing the end of FMCS's public sector services specifically cited the *Reduction* EO. (*See* Memorandum from A. Adger to D. Burgess at 1-2 (March 28, 2025), ECF No. 3-42.) FMCS also initiated a RIF, "aimed at all competitive areas and positions of the organization," implemented "in accordance with" the *Reduction* EO. (*Id.*; *see* A. 97.) These actions resulted in the immediate cessation of all FMCS assistance in the mediation of labor management disputes in the public sector and the immediate cessation of all FMCS assistance in grievance mediation in the public sector. (*See* A. 451-452.) As one employee explained, "[n]early all" of the services FMCS had previously provided "are no longer going to be provided." (A. 451 (quotation marks omitted).) Some unions were notified that "FMCS is basically being shut down." (A. 483.)

USICH followed suit. In response to the *Reduction* EO, USICH leadership reported that the agency needed at least thirteen staff members

to carry out its statutory duties. (A. 492.) A month later, all staff were placed on administrative leave. (A. 492-493.) All but two remained on administrative leave as of July 31, 2025; those two employees performed no programmatic work but instead prepared the agency for imminent closure. (*See* A. 493.) USICH ceased performing any programmatic functions required by statute, such as organizing USICH Council meetings, conducting research, or monitoring or evaluating state programs and activities. (A. 493-494.) The agency terminated its lease for office space (A. 493), took down its website (*see* A. 498), and informed constituents who tried contacting the agency that it had been shut down (A. 494).

## C.   This Lawsuit

In April 2025, plaintiffs filed this suit asserting that defendants' actions violated the APA and the Constitution. (*See* A. 185-193.) Plaintiffs initially moved for a temporary restraining order with respect to the Institute of Museum and Library Services, MBDA, and FMCS, which was converted to a preliminary injunction. (*See* Stipulation (Apr. 9, 2025), ECF No. 31.) The next month, the district court determined that plaintiffs were entitled to a preliminary injunction. (A. 121.) The district court held (among other things) that defendants' actions likely violated the APA and

12

the Constitution (A. 98-112), and that plaintiffs had demonstrated "irreparable and continuing harm" (A. 113).[4] Defendants appealed the district court's preliminary injunction order.

In September 2025, this Court denied defendants' motion to stay the preliminary injunction order pending appeal. *Rhode Island v. Trump*, 155 F.4th 35, 39 (1st Cir. 2025). The Court held that defendants failed to make a strong showing that they were likely to succeed on the merits of their appeal. Specifically, the Court found that defendants (a) failed to demonstrate a likelihood of success on their arguments concerning the States' article III standing, *id.* at 44, (b) "failed to persuasively contest" the district court's order with respect to plaintiffs' constitutional claims, *id.* at 45, and (c) relied on a Civil Service Reform Act (CSRA) argument "seemingly identical" to one the Court had already rejected, *id.* at 47. The Court also concluded that the public interest did not weigh in favor of a stay because "there is generally no public interest in the perpetuation of unlawful agency action, especially where—as here—the [defendants] make

---

[4] USICH was added as a defendant in plaintiffs' First Amended Complaint, which was filed on June 12, 2025, one month after the district court entered the preliminary injunction. (*See* A. 121, 175-184, 194.)

*no* argument that their actions were legal on the merits." *Id.* at 50 (quotation marks and citation omitted).

While the preliminary injunction appeal was pending, plaintiffs moved for summary judgment, supported by an extensive record demonstrating that defendants' challenged actions were illegal, injurious, and contrary to the public interest. For example, the record showed that:

- States were forced to halt essential MBDA programs (A. 423-424), displacing students and staff (*see* A. 416), and lost access to critical services furnished by MBDA, such as technical assistance (A. 427-428) and analytical tools (*see* A. 162-163, 411).

- States could not use FMCS services to resolve ongoing labor disputes (A. 464-465), which, in turn, made future work stoppages more likely (A. 452, 472-473, 485), and frustrated state laws and collective-bargaining agreements that require the use of FMCS services (A. 458).

- States were compelled to bear greater burdens in helping unhoused individuals access federal resources. (*See* A. 501-502.) States also suffered from losing vital interstate connections that USICH facilitates (A. 495), the guidance that USICH offers (A. 495-496), and the "community-specific expert assistance that each State's agencies" rely on (A. 45; *see* A. 495, 496-497).

The record was largely uncontroverted. (*See* Pls.' Resp. to Defs.' Statement of Disputed Facts at 3 (Oct. 24, 2025), ECF No. 93.)

14

In November 2025, the district court (McConnell, J.) concluded in a thorough forty-seven-page decision that plaintiffs were entitled to summary judgment on all their claims.[5] (*See* A. 1-47.) The district court found that plaintiffs had standing (A. 17-20), and that the court had jurisdiction over plaintiffs' claims (A. 10-17). On the merits, the district court ruled that defendants' actions implementing the *Reduction* EO were reviewable under the APA (A. 20-29), were arbitrary and capricious (A. 30-33), contrary to law (A. 33-36), and unconstitutional (A. 36-40). To redress these violations, the district court vacated the agencies' actions (A. 40-43) and permanently enjoined defendants "from taking any future actions to implement, give effect to, comply with, or carry out the directives contained in the *Reduction* EO with respect to" the agencies at issue (A. 47).

---

[5] In the same order, the district court denied defendants' cross-motions for summary judgment and for partial reconsideration of the court's earlier order staying the *Reduction* EO as to USICH. (A. 3-4 & n.1.) The district court also denied plaintiffs' separate motion to enforce the preliminary injunction as moot. (*See* A. 4 n.2.)

## STANDARD OF REVIEW

This Court reviews a district court's summary judgment decision de novo. *MacRae v. Mattos*, 106 F.4th 122, 132 (1st Cir. 2024). "A district court's decision to grant a permanent injunction involves factual, legal, and discretionary components" to which different standards apply. *Doe v. Rhode Island Interscholastic League*, 137 F.4th 34, 39 (1st Cir. 2025) (quotation marks omitted). "While questions of law are reviewed *de novo*, the scope of the injunction is reviewed for abuse of discretion, and factual findings are reviewed for clear error." *Id.* (alteration and quotation marks omitted).

## SUMMARY OF ARGUMENT

This Court should affirm the district court's decision to grant plaintiffs' motion for summary judgment and to vacate and permanently enjoin the challenged agency actions.

I. The district court properly exercised subject matter jurisdiction over this action. The Tucker Act does not apply to plaintiffs' claims because plaintiffs' claims are based on violations of the Constitution and federal statutes, rather than on violations of contracts, and plaintiffs seek only injunctive and equitable relief. Likewise, the Civil Service Reform Act does not preclude the district court from ordering reinstatement of agency

16

personnel to remedy plaintiffs' harms stemming from defendants' dismantling of federal agencies.

II. The district court correctly ruled that plaintiffs are entitled to summary judgment on their APA claims. Defendants' actions were arbitrary and capricious and contrary to law, and defendants offer no argument to the contrary. Defendants' only argument on appeal is that the challenged actions are not reviewable as final actions under the APA, but the district court properly rejected that assertion.

III. The district court correctly ruled that plaintiffs are entitled to summary judgment on their constitutional claims. By withholding funds that Congress appropriated to the agencies, and preventing the agencies from carrying out many of their statutory duties, defendants violated the Constitution's separation of powers doctrine and Take Care Clause. Defendants insist that no constitutional cause of action arises from the executive branch's violation of a statute, but that argument misconstrues plaintiffs' claims. Plaintiffs do not argue that defendants exceeded the authority delegated to the agencies by statute, but rather that defendants acted without any authority whatsoever.

17

IV. The district court properly exercised its discretion in crafting injunctive relief, in addition to the unchallenged remedies of vacatur and declaratory relief. Plaintiffs demonstrated irreparable harm through an extensive factual record detailing defendants' efforts to incapacitate the agencies and the consequent harms plaintiffs experienced and would continue to experience absent injunctive relief. The evidence of harm was unrefuted. Contrary to defendants' arguments, the order is appropriate in scope and is a proper exercise of the district court's remedial authority.

## ARGUMENT

### I.    THE DISTRICT COURT PROPERLY EXERCISED JURISDICTION OVER PLAINTIFFS' CLAIMS.

The APA waives federal sovereign immunity for suits that allege injury by agency action and seek "relief other than money damages," so long as no other statute "grants consent to suit expressly or impliedly forbids the relief which is sought" in the APA challenge. 5 U.S.C. § 702. When another statute is alleged to forbid APA relief, courts must examine whether the statute addresses "'the type of grievance which the plaintiff seeks to assert.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,* 567 U.S. 209, 216 (2012) (quoting Letter of Assistant Att'y

Gen. A. Scalia (May 10, 1976)). If the answer is no, "then the statute cannot prevent an APA suit." *Id.*

Here, the district court properly found that neither the Tucker Act nor the Civil Service Reform Act preclude judicial review over plaintiffs' APA claims. (A. 14-21.)

## A.    The Tucker Act Does Not Divest the District Court of Jurisdiction Over Claims Relating to Grant Terminations.

The Tucker Act vests the Court of Federal Claims (CFC) with exclusive jurisdiction over claims "founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The "longstanding test" for evaluating a claim's essential character under the Tucker Act hinges on (i) "the source of the rights upon which the plaintiff bases its claims" and (ii) "the type of relief sought." *Crowley Gov't Servs., Inc. v. General Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quotation marks omitted). Both prongs of this test demonstrate that plaintiffs' claims are not subject to the Tucker Act.

First, the legal rights on which plaintiffs base their claims stem from the Constitution and statutory law—rights that "exist[ed] prior to and apart from rights created under" grant agreements or any other contract

with the federal government. *Id.* at 1107 (quotation marks omitted). Whatever the grant terms stipulate, defendants do not assert that they can (or do) supplant the constitutional and statutory duties underpinning plaintiffs' claims. (*See* A. 15.) At bottom, plaintiffs' claims are about the dismantling of federal agencies. Grant terminations are not at issue at all with respect to FMCS and USICH, and comprised only one facet of defendants' categorical decision to incapacitate MBDA. The harms from gutting MBDA, moreover, manifested primarily in the agency's inability to perform its statutory functions, service existing MBDA centers, and issue new grant solicitations. (*See* A. 105-106, 404-405.)

Plaintiffs do not "'transform their suit'" into a contract dispute by citing grant terminations as one piece of evidence demonstrating MBDA's dismantling. (A. 13-14 (quoting *New York v. Kennedy*, 155 F.4th 67, 75 n.4 (1st Cir. 2025).) In *New York v. Kennedy*, this Court underscored the distinction between grant cancellation claims and claims based on an agency's dismantling. 155 F.4th 67 (1st Cir. 2025). In that case, the plaintiffs challenged a federal agency's "dismantling of sub-agencies," including a large-scale RIF of federal employees, and introduced evidence about the failure to process a grant "to support their claims that the sub-

20

agencies were no longer functioning." *Id.* at 75 n.4. This Court concluded that the allegations related to grants "d[id] not transform [the plaintiffs'] suit into a demand for money damages or an order to enforce a contractual obligation to pay money" subject to the Tucker Act. *Id.* (quotation marks omitted). Similarly here, plaintiffs are challenging the dismantling of federal agencies pursuant to the *Reduction* EO, and the interruption of grant funding illustrates just one component of the harm resulting from defendants' unlawful actions. (A. 14-15.)

Second, plaintiffs seek only equitable relief, which the CFC is incapable of affording. *See United States v. Tohono O'Odham Nation*, 563 U.S. 307, 313 (2011). Plaintiffs sought (and obtained) an order enjoining defendants' implementation of the *Reduction* EO, not an order compelling specific performance or compensation under the grant agreements. (A. 89.) Unlike the CFC, district courts have jurisdiction to grant equitable relief enforcing an agency's compliance with federal law. *See* 5 U.S.C. § 706. District courts do not lose that jurisdiction simply because an agency's compliance with federal law may result in "the payment of money."

21

*Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988); *see New York*, 155 F.4th at 75 n.4.[6]

Accordingly, the Supreme Court recently confirmed that challenges to categorical agency policies belong in the district courts, not the CFC, even if the challenged policies bear some relationship to grants. In *National Institutes of Health v. American Public Health Association*, the Court denied the government's request to stay a district court judgment insofar as it vacated internal agency guidance about grant funding. 145 S. Ct. 2658 (2025). Five Justices agreed that challenges to "policies related to grants" are properly brought in federal district court under the APA. *See id.* at 2661 (Barrett, J., concurring); *see also id.* at 2663 (Roberts, C.J., concurring in part) (reasoning that the plaintiffs' challenge to grant-related policies fell "well within the scope of the District Court's jurisdiction under the Administrative Procedure Act"); *id.* at 2671 (Jackson, J., concurring in part)

---

[6] Defendants cite to the Supreme Court's stay order in *Department of Education v. California*, 604 U.S. 650 (2025) (per curiam). But *California* "does not render [the district court] an improper forum" for plaintiffs' APA claims. (A. 87.) *California* does not purport to disturb well-settled law channeling only contract disputes to the CFC. (*See* A. 87-88.) Both before and after *California*, "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." 604 U.S. at 651 (quoting *Bowen*, 487 U.S. at 910).

22

(noting that five Justices agreed that "district courts may still exercise jurisdiction over—and vacate—grant-related policies that contravene federal law"). "That the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the CFC can hear." *Id.* at 2661 (Barrett, J., concurring) (quoting 28 U.S.C. § 1491(a)(1)).

Adhering to this guidance, this Court vacated a preliminary injunction only insofar as it "ordered specific performance" with respect to awarded grant contracts. *New York v. Trump*, 171 F.4th 1, 27-28 (1st Cir. 2025). Contrary to defendants' assertions (Br. at 17), this decision supports plaintiffs' argument that the district court properly exercised jurisdiction here. In *New York*, this Court *affirmed* the portions of the preliminary injunction that prohibited the defendants from "implementing" or "giving effect to" the challenged directive, including enjoining defendants from "impeding the disbursement of appropriated federal funds to the States" under that directive. 171 F.4th at 27 (quotation marks omitted). Here, too, the district court "enjoined [defendants] from taking any future actions to implement, give effect to, comply with, or carry out the directives contained in the *Reduction* EO with respect to" the subject agencies. (A. 47.) As in

23

*New York*, the language of the district court's injunction does not amount to "specific performance."

Thus, because plaintiffs' claims arise out of statutes and the Constitution and plaintiffs do not seek an order for specific performance or monetary damages, the Tucker Act does not apply.

## B.    The Civil Service Reform Act Does Not Bar the District Court from Ordering Reinstatement of Agency Personnel.

The Civil Service Reform Act channels adverse employment action claims by federal employees and their unions into administrative proceedings before the Merit Systems Protection Board. *See* 5 U.S.C. § 7701. "Provisions for agency review," like the CSRA, "do not restrict judicial review unless the statutory scheme displays a fairly discernible intent to limit jurisdiction, and the claims at issue are of the type Congress intended to be reviewed within the statutory structure." *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (alteration and quotation marks omitted).

To determine whether the CSRA applies, courts consider: (i) whether "precluding district court jurisdiction 'foreclose[s] all meaningful judicial review' of the claim"; (ii) whether "the claim [is] 'wholly collateral to the

24

statute's review provisions'"; and (iii) whether "the claim is 'outside the agency's expertise.'" *Axon Enter., Inc. v. Federal Trade Comm'n*, 598 U.S. 175, 185-86 (2023) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-13 (1994)). Here, the *Thunder Basin* factors confirm that plaintiffs' claims are not "the type Congress intended to be reviewed within [the CSRA's] statutory structure," *Axon Enter., Inc.*, 598 U.S. at 186 (quotation marks omitted), and so the district court properly exercised its jurisdiction in ordering reinstatement of agency personnel.

As the district court previously noted (A. 91-92), accepting defendants' argument under the CSRA would foreclose judicial review over all claims about agency action that involve personnel decisions. This factor "is all but dispositive here." *Lucas v. American Fed'n of Gov't Emps., (AFGE)*, 151 F.4th 370, 387 (D.C. Cir. 2025). In addition, plaintiffs' claims are "'wholly collateral' to CSRA's review provisions because they invoke constitutional and administrative questions" about the agencies' authority (or lack thereof) to dismantle themselves. (A. 92-93.) *See Thunder Basin Coal Co.*, 510 U.S. at 212-13.

Similarly, the resolution of plaintiffs' claims does not require any expertise relevant to adjudging employee grievances under the CSRA.

25

(*See* A. 92.) Plaintiffs' claims raise questions of constitutional and administrative law "relating not at all to 'considerations of agency policy.'" *Axon Enter., Inc.*, 598 U.S. at 188 (quoting *Free Enter. Fund*, 561 U.S. at 491); *see Carr v. Saul*, 593 U.S. 83, 92 (2021) ("[T]his Court has often observed that agency adjudications are generally ill suited to address structural constitutional challenges."); *American Fed'n of Gov't Emps. v. Trump*, 139 F.4th 1020, 1032 (9th Cir. 2025).

Rather than engage with this legal framework, defendants dispute the precedential effect of this Court's prior decisions rejecting similar CSRA arguments when they were made as part of the federal government's motions to stay various preliminary injunction rulings. *See* Br. at 22-23 (discussing *Rhode Island*, 155 F.4th at 47, and *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 71 (1st Cir. 2025).) Defendants miss the point. Even if, as they contend, this Court's prior stay orders do not dictate the outcome at summary judgment (*see* Br. at 22), defendants cannot avoid summary judgment unless they affirmatively show that the CSRA precludes judicial review. Under the framework in *Thunder Basin* and other Supreme Court precedents, defendants cannot show that the CSRA divests federal courts of jurisdiction.

26

For example, defendants insist that judicial review is unavailable because the CSRA is a "comprehensive" review scheme. *See* Br. at 10, 20, 49. But calling a statute "comprehensive" is not enough to supplant the district court's jurisdiction under *Thunder Basin*. Instead, the central question is "whether the particular claims brought were of the type Congress intended to be reviewed within this statutory structure." *Axon Enter., Inc.*, 598 U.S. at 185-86 (quotation marks omitted). Here, "[t]here is no dispute that the CSRA 'established a comprehensive system for *reviewing personnel action taken against federal employees.*'" (A. 90 (quoting *United States v. Fausto*, 484 U.S. 439, 455 (1988) (emphasis added)).) Plaintiffs did not ask the court to review the propriety of personnel actions. Rather, they asserted that defendants used mass terminations as a tool to dismantle the agencies in violation of the APA and the Constitution.[7] *See Rhode Island*, 155 F.4th

---

[7] By contrast, the cases cited by defendants (Br. at 20-21) all involve challenges to individual employment decisions brought by the aggrieved employees themselves, and none implicated an agency's ability to function. *See Fausto*, 484 U.S. at 440-41 (challenging individual employee's suspension); *Elgin v. Department of Treasury*, 567 U.S. 1, 6-7 (2012) (challenging individual employee terminations); *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 495 (D.C. Cir. 2009) (challenging employees' denial of promotions); *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 447 (D.C. Cir. 2009) (similar).

at 48-49. The CSRA therefore does not channel plaintiffs' claims to another tribunal.

Defendants fail to dispute that the mass terminations, if allowed to stand, would make it impossible for the agencies to carry out their statutorily mandated functions. As this Court has already noted, "the substantial harm that the plaintiffs allege with respect to the termination of employees is not the loss of government employment itself," but "the lost services that flow from the terminations' effective dismantling of each of the relevant agencies." *Id.* at 48. It is both contrary to law and "contrary to common sense" to suggest that plaintiffs harmed by government action are powerless to challenge it simply because the government utilized employment actions as one means of carrying out illegal conduct. *See Community Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 137 F.4th 932, 939 (9th Cir. 2025). That would mean States could *never* sue over an agency action that involves the termination of employees, no matter how directly or acutely the action injures the States. That is plainly not the law.

For all those reasons, this case is not subject to the CSRA.

28

## II.   THE DISTRICT COURT CORRECTLY HELD THAT DEFENDANTS' ACTIONS VIOLATE THE ADMINISTRATIVE PROCEDURE ACT.

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quotation marks omitted). Under the APA, a federal district court can "set aside" an agency action found to be arbitrary and capricious or "not in accordance with law." *See* 5 U.S.C. § 706(2)(A).

Here, the district court found that defendants' implementation of the *Reduction* EO was both contrary to law and arbitrary and capricious. (A. 30-36.) Defendants do not challenge either of these substantive holdings in their opening brief, and so have waived any argument about the merits of the district court's APA findings. *See United States v. Casey*, 825 F.3d 1, 12 (1st Cir. 2016). Instead, defendants argue that the district court lacked jurisdiction to review the agency actions under the APA because the actions are (1) not "final" or "discrete," (2) not "actions" at all, and (3) committed to the unreviewable discretion of the agencies themselves. Br. at 25-32. All three threshold arguments fail, and this Court should affirm the district court's decision on the merits.

29

### A.    Plaintiffs Challenge Discrete and Final Agency Action Subject to Judicial Review

The APA permits judicial review of "final agency action." 5 U.S.C. § 704. The type of "action" reviewable under the statute includes "comprehensively every manner in which an agency may exercise its power." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 478 (2001). An agency action is "final" if it (1) marks the consummation of the agency's decision-making process and (2) determines rights or obligations or creates legal consequences. *Corner Post, Inc. v. Board of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (citing *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). Courts apply this test in a "pragmatic" fashion. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quotation marks omitted).

As the district court correctly held, the actions challenged by plaintiffs represent final agency action subject to review under the APA. (*See* A. 20-25.) First, the unrefuted evidence established that defendants adopted policies to eliminate all non-statutorily mandated functions and to reduce to the minimum all statutorily required functions, effectively shuttering the agencies, just as the *Reduction* EO directed. And they implemented those categorical policies by severely curtailing the agencies' operations,

30

implementing mass reductions of staff, ending categories of services, and terminating grants en masse. (*See* A. 403-407, 448-452, 492-494.) As defendants agree, such decisions "necessarily follow from a series of internal (and potentially external) deliberations, communications, and analyses." Br. at 27. In other words, the policies marked the consummation of a decision-making process.

Second, "legal consequences" undoubtedly flowed from defendants' actions. The district court found, for example, that the States lost access to previously awarded funds and services on which the States relied. (A. 23-24.) For some of these actions, the agencies specifically cited the *Reduction* EO as all or part of their justification. (*See* A. 161-162, 206, 208.) It is also undisputed that the challenged actions left the agencies unable to expend their statutory appropriations within the time allowed. (*See* A. 33-35, 34 n.14, 107-111.) As this Court observed in another agency action case, the government "does not explain" how its implementation of the *Reduction* EO "did not have 'legal consequences'" given the drastic changes imposed at the agencies shortly thereafter. *See New York v. Kennedy*, 155 F.4th at 75-76.

Defendants' arguments to the contrary are meritless. Defendants claim that their implementation of the *Reduction* EO "marks the initiation, not the consummation, of the agency's decision-making process" (Br. at 30), but they point to nothing in the record substantiating this post hoc characterization. Nor is there any evidence in the record suggesting that the agencies' actions were in any way "tentative or interlocutory." (A. 23 n.12 (quotation marks omitted).) *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). While "operational decisions may be reversed" (Br. at 31), that possibility "is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal." *Hawkes Co.*, 578 U.S. at 598. Having definitively conveyed the agencies' positions by implementing the *Reduction* EO, defendants forfeited "the benefit of postponed judicial review." *Ciba-Geigy Corp. v. U.S. Env't Prot. Agency*, 801 F.2d 430, 436 (D.C. Cir. 1986); *see Trafalgar Cap. Assocs., Inc. v. Cuomo*, 159 F.3d 21, 35 (1st Cir. 1998).

Defendants are also wrong to assert (Br. at 27-30) that plaintiffs' claims amount to an impermissible "programmatic attack." Unlike the plaintiff in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), plaintiffs here identify "a completed universe of particular [agency] orders

and regulations," *id.* at 890, that violate the APA. Specifically, plaintiffs challenge each agency's express adoption of a policy to eliminate all non-statutorily mandated functions and to reduce their remaining functions to the bare minimum, effectively shuttering the agencies, and the concrete actions that flowed from those categorical policies. (*See* A. 145.) *Lujan* itself makes clear that if an agency applied "some particular measure across the board," then it could "of course be challenged under the APA." 497 U.S. at 890 n.2.

Indeed, this Court has rejected the "exact argument" defendants advance here (A. 22), recognizing that a series of "broad, categorical" agency decisions that seek to accomplish an overarching directive can constitute reviewable agency action. *See New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025) (decisions implementing "broad, categorical freezes on obligated funds"); *New York v. Kennedy*, 155 F.4th at 76 (decisions restructuring sub-agencies and implementing large-scale RIF). Like in *New York v. Kennedy*, plaintiffs here are challenging "a particular directive, not a "'variety of programmatic deficiencies' or 'all aspects of' a program.'" 155 F.4th at 76 (quoting *New York v. Trump*, 133 F.4th at 67). Contrary to defendants' assertion (Br. at 30), this Court has explicitly recognized that

33

"nothing prevents a plaintiff from challenging more than a single discrete final agency action in a single suit." *New York v. Trump*, 171 F.4th at 18; *New York v. Trump*, 133 F.4th at 68. A policy is not immunized from APA review simply because it consists of multiple unlawful parts.

### B.     Plaintiffs' Claims Are Not Subject to Review as Claims Seeking to Compel Unlawfully Withheld or Unreasonably Delayed Actions

Defendants mistakenly argue that the district court should have analyzed plaintiffs' APA claims as seeking to "'compel agency action unlawfully withheld or unreasonably delayed.'" Br. at 31 (quoting 5 U.S.C. § 706(1)). Because plaintiffs have brought meritorious claims under § 706(2), the theoretical application of § 706(1) is irrelevant. *See Connectu LLC v. Zuckerberg*, 522 F.3d 82, 93 (1st Cir. 2008) (noting that plaintiff "has the power to 'decide what law [it] will rely upon'" (quoting *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913))).

Plaintiffs were not required to bring their claims under § 706(1) because their challenge is based on affirmative steps defendants took to implement the *Reduction* EO, not on the subsequent omission of a particular action. *See Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 62-63 (2004) (explaining the difference between "failure to act" and "denial").

34

Insofar as plaintiffs challenge "an alleged failure to perform required functions" (Br. at 31), the failure was caused by affirmative steps defendants took to functionally incapacitate the agencies. That is different from cases in which an agency simply declines to take action. *See Ruskai v. Pistole*, 775 F.3d 61, 81 (1st Cir. 2014) (involving agency's failure "to adequately and timely investigate" complaints); *Organization for Competitive Mkts. v. U.S. Dep't of Agric.*, 912 F.3d 455, 462 (8th Cir. 2018) (involving agency's alleged failure to meet congressional deadline).

In any event, even if § 706(1) applied, the outcome would be the same. As the district court correctly identified, defendants (1) "flouted the agencies' *mandatory* statutory duties by implementing policies in accordance with the *Reduction* EO that prevented them from carrying out those duties," and (2) "violated each agency's appropriations statute by refusing to spend funds appropriated to them by Congress." (*See* A. 33-36.) MBDA "ceased performing many of its statutory duties" (A. 106; *see* A. 34 (incorporating reasoning)), FMCS stopped offering services that Congress directed it to provide (A. 106-107), and USICH's staffing cuts "made it impossible for the agency to continue to perform its statutory duties" (A. 34 n.14). Such failures to carry out statutory instructions, which defendants simply

35

ignore, would support relief under § 706(1). *See Vietnam Veterans of Am. v. Central Intel. Agency*, 811 F.3d 1068, 1075-76 (9th Cir. 2016). So, whether defendants' actions are framed as a series of unlawful actions or unlawful failures to act, the district court was "empowered to order a remedy." *N.A.A.C.P. v. Secretary of Hous. & Urb. Dev.*, 817 F.2d 149, 161 (1st Cir. 1987).

## C.   The Actions at Issue are Not Committed to Agency Discretion

Finally, defendants incorrectly assert (Br. at 32-39) that the challenged agency actions are unreviewable because they implicate decisions about federal funding and personnel that are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2). The exception to judicial review under § 701(a)(2) has been interpreted "quite narrowly." *Regents of the Univ. of Cal.*, 591 U.S. at 17; *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17 (1st Cir. 2020). Section 701(a)(2) precludes judicial review only in "rare circumstances" where the relevant statute provides "no meaningful standard against which to judge the agency's exercise of discretion." *Department of Com. v. New York*, 588 U.S. 752, 772 (2019) (quotation marks omitted).

The agency actions challenged here do not fall within § 701(a)(2)'s narrow purview. The agencies carried out the *Reduction* EO's mandate by terminating programs, eliminating funding, and implementing large-scale RIFs of agency employees. As the district court explained, these actions violated a host of statutory restrictions that govern how the agencies "are to be funded, operated, and staffed." (A. 27-28 (citing statutory provisions).) Congress appropriated funds to each agency, constrained "what can be done with those funds," and "provided explicit direction as to how each agency is to be staffed and operated." (A. 27-28.) Plaintiffs set forth facts demonstrating that defendants' actions violated the agencies' statutory responsibilities by leaving the agencies unable to carry out their statutory functions or spend congressionally appropriated funds. (*See, e.g.*, A. 400, 403, 404-405 (MBDA); 448, 450-452, 453-454 (FMCS); A. 488, 492-493 (USICH).)

The agencies' governing statutes supply meaningful standards against which to review the agencies' implementation of the *Reduction* EO. *See Department of Com.*, 588 U.S. at 772-73; *American Pub. Health Ass'n v. National Insts. of Health*, 145 F.4th 39, 53 (1st Cir. 2025).

37

"Because this is not a case in which there is 'no law to apply,'" the agency actions are subject to judicial review. *Department of Com.*, 588 U.S. at 773.

The cases defendants cite do not provide any support. Courts are clear that statutory commands "circumscribe agency discretion to allocate resources." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). Whatever discretion the agencies may exercise in making individual funding and staffing decisions, "an agency is not free simply to disregard statutory responsibilities." *Id.*; *see Community Action of Laramie Cnty., Inc. v. Bowen*, 866 F.2d 347, 352 (10th Cir. 1989); *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 752 (D.C. Cir. 2002); *see also Policy & Rsch., LLC v. United States Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 76 (D.D.C. 2018).

In arguing to the contrary, defendants misconstrue *Lincoln v. Vigil*. In that case, the Supreme Court held that an agency's decision to discontinue a program was "committed to agency discretion by law" because the decision involved "[t]he allocation of funds from a lump-sum appropriation" and the relevant statutes did "not so much as mention" the specific program at issue. 508 U.S. at 192-94 (quotation marks omitted). Contrary to defendants' arguments, *Lincoln* "did not address an agency's discretion to withhold obligated funds," and "thus did not hold that agencies have

38

unreviewable discretion to categorically stop disbursing obligated funds."
*New York*, 171 F.4th at 20. Therefore, defendants cannot rely on *Lincoln* to avoid judicial review of agency actions that squarely conflict with governing statutes. (*See* A. 26-29.)

The same is true as to personnel decisions. In *Union of Concerned Scientists*, for example, this Court permitted APA review to determine whether an agency's changing approach to staffing its advisory committees violated federal law. 954 F.3d at 18-19. This Court explained, "[t]hese are clearly not individual hiring decisions committed to discretion, but an agency-wide policy" subject to statutory constraints. *Id.* at 18 n.5. Similarly, in this case, defendants' "agency-wide" actions eliminating agency employees are subject to—and here violated—statutory restrictions.[8]

\* \* \*

---

[8] Unlike in *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), this case does not implicate the agencies' traditional discretion in deciding whether to bring enforcement actions, and the agencies are not entitled to deference in construing the statutes they are charged with administering. Nor do plaintiffs seek to impose procedural requirements in addition to those already mandated by the APA. *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 544-45 (1978).

In sum, none of defendants' threshold arguments can avoid the conclusion that their actions violated the APA.

## III.   THE DISTRICT COURT CORRECTLY HELD THAT DEFENDANTS' ACTIONS VIOLATE THE CONSTITUTION.

The district court also correctly concluded that defendants' actions violated the Constitution's separation of powers doctrine and Take Care Clause. (*See* A. 36-40.)

"[T]he Framers crafted the federal system of Government so that the people's rights would be secured by the division of power." *United States v. Morrison*, 529 U.S. 598, 616 n.7 (2000). The Constitution vests "[a]ll legislative Powers" in Congress, which makes laws, U.S. Const. art. I, § 1, and it vests the "executive Power" in the President, *id.* art. II, § 1, cl. 1, who "shall take Care that the Laws be faithfully executed," *id.* art. II, § 3. This separation of powers, which is "foundational" to our system of government, *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 227 (2020), means that the Executive has no power to enact, amend, or repeal statutes, *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Nor does the President have— under the Constitution or otherwise—the power to disregard or act contrary

to statutes, even in an emergency. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588 (1952).

When federal officials violate these "unshakable" Constitutional principles (A. 74), aggrieved parties can challenge the actions in court and seek to enjoin them. "[I]t is established practice" to "sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution." *Bell v. Hood*, 327 U.S. 678, 684 (1946); *see Free Enter. Fund*, 561 U.S. at 491 n.2; *see also Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (noting that the President's actions may "be reviewed for constitutionality").

Here, Congress created MBDA, FMCS, and USICH, assigned the agencies "a comprehensive set of statutory responsibilities," and every year appropriated funds it deemed necessary to carry out those agency functions. *See* Minority Business Development Act of 2021, Pub. L. No. 117-58, § 100003(a), 135 Stat. 1445, 1448 (authorizing MBDA); Labor Management Relations Act, 1947, Pub. L. No. 80-101, § 202, 61 Stat. 136, 153 (establishing FMCS); Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009, Pub. L. No. 111-22, § 1004, 123 Stat. 1663, 1666 (authorizing USICH); Full-Year Continuing Appropriations

and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(2), (8), 139 Stat. 9, 10-11. "[S]ettled, bedrock principles of constitutional law" require the Executive to expend the funds that Congress duly authorizes and appropriates. *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.). As the district court observed, it is "particularly remarkable" that defendants "proceeded to effectively shutter" these agencies just weeks after Congress appropriated the funds needed to administer them. (A. 36-37.)

By withholding funds that Congress appropriated to the agencies, defendants sought to override Congress's power of the purse as well as its authority to create and abolish federal agencies. (A. 38; *see* A. 112.) In the same vein, defendants' actions disabled the agencies from carrying out many of their statutory duties. These unilateral actions infringe on Congress's powers and are therefore unconstitutional. *See, e.g.*, *American Fed'n of Gov't Emps.*, 139 F.4th at 1035.

On appeal, defendants contend that no constitutional cause of action is available to plaintiffs. Br. at 39-42. This argument misreads *Dalton v. Specter*, 511 U.S. 462 (1994), the case on which defendants principally rely.

*Dalton* involved a challenge to the President's decision to close a naval shipyard in Philadelphia pursuant to an "elaborate" administrative process set out by statute. *Id.* at 464. The statute "d[id] not at all limit the President's discretion in approving or disapproving" shipyard closures, *id.* at 476, allowing him to decide to do so "for a good reason, a bad reason, or no reason" at all, *id.* at 478 (Souter, J., concurring). The President exercised that discretion to approve the Philadelphia shipyard closure, and opponents sued to enjoin the decision, claiming that it did not comport with the statute. *Id.* at 466-67. In deciding whether this alleged statutory violation gave rise to a constitutional claim subject to judicial review, the Court concluded that a claim that the President exceeded his statutory authority is not necessarily reviewable as a constitutional claim. *See id.* at 472-73; *see also Chamber of Com. of the U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996); *USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1369 (Fed. Cir. 2022). In reaching this conclusion, the Court emphasized the broad discretion afforded to the President by the statute at issue. *Dalton*, 511 U.S. at 477.

Contrary to defendants' assertions (Br. at 40-41), *Dalton* does not preclude all constitutional or statutory claims against the President or

43

an agency. As other courts have recognized, *Dalton* cannot be invoked "to bypass scores of statutory limitations on governmental authority." *Chamber of Com.*, 74 F.3d at 1332. For example, in *Murphy Co. v. Biden*, the Ninth Circuit interpreted *Dalton* to permit review of a constitutional claim based on presidential action that also allegedly violated a federal statute. 65 F.4th 1122, 1130 (9th Cir. 2023). The Court recognized the justiciability of the plaintiff's "core" constitutional claim—that "the President violated separation of powers by directing the [agency] to act in contravention of a duly enacted law." *Id.*; *see Sierra Club v. Trump*, 929 F.3d 670, 696-97 (9th Cir. 2019) (noting that "[s]tatutory and constitutional claims are not mutually exclusive" and holding that *Dalton* did not foreclose separation of powers claim based on defendants' taking action without statutory or "background constitutional authority").

So too here. Plaintiffs have demonstrated that in implementing the *Reduction* EO defendants acted without statutory authority to override congressional appropriations and the statutes setting forth the agencies' duties and obligations. *See Murphy Co.*, 65 F.4th at 1130. (*See* A. 111-112, 191-192.) Thus, defendants' actions "strike at the heart" of separation of

powers, *City of Chi. v. Barr*, 961 F.3d 882, 920 (7th Cir. 2020), and *Dalton* does not foreclose constitutional claims predicated on such actions.

Defendants cannot avoid these constitutional claims by disavowing any constitutional authority for their actions. *See* Br. at 41-42. The government's litigation position conflicts with the *Reduction* EO itself, which specifically invoked the President's constitutional authority as a basis for taking action. (*See* A. 49.) And regardless, defendants identify no statute authorizing the actions they took. While defendants have statutory authority to *issue* grants and *provide* services (*see* Br. at 41 n.6), there is no corresponding authority to nullify those duties at will. In the absence of any statutory authority, then, defendants' actions are reviewable under the Constitution—and defendants make no effort to defend the constitutionality of their actions under the Take Care Clause or the separation of powers doctrine.[9]

---

[9] The adverse decisions in *Sustainability Institute v. Trump*, 165 F.4th 817, 831-32 (4th Cir. 2026) and *Global Health Council v. Trump*, 153 F.4th 1, 17 (D.C. Cir. 2025) are factually distinguishable in several respects. The claims in *Global Health Council* were predicated on a violation of the unique provisions of the Impoundment Control Act (ICA), *see* 153 F.4th at 16, while *Sustainability Institute* dealt with the suspension or termination of grants rather than the dismantling of agencies, *see* 165 F.4th at

*(continued on the next page)*

## IV. THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION IN ORDERING INJUNCTIVE RELIEF.

## A. The Injunctive Relief is Appropriately Tailored.

Defendants are mistaken in contending (Br. at 42-48) that the district court abused its discretion in ordering a permanent injunction and vacatur of the agency actions as relief for the APA and constitutional violations proven by plaintiffs. (*See* A. 43-47.)

A permanent injunction is appropriate when "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Healey v. Spencer*, 765 F.3d 65, 74 (1st Cir. 2014) (quotation marks omitted). "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (quotation marks omitted). This Court reviews the scope

---

821. In any event, this Court need not accept those cases as persuasive insofar as they erroneously suggest that *Dalton* forecloses every claim implicating a statutory violation.

of that relief "for abuse of discretion only," because the "district court is in the best position to tailor the scope of injunctive relief to [the] factual findings." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 487 (1st Cir. 2009).

On appeal, defendants do not dispute that the third and fourth permanent injunction factors, concerning the balance of equities and the public interest, support the relief ordered by the district court. (*See* A. 46-47.) Instead, defendants challenge plaintiffs' showing of irreparable harm and the scope of relief the district court ordered. Both arguments fail. The district court acted well within its discretion by ordering injunctive relief to remediate the specific forms of irreparable harm that plaintiffs demonstrated.

The district court cited extensive and unrebutted evidence in the record illustrating how defendants' efforts to incapacitate the agencies caused (or would cause, absent injunctive relief) irreparable harm to plaintiff States. (A. 44-45.) *See Rhode Island*, 155 F.4th at 48-49 (noting district court's findings of irreparable harm). The dismantling of MBDA threatened to (among other things) eliminate critical services to small businesses (*see* A. 420-421), force state entities to default on contracts (A. 413),

47

and cause state employees to be terminated (A. 416). The loss of FMCS services meant that state entities "face[d] the very real prospect of work stoppage and negotiation impasses." (A. 45; *see, e.g.*, A. 453 (Maryland); A. 456 (New Mexico); A. 470-471 (Rhode Island); A. 482-483 (Illinois); A. 483-484 (Minnesota).) States would also suffer from the loss of USICH's "research-based and community-specific expert assistance" (A. 45), resulting in greater burdens on States (*see* A. 503) and less effective state policy (A. 505). (*See* A. 495 (Colorado); 496-497 (Michigan); A. 501 (Illinois).)

The district court identified these and other examples of irreparable harm sufficient to support the injunctive relief it ordered. (*See* A. 44-46.) Contrary to defendants' argument (Br. at 44), the district court was not required to recite every instance of harm demonstrated in plaintiffs' nearly 300-page submission when defendants themselves did not meaningfully rebut the evidence. In the end, a party cannot survive summary judgment unless it raises a genuine dispute of material fact, which requires "specific facts showing that a trier of fact could reasonably find in [the party's] favor." *John B. Cruz Constr. Co. v. Beacon Communities Corp.*, 169 F.4th 89, 95 (1st Cir. 2026) (quotation marks omitted). Defendants identify no such facts in the record.

Rather than dispute the evidence of direct harm to the States, defendants quibble with the district court's analysis by cherry-picking examples in the record that they say demonstrate harm to state instrumentalities rather than to the States themselves. *See* Br. at 45-46. But the Supreme Court has made clear that harm to a "public instrumentality of the State" is harm to the State. *Biden v. Nebraska*, 600 U.S. 477, 490 (2023) (quotation marks omitted). That the district court referenced harm to third parties does not indicate that the States were suing on behalf of those parties, as defendants contend (Br. at 45); rather, the district court was illustrating the large-scale effects of defendants' actions within the States. (*See* A. 469 (explaining that loss of FMCS functions "could disrupt the provision of essential state services" in Rhode Island).) While defendants argue that the record contains different types of grants and grant recipients (*see* Br. at 45-46), they do not explain why these distinctions require narrowing the scope of the injunctive relief when the record demonstrated the harm caused to the States directly by defendants' actions.

Defendants' other purported concern about the injunction's scope—that it "prohibits the government from giving effect to a facially lawful Executive Order" (Br. at 47-48)—is also baseless. The *Reduction* EO on

49

its face directed the agencies to engage in arbitrary and capricious action. (*See* A. 134.) By commanding the agencies to gut their core functions within a week, at the direction of the President, the Executive Order left no room for the agencies to engage in reasoned analysis, evaluate alternatives, consider reliance interests, or to take any other steps that agency decision-making requires. Moreover, the injunction responded to overwhelming evidence before the district court that defendants acted unlawfully in carrying out the Executive Order's directives. That was not the case in *Trump v. American Fed'n of Gov't Emps.*, on which defendants rely (Br. at 29-30), where the agencies' plans to implement the executive directives were "not before th[e] Court." 145 S. Ct. 2635, 2635 (2025).

The permanent injunction does not, as defendants contend (Br. at 47), categorically preclude the agencies from "streamlin[ing] their operations 'consistent with applicable law.'" Indeed, as defendants themselves understand, the permanent injunction allows actions that would improve the agencies' efficiency, size, or scope "if those actions are independent of" the *Reduction* EO. (*See* A. 512.) For example, MBDA took various actions to substantially reduce the agency's size and scope when the preliminary injunction was in effect, and plaintiffs did not challenge those actions. (Pls.'

Reply Mem. in Support of Mot. to Enforce P.I. at 4-5 (Nov. 7, 2025), ECF No. 95.) In other words, the agencies may still find ways to streamline their operations, but they cannot do so by effectuating the directives in the *Reduction* EO. In any event, defendants identify no specific lawful action that the permanent injunction impedes. Rather, the injunction serves to prevent defendants from taking further unlawful actions to implement the *Reduction* EO.[10] (A. 46.)

The cases on which defendants rely for their contrary view (Br. at 47-48) are inapposite. Unlike in those cases, the injunctive relief is supported "by a finding of likely success on a relevant claim," *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 173 (1st Cir. 2015), and does not purport to ban "unidentified types" of activity not at issue in the litigation, *City of New York v. Mickalis Pawn Shop, LLC,*

---

[10] For example, in October 2025, defendants attempted to dismantle MBDA again by issuing a RIF that mimicked the language of the *Reduction* EO and would have incapacitated the agency. This forced plaintiffs to seek relief from the district court to enforce the preliminary injunction. (Pls.' Mot. to Enforce P.I. at 1 (Oct. 17, 2025), ECF No. 88; *see* A. 4 n.2.) The district court denied plaintiffs' motion to enforce the preliminary injunction as moot, but "remind[ed] Defendants that it is never acceptable to violate a court order" and cautioned that in the future such violations may warrant punishment for contempt. (*See* A. 4 n.2 (citing 18 U.S.C. § 401).)

645 F.3d 114, 145 (2d Cir. 2011). The injunction itself does not employ vague terminology to describe the conduct enjoined, *Mallet & Co. v. Lacayo*, 16 F.4th 364, 382-83 (3d Cir. 2021) (injunction failed to satisfy "standard for specifying a trade secret"), nor does it exceed the scope of plaintiffs' claims, *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 364 (6th Cir. 2022) (finding risk that "scope of the injunction exceeds the Agreement that the parties signed").

The district court was also correct in vacating the challenged agency actions. Contrary to defendants' suggestion (Br. at 43-44), federal courts, including this one, "have long understood § 706(2) to authorize vacatur." *Corner Post, Inc.*, 603 U.S. at 826 (Kavanaugh, J., concurring); *Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002) (collecting cases); *see American Pub. Health Ass'n*, 145 F.4th at 50. Unlike an injunction, which acts upon a party and governs that party's conduct, vacatur generally acts upon the agency action itself. *See Corner Post, Inc.*, 603 U.S. at 826 (Kavanaugh, J., concurring); *National Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). In arguing that the vacatur order should have been limited to the named plaintiffs, defendants "fundamentally misunderstands vacatur as a remedy." (A. 42.) Even if

defendants were right that a vacatur order must be limited to the agency actions that impacted plaintiffs specifically, defendants nowhere specify how the vacatur order here is overbroad. And defendants have proposed no feasible alternative to the typical vacatur remedy that would afford plaintiffs complete relief.

In all, defendants' generic arguments do not satisfy their "heavy burden of showing that the district court either committed a mistake of law or abused its discretion" in crafting the scope of injunctive relief. *Gately v. Massachusetts*, 2 F.3d 1221, 1225 (1st Cir. 1993).

**B.    Employee Reinstatement is an Appropriate Exercise of the District Court's Equitable Authority.**

Finally, defendants argue that the district court exceeded its "remedial authority" to the extent it ordered employee reinstatement. Br. at 42, 48-50. That is incorrect.

"[T]he scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1970). "[I]t is established in this circuit" that reinstatement is one such "equitable remedy," which "lies within the discretion of the trial court" to

53

impose. *Rosario-Torres v. Hernandez-Colon*, 889 F.2d 314, 320-21 (1st Cir. 1989) (en banc); *see Santiago-Negron v. Castro-Davila*, 865 F.2d 431, 437 (1st Cir. 1989) (noting that reappointment is "[o]ne of the remedies available" for an unconstitutional discharge); *Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959) (concluding that government employee who had been dismissed illegally "is entitled to the reinstatement which he seeks").

In resisting this conclusion, defendants cite a long list of inapt cases (Br. at 48-49) involving equitable relief in the context of property transfers, *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999), state apportionment, *Baker v. Carr*, 369 U.S. 186, 231 (1962), the impeachment of state officers, *Walton v. House of Representatives of Okla.*, 265 U.S. 487, 489 (1924), and the arrest of state officials, *In re Sawyer*, 124 U.S. 200, 212 (1888). None of these cases bear on the specific issue here.

Defendants also rely on *Sampson v. Murray*, where a discharged federal employee sought to enjoin her dismissal pending an administrative appeal. 415 U.S. 61, 62-63 (1974). *Sampson* does not hold, as defendants suggest (Br. at 48), that reinstatement is unavailable in equity. *See Sampson*, 415 U.S. at 84. Although *Sampson* notes that courts of equity

54

are traditionally unwilling "to enforce contracts for personal service either at the behest of the employer or of the employee," *id.* at 83, that principle has no application here. Plaintiffs do not seek to vindicate any particular employment contract or relationship. Instead, plaintiffs seek to ensure that the States receive statutorily mandated funding and services that require agency employees to effectuate them. The States are challenging improper agency action effectuated, in part, through mass terminations. Nothing in *Sampson*—or any other case defendants cite—bars federal courts from remedying such unlawful actions.

## CONCLUSION

This Court should affirm the order and judgment in favor of plaintiffs.

Dated:   New York, New York
         May 6, 2026

Respectfully submitted,

PETER F. NERONHA
 *Attorney General of Rhode Island*

*/s/ Natalya A. Buckler*
KATHRYN M. SABATINI
 *Chief, Civil Division*
 *Special Assistant Attorney General*
KATHERINE CONNOLLY SADECK
 *Solicitor General*
KEITH D. HOFFMANN
 *Chief of Policy*
 *Assistant Attorney General*
NATALYA A. BUCKLER
 *Assistant Attorney General*
PAUL MEOSKY
 *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903

ANNE E. LOPEZ
 *Attorney General of Hawaiʻi*

*/s/ Kalikoʻonālani D. Fernandes*
DAVID D. DAY
 *Special Assistant to*
   *the Attorney General*
KALIKOʻONĀLANI D. FERNANDES
 *Solicitor General*
425 Queen Street
Honolulu, HI 96813

LETITIA JAMES
 *Attorney General of New York*

*/s/ Kartik Naram*
BARBARA D. UNDERWOOD
 *Solicitor General*
ESTER MURDUKHAYEVA
 *Deputy Solicitor General*
KARTIK NARAM
 *Assistant Solicitor General*
28 Liberty Street
New York, NY 10005
(212) 416-6347

(*Counsel listing continues on following pages.*)

56

KRISTIN K. MAYES
 *Attorney General of Arizona*

/s/ *Syreeta A. Tyrell*
SYREETA A. TYRELL
 *Assistant Attorney General*
2005 North Central Avenue
Phoenix, AZ 85004

ROB BONTA
 *Attorney General of California*

/s/ *Jay C. Russell*
JAY C. RUSSELL
 *Deputy Attorney General*
THOMAS S. PATTERSON
 *Senior Assistant Attorney General*
ANYA M. BINSACCA
 *Supervising Deputy*
   *Attorney General*
ZELDA VASSAR
 *Deputy Attorney General*
455 Golden Gate Avenue,
   Suite 11000
San Francisco, CA 94102

PHILIP J. WEISER
 *Attorney General of Colorado*

/s/ *David Moskowitz*
DAVID MOSKOWITZ
*Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203

WILLIAM TONG
 *Attorney General of Connecticut*

/s/ *Ashley Meskill*
ASHLEY MESKILL
 *Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
 *Attorney General of Delaware*

/s/ *Vanessa L. Kassab*
IAN R. LISTON
 *Director of Impact Litigation*
VANESSA L. KASSAB
 *Deputy Attorney General*
820 North French Street
Wilmington, DE 19801

KWAME RAOUL
 *Attorney General of Illinois*

/s/ *Holly F.B. Berlin*
HOLLY F.B. BERLIN
 *Assistant Attorney General*
115 South LaSalle Street
Chicago, IL 60603

57

AARON M. FREY
  *Attorney General of Maine*

*/s/ Vivian A. Mikhail*
Vivian A. Mikhail
Deputy Attorney General
6 State House Station
Augusta, ME 04333-0006

ANTHONY G. BROWN
  *Attorney General of Maryland*

*/s/ Keith M. Jamieson*
JULIA DOYLE
 *Solicitor General*
KEITH M. JAMIESON
 *Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*

*/s/ Katherine Dirks*
KATHERINE DIRKS
*Chief State Trial Counsel*
One Ashburton Place, 20th Floor
Boston, MA 02108

DANA NESSEL
 *Attorney General for
   People of Michigan*

*/s/ Neil Giovanatti*
NEIL GIOVANATTI
BREANNA LISTERMANN
 *Assistant Attorneys General*
525 West Ottawa
Lansing, MI 48909

KEITH ELLISON
  *Attorney General of Minnesota*

*/s/ Jacob Harris*
JACOB HARRIS
 *Assistant Attorney General*
445 Minnesota Street, Suite 600
St. Paul, MN 55101

AARON D. FORD
  *Attorney General of Nevada*

*/s/ Heidi Parry Stern*
HEIDI PARRY STERN
 *Solicitor General*
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119

MATTHEW J. PLATKIN
  *Attorney General of New Jersey*

*/s/ Joshua Bohn*
JOSHUA BOHN
MAX LESSER
 *Deputy Attorneys General*
25 Market Street
Trenton, NJ 08625

RAÚL TORREZ
  *Attorney General of New Mexico*

*/s/ Anjana Samant*
ANJANA SAMANT
 *Deputy Counsel for
   Impact Litigation*
P.O. Drawer 1508
Santa Fe, NM 87504

58

DAN RAYFIELD
  *Attorney General of Oregon*

/s/ *Erin K. Galli*
ERIN K. GALLI
 *Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201


CHARITY R. CLARK
  *Attorney General of Vermont*

/s/ *Ryan P. Kane*
RYAN P. KANE
 *Deputy Solicitor General*
109 State Street
Montpelier, VT 05609

NICHOLAS W. BROWN
  *Attorney General of Washington*

/s/ *Kate S. Worthington*
KATE S. WORTHINGTON
SARAH E. SMITH-LEVY
 *Assistant Attorneys General*
7141 Cleanwater Drive SW
P.O. Box 40111
Olympia, WA 98504

JOSHUA L. KAUL
  *Attorney General of Wisconsin*

/s/ *Colin T. Roth*
COLIN T. ROTH
 *Assistant Attorney General*
P.O. Box 7857
Madison, WI 53707

# Certificate of Compliance With Type-Volume Limit

### Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1.    This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

☑ this document contains   10,837   words, **or**

☐ this brief uses a monospaced typeface and contains _____ lines of text.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑ this document has been prepared in a proportionally spaced typeface using Century Schoolbook in 14 point , **or**

☐ this document has been prepared in a monospaced typeface using _____ with _____ .

(s) Kartik Naram

Attorney for  New York et al.

Dated:  May 6, 2026